STATE OF NEW YORK
SUPREME COURT          **ALBANY COUNTY**

---

**HOMESTEAD FUNDING CORP.**

**Plaintiff,**

   –against–                                    **VERIFIED COMPLAINT**
                                               **Index No.**

**FAIRWAY INDEPENDENT MORTGAGE
CORPORATION**

**Defendant.**

---

Plaintiff, Homestead Funding Corp., by its attorneys, Law Offices of Richard C. Miller, Jr.,

PLLC, as and for its Verified Complaint alleges as follows:

## THE PARTIES

1.     Plaintiff, Homestead Funding Corp. (hereinafter "Homestead" or "Plaintiff") is a corporation duly organized and existing under the laws of the State of New York, with its principal place of business at 8 Airline Drive, Albany, New York.

2.     Defendant Fairway Independent Mortgage Corporation (hereinafter "Fairway" or "Defendant") is, upon information and belief, a foreign business corporation doing business in New York operating as a licensed mortgage lender duly organized and existing under the laws of the State of Wisconsin, with its principal place of business at 4750 S. Biltmore Lane, Madison, WI 53718.

## JURISDICTION AND VENUE

3.     Jurisdiction over Fairway is proper in New York as Homestead has its principal place of business located in Albany, NY and Fairway is doing business in New York State as a foreign business corporation.

4.     Venue is proper in Albany County based upon Homestead's principal place of business being located in Albany County.

## NATURE OF ACTION AND ALLEGATIONS
## COMMON TO ALL CAUSES OF ACTION

5.     On or about January 1, 2019, Homestead and Andrew Aiello ("Aiello") entered into an Employment Agreement with Homestead in which Aiello would work as an employee for Homestead as a licensed mortgage loan originator in the Clifton Park, New York branch office. A copy of Aiello's Employment Agreement with Homestead is attached hereto and expressly made a part hereof as if fully incorporated herein as Exhibit A and is hereinafter referred to in this Complaint as "Employment Agreement".

6.     That the language of the Employment Agreement provides that Aiello's employment with Homestead would have a term of one year, and further provides that it would be automatically renewed for successive one-year terms thereafter if neither party elected to terminate the Agreement 60 days prior to the termination date of the one-year contract term.

7.     The Employment Agreement further provides that it could be terminated at any time by either party upon 60 days' written notice given to the other party.

8.     That the Aiello Employment Agreement is valid and enforceable and in full force and effect at the present time.

9.     That upon information and belief, over the course of the last few weeks or months, Fairway has been seeking to induce Aiello to breach his Employment Agreement with Homestead and come to work for Fairway.

10.    That, in addition to targeting Aiello, Fairway expanded its attempts to solicit even more Homestead loan originators and producing branch managers in various geographic locales by sending text messages intentionally misrepresenting that "a group" of Homestead employees was considering a change and ultimately inquiring if the targeted employees were keeping options open, which messages are attached hereto and made a part hereof as Exhibit B.

11.    That Fairway was previously made aware that all Homestead loan originators were bound by employment agreements as Homestead had sent correspondence to Fairway on or about May 19, 2022 advising Fairway that the same were bound by employment agreements for a set term which automatically

renewed if not terminated at least 60 days in advance of the termination date. A copy of the correspondence providing such notice is attached hereto and made a part hereof as Exhibit C.

12. As such, Fairway was fully aware that Homestead's loan originators were bound by employment agreements and that any efforts to recruit Homestead loan originators to work for Fairway would constitute the tort of tortious interference with contract if such recruitment induced a Homestead loan originator to breach his or her employment agreement.

13. That on May 31st, 2022, Homestead directly communicated with a legal representative for Fairway, and reiterated that all of Homestead's loan originators had signed employment agreements for a set term and that efforts by Fairway to induce Homestead's loan originators to breach their employment agreements would accordingly be treated as tortious interference with contract under relevant New York State law by Homestead.

14. That on June 14th, 2022, Aiello tendered his resignation, seeking to immediately terminate his employment with Homestead in direct contravention of the 60-day notice requirement of his employment agreement.

## AS AND FOR A FIRST CAUSE OF ACTION
### PLAINTIFF ALLEGES AS FOLLOWS:

15. Homestead repeats and re-alleges each and every allegation contained in paragraphs "1" through "14" as though fully set forth herein at length.

16. That Homestead has already suffered and will continue to suffer irreparable injury as a result of Fairway's orchestrated and intentional raiding of its loan originators—first, by inducing Aiello to breach his agreement, and second, by using Aiello's defection and new position as branch manager to surreptitiously entice other Homestead loan originators to follow suit.

17. That any available remedies at law for Homestead are inadequate as this is a wholesale effort by Fairway to raid Homestead's workforce in an attempt to establish an immediate footprint in markets that have heretofore been unsuccessful efforts by way of organic development.

18. That the economic harm imposed on Homestead as a result of Fairway's unfettered attempts to solicit its loan originators would be incalculable in that it would result in the loss of seasoned

loan originators with years of experience, training, and professional relationships, all or most of which have been facilitated by Homestead.

19.    That a balance of the equities strongly favors permanent injunctive relief for Homestead because enjoining Fairway's attempts and successes at soliciting Homestead's loan originators would allow Homestead to maintain the very lifeblood of its existence without tortious interference with its employment agreements and would prevent significant economic harm against the company; whereas, an order enjoining Fairway from raiding Homestead's employees with impunity would merely cause it to recruit at-will employees or find alternative ways of establishing a presence in the markets where it has been targeting Homestead's loan originators.

20.    Homestead has no adequate remedy at law under the current facts.

21.    Homestead is not guilty of laches.

22.    Homestead has not sought the same or similar relief in this or any other related action.

23.    Homestead seeks the exercise of the Court's equitable powers in this action in good faith and with clean hands to prevent irreparable harm and to protect its legitimate business interests through the grant of a permanent injunction restraining and enjoining Fairway and its employees and/or representatives from recruiting Homestead loan originators bound by an employment agreement and from seeking to induce these other Homestead loan originators to breach their respective employment agreements.

24.    In light of the foregoing, Homestead respectfully requests the grant of a permanent injunction enjoining and restraining Fairway, including any employees and/or representatives of Fairway, from continuing their intentional and improper efforts to procure the breach of the employment agreement by Homestead loan originators.

25.    As a result of the foregoing, intentional and improper actions of Fairway to procure a breach of the employment agreement by Aiello, Homestead has been and is continuing to be irreparably damaged by the tortious conduct of the Defendant, and the grant of equitable relief in the form of a permanent injunction is required to protect Homestead from such irreparable harm.

## AS AND FOR A SECOND CAUSE OF ACTION
## PLAINTIFF ALLEGES AS FOLLOWS:

26.     Homestead repeats and re-alleges each and every allegation contained in paragraphs "1" through "14" and "16" through "25" as though fully set forth herein at length.

27.     That, upon information and belief, despite full knowledge of the existence of a valid and enforceable employment agreement for a set term between Homestead and all of its loan originators, Fairway intentionally and improperly sought to procure the breach of such employment agreement by Aiello, a Homestead loan originator bound by an employment agreement with Homestead.

28.     That, upon information and belief, communications by Fairway to Aiello falsely alleged that Homestead employees are considering leaving Homestead in an effort to destabilize Aiello's relationship with Homestead and improperly induce Aiello to breach his employment agreement.

29.     That evidence of Fairway's tortious interference with contract is explicitly found in the purported "conditional offer of employment" agreement dated June 10, 2022—issued more than three weeks after Fairway was notified via a cease-and-desist letter that Aiello was under contract with Homestead—and sent to Aiello as an inducement to breach his employment agreement, a copy of which is attached hereto and made a part hereof as Exhibit D.

30.     That the terms of the "conditional offer of employment" intentionally, maliciously and improperly provided Aiello with a signing bonus of $600,000.00 upon his immediate commencement of employment with Fairway, which would constitute a material breach of his employment agreement with Homestead.

31.     That the terms of the "conditional offer of employment" further provide for an additional $500,000.00 "volume bonus" if Aiello's branch (which does not exist at the time of this writing) closes a minimum of $200,000,000.00 in loans during the first two years of his employment with Fairway – all of which serves as a thinly veiled attempt to entice Aiello to recruit other loan originators from Homestead— who are also under employment agreements—to Fairway.

32.    That the terms of the "conditional offer of employment" are specifically designed to encourage and reward Aiello to breach the covenant not to solicit Homestead employees contained in his employment agreement.

33.    That the efforts of Fairway to intentionally and improperly procure a breach by Aiello of his employment agreement and the restrictive covenants contained therein constitutes unfair business practices on the part of Fairway.

34.    That, upon information and belief, the efforts by Fairway to intentionally and improperly induce Aiello to breach his employment agreement with Homestead caused Aiello to breach his employment agreement with Homestead.

35.    That, upon information and belief, as a result of the intentional and improper actions of Fairway, Aiello indicated his acceptance of employment with Fairway and received a laptop computer and other miscellaneous equipment, sent from Fairway for Aiello to originate mortgage loans for Fairway, thereby breaching his employment agreement.

36.    That on June 14th, 2022, Aiello tendered his resignation, seeking to terminate his employment with Homestead directly due to the intentional and improper efforts by Fairway to procure such a breach of the employment agreement by Fairway.

37.    That the actions of Fairway in inducing Aiello to breach his employment agreement and begin work for Fairway as described herein have caused and continue to cause irreparable damage to Homestead.

38.    Based on the significant incentives built into the "conditional offer of employment" to grow a branch and recruit other loan originators to work for Fairway, Homestead anticipates that Aiello will seek to induce other Homestead loan originators similarly bound by employment agreements for a set term with Homestead to breach their employment agreements.

39.    That Homestead's damage would occur from the loss of Aiello as a seasoned loan originator, who has over 20 years of institutional knowledge and experience at Homestead; and further,

incalculable damage would occur if Fairway were able to exploit Aiello's possible defection to induce more Homestead loan originators to breach their respective employment agreements in furtherance of Fairway's attempt to raid Homestead's sales force in service of establishing a presence in the Capital Region market.

40.     That Fairway had actual knowledge that Aiello and other loan originators are bound by an employment agreement for a set term.

41.     Notwithstanding this knowledge of the existence of an employment agreement, Fairway intentionally, maliciously and improperly sought to induce Aiello to breach his employment agreement and come to work for Fairway.

42.     As a result of the foregoing intentional, malicious and improper actions of Fairway to induce a breach of the employment agreement by Aiello, he breached his employment agreement on June 14, 2022, and upon information and belief based on communications sent by Aiello to realtors and referral sources on June 15, 2022 and his changed listing on the MNLS as of June 15th, 2022, (where he is listed as working with Fairway), Aiello immediately commenced services on behalf of Fairway, damaging Homestead as a result of the tortious conduct of Fairway.

43.     Based on the foregoing, Homestead seeks ancillary money damages against Fairway in addition to the grant of a permanent injunction as requested in the first cause of action in an amount to be determined at trial, based upon the facts and circumstances presented at that time, but based upon present calculations of damages, an amount not less than $400,000.00.

WHEREFORE, Plaintiff seeks a judgment for the following relief:

1.     Under the First Cause of Action, Plaintiff seeks a judgment granting a permanent injunction against Fairway, restraining and enjoining Fairway and its employees and agents from directly interfering with Homestead's contractual relationships with its loan originators or by continuing to intentionally and improperly seek to procure a breach of the employment agreements by Homestead loan originators through its efforts to induce other Homestead loan originators to breach their respective employment agreements, and to solicit, hire or contact these other Homestead loan originators to come to work for Fairway.

2.    Under the Second Cause of Action, Plaintiff seeks a judgment or an award of damages against the Defendant herein, in an amount to be proven at trial, the exact amount not being known at this time, but estimated to be no less than $400,000.00, as ancillary damages, in addition to the grant of the permanent injunctive relief sought in 1 above.

3.    For such other, further, and different relief as the Court deems just, equitable and proper, including costs and disbursements of this action.

Dated: June 15th, 2022

Richard C. Miller, Jr., Esq.
LAW OFFICES OF
RICHARD C. MILLER, JR., PLLC
*Attorneys for Plaintiff*
P.O. Box 12155
Albany, New York 12212-2155
(518) 464-9700

## VERIFICATION

STATE OF NEW YORK )

                               ss.:

COUNTY OF ALBANY )

      Michael Rutherford, being duly sworn, deposes and says:

      That he is the President of Homestead Funding Corp., the Plaintiff in the within action; that deponent has read the foregoing Complaint and knows the contents thereof; that the same is true to deponent's own knowledge, except as to the matters therein stated to the alleged upon information and belief, and that as to those matters, deponent believes it to be true.

      The grounds of deponent's belief as to all matters not stated upon deponent's knowledge are as follows: conversations with individuals having personal knowledge and review of documents related to this action.

Michael Rutherford, President

Sworn to before me this
15th day of June, 2022

Notary Public

KELLY A. SANFORD
Notary Public, State of New York
Registration No. 01SA6398130
Qualified in Schenectady County
Commission Expires 09/23/2023

Exhibit A



# HOMESTEAD
## FUNDING CORP.

**Loan Originator Employment Agreement**
**And Associated Documents**

This booklet explains the essential and universal components of the Homestead Funding Corp. (hereinafter "Homestead") Loan Originator Compensation Plan for Loan Originators. This Employment Agreement may be supplemented and modified by the terms of an employment offer letter, job description or other written document outlining the employment terms, if such a letter job description or other written document is provided to the Loan Originator. If an employment offer letter, job description or other written document outlining the employment terms was provided to the Loan Originator, it will be incorporated herein by reference and is thereby made a material part of this Employment Agreement, to be read together with and reconciled with the language of the Employment Agreement, to the extent possible.

The purpose of this Loan Originator Employment Agreement is to provide a comprehensive, universal and consistent employment relationship for all Homestead Loan Originators. It is hoped that this will serve as the foundation for all legal understandings between Homestead and the Loan Originator.

For the purposes of this entire Agreement, "Loan Originator" applies to all Loan Originators, regardless of whether they are considered Outside Sales or Inside Sales. In cases where there is differentiation between Outside Loan Originators and Inside Loan Originators, they will be referred to thusly.

**HOMESTEAD FUNDING CORP. IS AN**
**EQUAL OPPORTUNITY EMPLOYER**

Initials

Loan Orig

HFC

# TABLE OF CONTENTS

Page 1            EMPLOYMENT AGREEMENT

**APPENDIX**

SCHEDULE A:    LOAN ORIGINATOR COMPENSATION PLAN

SCHEDULE B:    LOAN ORIGINATOR RESPONSIBILITIES

SCHEDULE C:    ADDENDUM TO EMPLOYMENT AGREEMENT

# EMPLOYMENT AGREEMENT

THIS AGREEMENT (hereinafter referred to as "Employment Agreement") made and entered into as of 1/1/2019 by and between Homestead Funding Corp., (hereinafter "Homestead"), with a principal place of business at 8 Airline Drive, Albany, NY and Andrew Aiello residing at 2 Towline Lane Clifton Park NY 12065 (hereinafter "Loan Originator").

## WITNESSETH:

WHEREAS, Homestead is duly licensed in the State of New York and various other states as a mortgage banker and as a mortgage broker to originate, service and sell residential mortgage loans and desires to retain the services of Loan Originator to originate residential mortgage loans on behalf of Homestead; and

WHEREAS, the Loan Originator desires to be employed by Homestead in the capacity of a Loan Originator and to originate residential mortgage loans on behalf of Homestead in accordance with the provisions of this Employment Agreement;

NOW, THEREFORE, and in consideration of the promises and mutual covenants hereinafter contained, and other good and valuable consideration, it is mutually agreed by and between the parties as follows:

1. <u>Loan Programs</u>. Homestead agrees to make available to the Loan Originator all current loan programs and mortgage products available to the particular department or branch in which the Loan Originator is employed. It is understood that Homestead's various departments and branches may provide different mortgage programs and products to offer to its customers, and only the programs and products available to the Loan Originator's specific department or branch will be available to him/her, as the same may change from time to time. Homestead agrees to assist the Loan Originator in his/her work by providing advice and instruction from Homestead management, which seeks to provide its full cooperation to help facilitate the Loan Originator's success.

2. <u>Exclusive Best Efforts to Homestead</u>. Loan Originator agrees to work diligently and utilizing his/her best efforts to originate residential mortgage loans solely on behalf of Homestead, and agrees that during the term of this Agreement, he/she will work exclusively for Homestead.

3. <u>Conduct</u>. Loan Originator and Homestead each agree to conduct their business and regulate their habits and working hours so as to maintain and to increase the good will, business, profits and reputation of both Homestead and Loan Originator. The parties agree to conform to and abide by all laws, rules, regulations, and code of ethics that are binding on, or applicable to, Mortgage Bankers and Mortgage Brokers (when a loan is taken as a brokered product), in all jurisdictions in which Homestead originates loans. It is expressly understood that the Loan Originator shall guard, at all times, against even the appearance of impropriety or the perpetration of fraud, forgery or misrepresentation by the Loan Originator or others. The Loan Originator agrees to promote and enhance Homestead's reputation and standing within the local community in general as well as within the local mortgage community by serving the public in mortgage loan transactions, to the end that each of the parties may derive the greatest possible benefit through repeat customers and strong referral business.

Initials

Loan Orig

HFC

4. <u>Regulatory Compliance</u>. It is expressly understood and agreed that both Homestead and the Loan Originator are subject to regulation by the governing regulatory agencies of all states in which Homestead is authorized to originate mortgage loans as well as the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development, the Veterans Affairs Administration, the Consumer Finance Protection Bureau ("CFPB"), the Federal Reserve Board, Federal Trade Commission and other regulatory oversight agencies. Loan Originator agrees to be governed by all applicable statutes and implementing rules and regulations promulgated by these agencies affecting his/her duties as a Loan Originator for Homestead.

5. <u>Compensation Plan Attached</u>. The terms of the Loan Originator Compensation Plan are attached to this Employment Agreement as Schedule A which is expressly made a part hereof and are subject to change at any time with or without notice to the Loan Originator at the sole discretion of Homestead. The goal of the Plan is to maximize the productivity, quality and volume of mortgage originations produced by Homestead's sales force through a compensation program that encourages the Loan Originator to increase his/her sales, productivity and overall quality of originated loans.

6. <u>Duration of Agreement</u>. This Employment Agreement shall be valid and effective for a set term of one-year, subject to the provisions of Section 10 herein. This Employment Agreement will be automatically renewed for five additional one-year terms.

7. <u>Membership Dues</u>. Loan Originator shall pay his/her own expenses and dues for membership in professional organizations, unless otherwise specifically agreed in writing by the parties.

8. <u>No Authority</u>. Loan Originator acknowledges and agrees that he/she has no authority to enter into agreements on behalf of Homestead of any kind or nature; all agreements to which Homestead is to be a party must be reviewed by Homestead upper management and signed by an authorized Homestead officer in order to be valid and effective. Loan Originator may not hold himself/herself out to vendors, landlords or others as possessing any actual or apparent authority to enter into agreements on behalf of Homestead or otherwise legally bind Homestead to the terms of any agreements or other documents.

9. <u>Proprietary Rights</u>. It is expressly agreed by the parties, as a material part of this Employment Agreement, that all loan applications taken, appraisals, credit reports, correspondence received, copies of all correspondence written, plans, memoranda, files, photos, reports, confidential customer lists, legal opinions, accounting information, mortgage pricing systems and pricing information, sales and marketing plans, strategies and practices, Homestead's training manual and training procedures, and any and all other instruments, documents or information of any nature whatsoever concerning loan transactions handled by Homestead or by Loan Originator or jointly are and shall remain the sole and exclusive property of Homestead, and the Loan Originator acknowledges that he/she has no proprietary right to any of the foregoing.

10. <u>Nature of Employment Relationship</u>. Both parties agree that Loan Originator will be employed by Homestead for the duration of this Employment Agreement, starting with the effective date of this Agreement and continuing for a one-year term. Either party may, however, terminate this Employment Agreement upon providing the other party 60-days advance notice in writing of their intention to terminate the Employment Agreement for any reason. This

Initials

Loan Orig          HFC

Employment Agreement will be automatically renewed for five additional one-year terms unless either party provides the other with 60-days advance written notice of their intention not to renew the Employment Agreement. The parties may, however, shorten or lengthen the time period from the date notice is given to date of actual termination by mutual agreement, so long as it is put in writing and signed by both parties.

It is specifically agreed between the parties hereto that the Loan Originator will receive his/her commissions in accordance with this Employment Agreement for the 60-day period following the date written notice of either party's intent to terminate this agreement is delivered to the other party, (unless otherwise agreed to by the parties in writing at the time), provided the Loan Originator abides by the relevant terms of this Employment Agreement during the termination transition and assists, as may be requested by Homestead, with facilitating the processing and closing of his/her pipeline of mortgage loans. Compensation paid to the Loan Originator during the above referenced 60-day notice period will be limited to his/her commission only. Commissions for loans that close after the expiration of the 60-day notice period are not payable to the Loan Originator.

Homestead shall have the right to immediately terminate the Employment Agreement for reasonable cause, however, at any time. Reasonable cause, as used in this Employment Agreement, shall mean what is often referred to in labor employment settings as "just cause" and would include (merely as illustrations, but not intended to be an exhaustive or comprehensive list), the following situations or conditions:

    a) Evidence that the Loan Originator has knowledge of, participated in, or otherwise engaged in collusive activities with a borrower, appraiser, Realtor or others towards the submittal of a fraudulent loan or any aspect of a fraudulent loan application;

    b) The breach of the Loan Originator's fiduciary duty of loyalty and utmost fidelity to Homestead as his/her employer;

    c) An instance of gross dereliction of duties by the Loan Originator in any respect;

    d) An unintentional material violation on the part of the Loan Originator to follow regulatory compliance mandates exposing Homestead to regulatory oversight consequences, (whether or not the act or omission was known by the Loan Originator to be a material violation, as the Loan Originator is expected to be fully conversant with all applicable regulatory compliance mandates and comply with them) and/or an intentional violation, (whether material or not);

    e) With regard to the following forms: Application for Employment; Background Investigation Consent Form; Employment Screening Form; and the Annual Background Certification Form, any information provided by the Loan Originator that is found to be false, intentionally incomplete or misrepresented in any respect, will be sufficient cause to immediately discharge the Loan Originator from Homestead's service, whenever it is discovered. In addition, certain criminal convictions will prohibit the Loan Originator from employment in the field of mortgage banking. These convictions vary from state-to- state. Other criminal convictions, which do not automatically bar the Loan Originator from employment in the field of mortgage banking and/or information submitted about the Loan Originator by a consumer

Initials

Loan Orig          HFC

reporting agency or by former employers or others, will be evaluated on a case-by-case basis by Homestead. If Homestead deems, in its sole discretion, that the other criminal conviction(s) and/or information provided by the Loan Originator's former employers or by a consumer reporting agency or others is such that he/she is not suited for a position with Homestead, the Loan Originator's employment will be subject to immediate termination;

f) other similar instances of misconduct, including a violation of Homestead company policies and/or the provisions of the Homestead Employment Policy Handbook.

11. Oral Commitments. Homestead has made no oral commitments to the Loan Originator outside of this Employment Agreement. No one at Homestead is authorized to make oral commitments regarding employment – either now or in the future.

12. Fiduciary Obligation. During his/her employment, Loan Originator shall use his/her best efforts solely to advance the interests of Homestead. In this regard, Loan Originator commits to exercise his/her best good faith efforts in the performance of his/her loan originator responsibilities, which requires a strict fiduciary obligation of loyalty to Homestead as his/her employer. Loan Originator agrees that he/she will not be associated with any other commercial or business duties or pursuits without first obtaining the written approval of Homestead management. The Loan Originator acknowledges that he/she must sign a HUD Prohibited Outside Employment Policy Statement. Any employment (which term shall include acting as an officer, employee, independent contractor, consultant or in any other capacity whatsoever) or ownership interest in another employer in either the mortgage lending or real estate industry or in any other related field is strictly prohibited under any circumstances and will constitute grounds for immediate termination of the Loan Originator under this Employment Agreement. If the Loan Originator obtains prior written approval from Homestead management for non-prohibited outside employment, such employment must not interfere or conflict with the interests of Homestead. Further, such employment must not adversely affect the quality or quantity of work performed for Homestead as might result from undue fatigue or in placing employment with Homestead secondary to outside employment.

13. Class, Collective and Multi-Party Action Waiver. Loan Originator further waives and gives up any right to become a participant in any class, collective or multi-party action against Homestead. As part of this waiver, Loan Originator promises not to join or consent to join or participate in any case against Homestead asserting class, collective or multi-party claims against Homestead that are related in any way to Loan Originator's employment or the termination of Loan Originator's employment with Homestead. If, without Loan Originator's prior knowledge and consent, Loan Originator is made a member of a class in any proceeding, Loan Originator agrees to opt out of the class at the first opportunity to do so. This waiver applies to all claims arising out of Loan Originator's employment or termination from employment including claims brought under federal or state wage laws, federal or state laws against discrimination or any other claim against Homestead.

14. Indemnification. Loan Originator hereby agrees to indemnify and hold Homestead, its shareholders, directors, officers, managers, successors and assigns, harmless against any and all claims, liabilities and obligations, of every kind and description, including reasonable attorney fees and court costs arising out of or related to: (a) any failure by the Loan Originator to duly perform or strictly observe any term, provision, covenant, or condition contained herein; and (b) the breach

Initials

Loan Orig

HFC

of any other term, provision, covenant, condition or promise set forth herein. This indemnification and hold harmless agreement does not extend to any recovery against a Loan Originator related to loans originated by a Loan Originator or lawsuits commenced against Homestead as a result of the acts or omissions of a Loan Originator.

15. <u>Confidentiality</u>. Loan Originator acknowledges that, during his/her employment with Homestead, he/she may come into possession of confidential and proprietary information of Homestead, including trade secrets, (all of which are referred to in this Agreement as "Proprietary Information"), which includes, among other things, information about:

    a) Existing or planned business ventures, acquisitions, mergers, or initiatives, if treated as secret by Homestead;

    b) All of Homestead's accounting and business information, including documents addressing its financial condition and net worth, or the results of any external or internal audits;

    c) Details regarding Homestead's method of pricing mortgage loans, which is agreed to be unique and proprietary, which is and will always be kept secret by Homestead;

    d) Homestead's and/or its affiliates' business, mortgage marketing and/or solicitation strategies / techniques, if treated as secret by Homestead and/or its affiliates;

    e) A Borrower's non-public personal information;

    f) Proposals designed to meet borrower's needs or requirements if it involves confidential information;

    g) The resolution of a particular borrower's problems, if it involves confidential information of the borrower;

    h) The names of and other details concerning Homestead's customers, including any confidential customer lists of Homestead, including present or former borrowers of Homestead;

    i) The resumes of and other information concerning officers, managers, loan originators, employees, agents, or contractors who are or may be employed by Homestead, under any terms, to meet the needs of Homestead's borrowers.

    j) Both parties to this Employment Agreement acknowledge and agree that the above Proprietary Information is kept secret by Homestead and is protected by Homestead as secret in order to satisfy the "trade secret" threshold recognized by the courts.

Loan Originator acknowledges that the foregoing types of Proprietary Information are only illustrative of some of the kinds of highly confidential information that he/she may become aware of during his/her employment with Homestead, and the foregoing list is not meant to be a complete and exhaustive compilation of all of the types of confidential information Loan Originator may have the opportunity to obtain while in the employ of Homestead. Loan Originator also acknowledges that much of the above information constitutes a trade secret of Homestead; that it

is a valuable resource of Homestead that was developed by Homestead through the investments of significant managerial effort and the expenditures of considerable sums of money, and is consistently reviewed, improved and refined by Homestead, and is unique and proprietary to Homestead and treated as such at all times. These trade secrets provide a competitive advantage to Homestead and would not be easily obtained or duplicated by others who have not been able to acquire such information other than through employment with Homestead.

16. <u>Non-Disclosure</u>. As a consequence of the above and in consideration for his/her employment, Loan Originator agrees that, unless he/she first obtains the prior written consent of Homestead, he/she shall not communicate, disclose, release, take, transfer or give (either directly or indirectly) to any person or firm, or use at any time, (either during or subsequent to his/her employment with Homestead), any of Homestead's Proprietary Information to which he/she has access during his/her employment with Homestead, whether or not such information was developed or obtained by Loan Originator, except insofar as Loan Originator may, where authorized and approved, use such information in the furtherance of his/her employment duties with Homestead. Loan Originator shall retain all such information in strict confidence for the sole benefit of Homestead, and shall surrender, to Homestead, all loan applications, confidential customer lists, documents, papers, data bases, etc., containing any of such Proprietary Information or trade secrets upon the termination of employment with Homestead, including all such information contained in any electronic format. The parties acknowledge and agree that the disclosure or unauthorized use of any of the above described Proprietary Information and trade secrets would cause irreparable harm to Homestead and the parties acknowledge that immediate injunctive relief, including a temporary restraining order and a preliminary injunction, restraining the use and/or disclosure of such information is necessary and appropriate, and the Loan Originator states that he/she understands that such equitable relief will be sought by Homestead and agrees that the grant of such relief is consistent with the unique and proprietary nature of this information and its importance to Homestead.

17. <u>Non-Solicitation</u>. Likewise, Loan Originator further agrees, as a material part of this Employment Agreement, and in consideration for his/her employment by Homestead, that during his/her employment with Homestead, or for one year following the termination of such employment, Loan Originator will not approach, solicit, initiate or otherwise seek or encourage a discussion with a present Homestead loan originator, manager and/or employee about going to work for another mortgage lender, mortgage banker or mortgage broker, or take any other steps in furtherance of encouraging or soliciting a present Homestead loan originator, manager and/or employee to go to work for any other mortgage lender, mortgage banker or mortgage broker. The parties acknowledge and agree that any solicitation of Homestead loan originators, managers and/or employees to go to work for any other competing mortgage lender, mortgage banker or mortgage broker would cause irreparable harm to Homestead and the parties acknowledge that immediate injunctive relief, including a temporary restraining order and a preliminary injunction, restraining such solicitation is necessary and appropriate.

18. <u>Information Security</u>. Loan Originator hereby acknowledges that he/she has received a copy of Homestead's comprehensive written information security plan or policy (hereinafter "WISP"). Loan Originator further acknowledges and agrees that he/she must comply with the provisions of the WISP and that any non-conforming use of personal information during or after employment is prohibited; and further that mandatory disciplinary action will be taken for violations of the security provisions of the WISP, pursuant to the discipline policy described in the Homestead Employment Policy Handbook.

Initials

Loan Orig        HFC

Personal Information, as used in this Employment Agreement, shall include, (merely as illustrations, but not intended to be an exhaustive or comprehensive list), the following information: A Homestead customer or consumer's first name and last name or first initial and last name in combination with one or more of the following data elements that relate to such customer or consumer:

     a) Social Security Number;
     b) Driver's License Number;
     c) State-Issued Identification Card Number;
     d) Financial Account Number;
     e) Credit Card Number; or
     f) Debit Card Number.

Personal Information does not include information that is lawfully obtained from publicly available information or from federal, state or local government records lawfully made available to the general public.

19. Licensing is Mandatory. The Loan Originator hereby states and affirms that he/she is already licensed as a loan originator in the jurisdictions in which he/she will originate loans; or if not, that he/she has accurately informed Homestead of his/her licensing status and will expeditiously obtain all necessary licenses prior to discussing loan terms or performing any other origination duties with a borrower in all jurisdictions in which he/she will originate loans and will not originate loans until and unless the appropriate license is obtained. In the event that any occurrence causes the Loan Originator to have his/her license threatened to be suspended or revoked, the Loan Originator agrees to immediately notify Homestead. Under no circumstances shall a Loan Originator originate a loan in any jurisdiction unless he/she is licensed in that jurisdiction. Any violation of this paragraph is grounds for immediate termination.

20. Mandatory Mediation/Arbitration. Any disputes arising out of or relating to this Employment Agreement, the LO's employment with Homestead or termination from employment (hereinafter "Dispute") shall be resolved exclusively by mandatory mediation under the rules of the American Arbitration Association. In the event that any Dispute cannot be fully resolved through mediation, the parties agree that the Dispute shall then be exclusively resolved by final and binding arbitration on an individual basis before one neutral arbitrator through the rules of the American Arbitration Association. Any type of class; collective claims; or multi-party claims are expressly prohibited, and the arbitrator will have no authority to alter the parties' agreement in this regard. Any such arbitration shall be held in the county in which the Loan Originator last worked unless otherwise stipulated by the parties and pursuant to the Model Rules for Arbitration of Employment Disputes of the American Arbitration Association ("AAA") then in effect.

The parties voluntarily and irrevocably waive any and all rights to have any Dispute heard or resolved in any forum other than through arbitration. This waiver specifically includes, but is not limited to, a jury trial. This does not limit the right of either party to apply to a court of competent jurisdiction for any provisional remedy pending the completion of arbitration consistent with applicable law. In any arbitration held pursuant to this Agreement, Employer shall bear all fees and costs unique to arbitration, including the Arbitrator's fee. Each party shall pay for its own attorneys' fees and costs, if any. However, the Arbitrator may award reasonable attorneys' fees to the prevailing party in accordance with this Agreement or applicable law. The parties shall be

Initials

Loan Orig    HFC

entitled to any remedy which would have been available in court. Any award of the arbitrator shall be in writing. Either party may bring an action in any court of competent jurisdiction to compel arbitration under this Agreement and / or to enforce an arbitration award. If, in any action to enforce this Agreement, a court of competent jurisdiction rules that any portion of the parties' agreement to arbitrate is not enforceable, then the parties agree that such provision be severed, and the remainder of the Employment Agreement be enforced. Nothing herein prevents the Loan Originator from filing a charge with an administrative agency including but not limited to the NLRB or the EEOC.

21. Controlling Law. This Employment Agreement shall be governed by the applicable laws of the state in which such Loan Originator is employed and Loan Originator consents to the personal jurisdiction of any court in a state in which Homestead is conducting business, including, specifically, New York State, for the determination of any questions of interpretation or enforcement of any provision of this Employment Agreement.

22. Severability. In case any one or more of the provisions hereof shall be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Employment Agreement, (or its collateral agreements), but this agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

23. Survival of Covenants. All representations, warranties, covenants, and agreements of the parties hereto shall survive the termination of this Employment Agreement and the termination of employment of the Loan Originator.

24. Amendment. This Employment Agreement may not be amended orally. It may only be amended by way of a writing designated as an amendment to this agreement that is executed by the parties hereto.

25. Entire Agreement. This Employment Agreement supersedes any previous written or oral agreements, understandings or representations existing between the parties. There are no promises, understandings or agreements except as set forth expressly in writing in the Loan Originator Employment Agreement and Associated Documents. The parties expressly understand and agree that the Introduction, Employment Offer Letter, (if any), and Loan Originator Compensation Plan attached as Schedule A are incorporated by reference herein. However, in the event of a conflict between any provisions of these documents, the terms and conditions of the Employment Agreement and Loan Originator Compensation Plan attached as Schedule A shall control.

26. Full Knowledge. Loan Originator expressly warrants and represents to Homestead that before executing this Employment Agreement he/she was fully informed of the terms, contents, conditions and effect of this Employment Agreement; that the Loan Originator has relied solely on his/her own judgment in executing this Employment Agreement; and that he/she has had the opportunity to seek and obtain the advice of legal counsel before entering into this Agreement.

27. Interpretation. No provision in this Agreement shall be interpreted for or against any party because that party or that party's legal representative drafted the provision.

28. Headings. The headings used in this Employment Agreement are for the convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Employment Agreement.

Initials

Loan Orig          HFC

29. Counterparts. This Agreement may be executed in two counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

30. Job Description. This Employment Agreement may be immediately terminated at the option of Homestead in the event that any statute, regulation or judicial decision results in a determination by Homestead that the duties and obligations of Homestead's Loan Originators do not qualify for the applicable Exemption. (This paragraph applies exclusively to Outside Sales Loan Originators).

31. Situs. This Employment Agreement shall be construed in accordance with the laws of the State of New York, except as provided for herein to the contrary herein or if contrary to applicable law. The parties consent to jurisdiction and venue of all matters arising out of the interpretation or enforcement of this Employment Agreement being vested exclusively in Albany County Supreme Court, in the State of New York.

IN WITNESS WHEREOF, the parties hereto cause this Employment Agreement to be duly executed and delivered as of the day and year first above written.

Homestead Funding Corp.

By: _____        By: _____

Andrew Aiello                           Jeffrey N. Mason
Loan Originator                         Authorized Representative

<u>SCHEDULE A</u>

**Loan Originator Compensation Plan ("Plan")**

Applies to all loans locked on or after January 1, 2019

[See attached Plan]

Initials

Loan Orig          HFC

## SCHEDULE B
## LOAN ORIGINATOR RESPONSIBILITIES

The Loan Originator will be responsible for complying with the specific requirements, duties and responsibilities of the loan originator position, as the same may be modified or supplemented by Homestead over the course of the employment; which includes obtaining all necessary licenses to originate loans in all of the jurisdictions in which they originate loans and properly maintaining these licenses (once obtained) at all times they are employees of Homestead This also includes compliance with Homestead's Employment Policy Handbook, Homestead's Exclusive Employment Policy, Homestead's Pricing Policy, Homestead's Fair Lending Policy, Homestead's Privacy Policy, Homestead's Information Security Policy and other mandates as may be adopted by Homestead from time-to- time. This obligation also includes compliance with all relevant and applicable statutes and regulations governing the mortgage industry including satisfactorily meeting the legal and regulatory requirements applying to the origination of mortgage loans by loan originators, including the Truth in Lending Act ("TILA"), Regulation Z and HOEPA; Equal Credit Opportunity Act ("ECOA") and Regulation B; Real Estate Settlement Procedures Act ("RESPA") and Regulation X; the Fair Credit Reporting Act, ("FCRA") as amended and supplemented by the Fair and Accurate Credit Transactions Act ("FACTA"); the Gramm-Leach-Bliley Act ("GLBA"); the Telemarketing and Consumer Fraud and Abuse Prevention Act and the Telemarketing Sales Rule; the Home Mortgage Disclosure Act ("HMDA") and Regulation C; the Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE") as well as all other Fair Lending laws that may be applicable including those which are not, as of this time, enacted or effective but which will become effective during the course of this Employment Agreement; the U.S. Patriots' Act of 2001, as it may be extended and modified; and any other federal, state or local laws and regulations pertaining to or restricting predatory, high-cost or abusive lending; and all other similar federal, state or local laws and regulations as may be in effect at this time, or as they may be amended from time-to-time. Consistent with the foregoing obligations, Loan Originators are forbidden from offering or receiving any "thing of value" for the referral of mortgage loans (RESPA Section 8) or from accepting any form of compensation or gratuities such as game tickets or other perks from any borrower (Reg. Z Prohibition on Dual Compensation).

The Outside Loan Originator's duties include marketing and promoting themselves to potential borrowers, (both purchase and refinance) directly, and also to real estate agents, accountants, lawyers, financial planners, builders, bank personnel, etc., (who all constitute a referral source of potential borrowers for Loan Originators and are hereinafter described herein as "Referral Sources"). The foregoing duties involve meeting with borrowers in their homes, real estate brokers' offices, banks, builders' offices and other public places, to persuade the borrower that the loan products offered by Homestead would be the best alternative for the borrower and that he/she would be the best loan originator to take and oversee the mortgage loan application. The Loan Originator's duties would also include calling on the Referral Sources both in person at their places of business, restaurants and/or other public places; as well as by telephone, email, direct mail, marketing brochures, and the use of Homestead approved internet social media, etc.

Outside Loan Originators are free to determine independently how they wish to arrange their work schedule, how to schedule their loan applicant interviews and applications, what means and efforts they choose to market themselves and promote their outside sales business and all other facets of their outside sales positions and sales efforts.

Initials

Loan Orig          HFC

The Inside Loan Originator will work at an assigned Homestead office, under the direct supervision of his / her manager, originating investment quality residential mortgage loans (Bankered; Brokered; FHA; VA; RHS; Conventional; Jumbo; Reverse; Second) by prospecting and following up on Company provided leads via phone in a timely manner. Company provided leads are obtained from Internet sources, direct mail campaigns, referrals or other special marketing campaigns. All Company provided leads are owned by Homestead and the Inside Loan Originator acknowledges they are the proprietary information of Homestead and agrees to only utilize those leads and related information during employment with Homestead.

Should the Inside Loan Originator wish to develop his / her own loan referral sources they may, with the prior approval of management in Albany NY, also undertake the following activities normally associated with outside sales: directly marketing and promoting themselves to potential borrowers (both purchase and refinance), and also to real estate agents, accountants, lawyers, financial planners, builders, bank personnel, etc., (who all constitute a referral source of potential borrowers for loan originators engaged in outside sales activities and are hereinafter referred to as "Referral Sources"). The foregoing loan origination duties involve meeting with borrowers in their homes, real estate brokers' offices, bank branches, builders' offices and other public places, to persuade the borrower that the loan products offered by Homestead would be the best alternative for the borrower and that he / she would be the best loan originator to take and oversee the mortgage loan application. The loan originator's duties would also include calling on the Referral Sources both in person at their places of business, restaurants and/or other public places; as well as by telephone, email, direct mail, marketing brochures, and the use of Homestead approved Internet marketing efforts, Social Media, etc.

Once the Loan Originator has sold the borrower on using him/her and Homestead for their mortgage, the Loan Originator's duties also include obtaining the necessary financial information from the borrowers, the accurate completion of residential mortgage loan applications, and counseling borrowers to identify the loan product(s) that best meet the borrowers' needs. The Loan Originator's marketing and promotion of themselves, solicitation of loan applications and the negotiation of loan terms must be performed in a manner consistent with Homestead's Privacy, Information Security, Fair Lending and Pricing Policies. The Loan Originator is responsible for communicating with applicants throughout the entire loan production process from origination through processing, underwriting, closing and (if necessary) post-closing of the originated transaction.

The Loan Originator will assist in facilitating the resolution of issues that may arise throughout the entire loan production process. Such assistance may include, but is not limited to, such tasks as the correction or collection of documents necessary to make the loan suitable for sale in the secondary market. The Loan Originator is also responsible for keeping up-to-date with changes in existing loan products and internal lending procedures; the introduction of new loan products and new mortgage lending procedures; and keeping current with the changing regulatory environment affecting the mortgage industry. Attendance at sales meetings, when scheduled, is mandatory.

The contents of this Employment Agreement and Loan Originator Compensation Plan, as supplemented with the details contained within an employment offer letter, job description or other written document, if such a letter, description or document was provided, shall constitute the entire understanding existing between the parties, and there are no other promises, understandings or agreements existing between the parties, unless provided for in writing outside of this agreement.

Initials

Loan Orig          HFC

The Loan Originator hereby states and affirms that he/she is already licensed as a loan originator in the jurisdictions in which he/she will originate loans; or if not, that he/she has accurately informed Homestead of his/her licensing status and will expeditiously obtain all necessary licenses prior to discussing loan terms or performing any other origination duties with a borrower in all jurisdictions in which he/she will originate loans, and will not originate any loans until and unless the appropriate license is obtained. In the event that any occurrence causes the Loan Originator to have his/her license threatened to be suspended or revoked, the Loan Originator agrees to immediately notify Homestead.  Under no circumstances shall a Loan Originator originate a loan in any jurisdiction unless he/she is licensed in that jurisdiction. Any violation of this paragraph is grounds for immediate termination.

Homestead Funding Corp.

By: _____

By: _____

Andrew Aiello
**Loan Originator**

Jeffrey N. Mason
Authorized Representative

# SCHEDULE C

## ADDENDUM TO EMPLOYMENT AGREEMENT
Regarding Existence of Restrictive Covenants from a
Prior Employer Employment Agreement

**Please sign Section(s) A, B and C as applicable to you**

The undersigned hereby acknowledges the execution of an Employment Agreement (hereinafter "Agreement") with Homestead Funding Corp. (hereinafter "Homestead") commencing an employment relationship with Homestead. The Agreement contains several understandings and covenants made with Homestead that the employment relationship is predicated upon.

Set forth below are three different provisions relating to the status of a Loan Originator as this Employment Agreement is signed, which are mutually exclusive. If a Loan Originator is not subject to any restrictive covenants emanating out of any previous employment agreement with a prior employer, Section A applies. In this case, please sign at the end of Section A affirming that you are not presently bound by any restrictive covenant arising out of any previous employment agreement. If a Loan Originator is bound by restrictive covenants emanating out of a previous employment agreement with a prior employer, (other than 1st Priority Mortgage, Inc. which is hereinafter referred to as 1st Priority"), Section B applies. In this case, please sign at the end of Section B affirming that you are subject to restrictive covenants arising out of a previous employment agreement and that you agree to fully comply with these restrictive covenants. Finally, if you were previously an employee of 1st Priority, and you are bound by the terms of restrictive covenants from your employment agreement with 1st Priority, please sign Section C.

## <u>Section A - Undersigned Not Bound by Restrictive Covenants</u>

The undersigned states that he/she is not bound under the terms of a previous employment agreement with his/her prior employer, and that there are no restrictive covenants that apply to the undersigned.

This Addendum shall be incorporated by reference into the Employment Agreement and made a part thereof and the undersigned agrees to be bound by the terms of this Addendum.

IN WITNESS WHEREOF, the parties hereto cause this Addendum to Employment Agreement to be duly executed and delivered as of the date of the Employment Agreement.

By: _____

Andrew Aiello
**Loan Originator**

Homestead Funding Corp.

By: _____

Jeffrey N. Mason
Authorized Representative

Initials _____    _____
Loan Orig          HFC

## Section B - Undersigned Bound by Restrictive Covenants

The undersigned states that he/she is bound under the terms of a previous employment agreement with his/her previous employer, which included restrictive covenants that were by their terms intended to survive the termination of employment with this previous employer. As a condition of employment at Homestead, the undersigned agrees that he/she will comply with all legally enforceable provisions of the previous employment agreement for so long as those terms remain in effect.

This Addendum shall be incorporated by reference into the Employment Agreement and made a part thereof and the undersigned agrees to be bound by the terms of this Addendum.

IN WITNESS WHEREOF, the parties hereto cause this Addendum to Employment Agreement to be duly executed and delivered as of the date of the Employment Agreement.

By: _____

Andrew Aiello
Loan Originator

Homestead Funding Corp.

By: _____

Jeffrey N. Mason
Authorized Representative

## Section C - Undersigned Was Previously Employed by 1st Priority and Is Bound by Restrictive Covenants

This Addendum is applicable to the undersigned because of the previous employment with 1st Priority, which is a mortgage lender that competes with Homestead. This Addendum is made a part of your new employment package with Homestead. Homestead wants to emphasize to you that your employment agreement with 1st Priority contains certain restrictive covenants that by their terms survive the termination of employment at 1st Priority and would, if enforceable, affect what you may do while the restrictive covenants remain in effect.

Homestead anticipates that you will comply with these provisions of your previous employment agreement. It should be noted that Homestead is taking no position regarding the validity or enforceability of these provisions as written, and instead recommends that you seek the advice of independent legal counsel in the event you have any questions regarding these covenants.

By: _____

Andrew Aiello
Loan Originator

Homestead Funding Corp.

By: _____

Jeffrey N. Mason
Authorized Representative

Initials _____
Loan Orig        HFC

Exhibit B



Hi Maureen

Chris Lowis with Fairway Mortgage here, hope you are well and had a great 2020 all things considered... Curious if you're keeping your options open in 2021?

We opened an office in Rochester this summer as well as Saratoga, and coming soon in White Plains... Let's catch up soon!

Tuesday 10:54 AM

Hi Maureen, heard a rumor that a group from your company is thinking about a change and was curious if you were keeping your options open?

Tuesday 12:10 PM

No but thank you reaching








+1 (401) 662-0588

iMessage
Tuesday 3:11 PM

Hey Eric, just left you a voicemail... Heard a rumor that a group from your company is thinking about a change and was curious if you were keeping your options open?

Tuesday 4:57 PM



All set for now. Thanks.

Delivered

      

Exhibit C



May 19, 2022

To:     Fairway Independent Mortgage Corporation ("Fairway")
        Attn: General Counsel/Legal Department

Re:     Employment Solicitation/Tortious Interference with Contract

To Whom It May Concern:

Please be advised that I am corporate counsel for Homestead Funding Corp.
("Homestead"). My office has been provided with documentation regarding the
recruiting and solicitation efforts of Chris Lowis, Business Development for Fairway
toward Homestead employees including Loan Originators and/or Branch Managers
(see attached screenshots). This letter is advising you to cease all such communications
and recruitment efforts or risk legal action.

Please allow this communication to serve as formal notice that all of Homestead's Loan
Originators and Branch Managers are covered by an employment agreement for a set
term. Therefore, continued attempts to solicit any of these Homestead employees with
employment opportunities at Fairway would constitute tortious interference with
contract.

To the extent that all Loan Originators and Branch Managers are signatories of such
employment agreements, you are hereby advised to CEASE AND DESIST ANY
FURTHER SOLICITATION EFFORTS IN VIOLATION OF THESE CONTRACTUAL
RIGHTS. Such notice is given with a full reservation of rights to prosecute any prior or
future torts.

Additionally, the dishonest and subversive tactics employed by Mr. Lowis to imply that
there is a factual basis to believe that Homestead employees are considering leaving the
organization, and thus the target of the solicitation should consider the same, is a bad
faith tactic that violates even the minimum standard of business ethics.

Any future attempt by you or any representatives or agents acting on behalf of Fairway
to recruit a Homestead Loan Originator or Branch Manager by any means, electronic,
telephonic or otherwise, will be construed by Homestead as an act of tortious
interference with the employment agreement and would be actionable in an
appropriate legal proceeding.

Any recruitment efforts by Fairway will cause Homestead to suffer irreparable damages and Homestead intends, in this event, to seek appropriate redress through the courts for these solicitation efforts in violation of the contractual rights that are in place including, if the circumstances warrant it, seeking immediate injunctive relief restraining and enjoining further tortious actions by Fairway as well as to seek appropriate money damages.

Please confirm your intention to comply with this demand within ten (10) days of receipt of this communication. Should evidence of such conduct continue, Homestead will not hesitate to initiate legal action. I would encourage you to contact my office if you have any questions or concerns regarding this correspondence.

Best,

Justin M. Rutherford, Esq., LL.M.
Vice President, Business & Legal Affairs
Homestead Funding Corporation

Exhibit D



June 10, 2022

Andrew Aiello

## Re: Conditional Offer of Employment

Dear Andrew:

On behalf of Fairway Independent Mortgage Corporation ("Fairway"), I am pleased to present you a conditional offer of employment for the position of Producing Branch Manager (Branch TBD) with a start date ofJune 13, 2022 . This is a full-time position, with the expectation that you will work 40 hours per week. In your position, you will perform duties and responsibilities that are reasonable and consistent with such position and as may be assigned to you from time to time. You will report to Susan Howe. You agree to devote your full business time, attention, and best efforts to the performance of your duties and the furtherance of Fairway's interests.

In consideration for your services, you will receive a salary at the minimum salary requirement in effect in your state of employment; except where the federal, state, and local laws have different minimum salary rates, then the highest minimum salary rate applies so long as you remain employed, payable in accordance with Fairway's standard payroll practices and subject to all withholdings and deductions as required by law.

This position is an exempt position, meaning you will not be paid overtime. Your compensation will be outlined in your Producing Branch Manager Compensation Plan. Your general compensation will be as follows:

Within your first 30 days of employment, you shall meet with Fairway's Legal and Compliance Departments to discuss loan originator compensation options and licensing regulations, in addition to any other questions you may have.

- o You will receive a sign-on bonus in the amount of **$600,000.00**, which will not be offset by Total Compensation. The sign-on bonus will be paid in two (2) installments of $300,000.00, with the first installment payable on the first regularly scheduled pay period of your employment with Fairway and the second installment payable on the first regularly scheduled pay period of your second full calendar month of employment, so long as you are employed on each payroll date in which the sign-on bonus is scheduled to be paid. *In the event you voluntarily terminate employment or are terminated, with or without cause, within twenty-four (24) months of receiving the sign-on bonus, you will be obligated to repay a pro-rated portion of the sign-on*

*bonus to Fairway. Specifically, the sign-on bonus will be reduced by one-twelfth (1/24) for each month you remain employed after receiving the sign-on bonus (i.e., if you remain employed for twelve (12) months, you will be obligated to repay twelve (12) months, or one-half (1/2), of the sign-on bonus. As permitted by applicable law, the applicable sum will be withheld from your final paycheck; any overage of the applicable repayment amount will be due to Fairway within thirty (30) calendar days.*

- You will receive **100 bps** multiplied by the loan amount of each self-generated closed-end loan and **50 bps** multiplied by the loan amount of each company-generated closed-end loan you personally originate.
- You will receive **50 bps** multiplied by the loan amount of each brokered loan you personally originate.
- You will receive **50%** of Branch Revenue for each reverse open-end loan you personally originate. Branch Revenue is the difference between (a) a consumer's price and the branch price, as determined by Fairway and (b) non-third party fees paid by a consumer that are not required to be collected by Fairway or you as non-compensable revenue, including, but not limited to, origination fees; (c) less a $995 per loan administration fee (for exempt reverse mortgage loans only).
- You will receive **50%** of Branch Revenue for each non-reverse open-end loan you personally originate. Branch Revenue is the difference between (a) a consumer's price and the branch price, as determined by Fairway and (b) non-third party fees paid by a consumer that are not required to be collected by Fairway or you as non-compensable revenue, including, but not limited to, origination fees; (c) less a $995 per loan administration fee (for exempt reverse mortgage loans only).

- You will receive a one-time **volume bonus** in the amount of **$500,000.00** if your Branch closes and funds a minimum of $200 million during your first two (2) years (based on hire date) of employment with Fairway. This bonus will be paid out in two (2) installments over two (2) months, $250,000.00 per month. Second liens, employee loans, company-generated loans, open-end reverse loans, HELOCs, brokered loans, and construction loans, are excluded from the performance bonus. You must be employed by Fairway for the entire bonus period or the bonus is forfeited. No pro-rated or partial bonus payments will be made in the event you leave employment, whether voluntarily or involuntarily, prior to the end of the bonus period.

During employment and for twelve (12) months following termination of employment for any reason, whether voluntary or involuntary, you shall not, directly or indirectly, whether on behalf of yourself or for any other person or entity, solicit, recruit, or promote the solicitation or recruitment of any current Fairway employee or consultant in order to encourage such employee or consultant to leave Fairway's employ or sever an agreement for services. By signing this conditional offer of employment, you agree that the restrictions outlined herein are reasonable in length of time and scope, necessary to protect Fairway's legitimate business interests and confidential information, and will not hinder your ability to find employment without violating such restrictions. This non-solicitation provision will also be outlined in your compensation plan upon commencing employment with Fairway.

This conditional offer of employment is contingent upon satisfactory completion of a background investigation; verification of employment; completion of an application and other required employment forms; the completion of an employment agreement/compensation plan, if applicable; verification of your right to work in the United States, as demonstrated by your completion of Form I-9 **on your first day of hire** and your submission of acceptable documentation (as noted on the Form I-9; a list of acceptable documents is also noted on the U.S. Citizenship and Immigration Services' website*) verifying your identity and work authorization **within three (3) days** of starting employment; and all other forms and requirements of Fairway. Additionally, this conditional offer of employment is contingent upon the understanding that you fully disclose any and all secondary employment/business activities, ownership stake/involvement, including domestic partner/spousal ownership stake/involvement, and outside, industry-related licenses, including, but not limited to, real estate, insurance, and securities licenses. Failure to disclose such secondary employment, ownership stake, or licenses prior to accepting employment with Fairway may cancel further consideration of your employment and constitutes sufficient grounds to terminate your employment whenever it is discovered. Moreover, if you wish to hold secondary employment, engage in outside business activities, hold ownership stake/involvement, including domestic partner/spousal ownership stake/involvement, or obtain an industry-related license after becoming employed with Fairway, you must first contact Fairway's Legal Department to ensure there is no conflict of interest. This offer may be withdrawn if any of the conditions above are not satisfied.

This position meets the definition of a "mortgage loan originator" under the Secure and Fair Enforcement for Mortgage Licensing (SAFE) Act of 2008. As such, you are required to obtain and/or transfer an active state mortgage license to sponsorship with Fairway in at least one state where you do business within thirty (30) calendar days of hire, which must include your home/branch state. Under no circumstances will you be allowed to work as a mortgage loan originator without obtaining the required state license and timely completing your continued education requirements. If your license is not obtained or transferred (as approved by the state) within the thirty (30) day timeframe, your employment may be terminated.

Fairway offers its employees a competitive benefits package. Your coverage under Fairway's benefit programs begins on the first day of the month following or coinciding with your 30th day of employment, if you elect to participate. If you are a PTO-eligible employee, the amount of paid time off you are eligible for is outlined in the Employee Handbook. The benefit plans offered may be changed from time to time at Fairway's sole discretion.

Your employment with Fairway is "at will," meaning either you or Fairway may terminate your employment at any time and for any reason, with or without cause, or advance notice. Nothing in this conditional offer of employment, nor any other communication by a Fairway representative or any other employee, whether written or oral, is intended in any

way to create a contract of employment, unless specifically approved in writing by a member of Fairway's Executive Committee with a chief officer title. Any contrary representations are superseded by this conditional offer of employment.

Upon employment, you will be subject to all applicable employment rules and other policies of Fairway, as outlined in the Employee Handbook and elsewhere. The terms, conditions, and duties of your employment are within Fairway's sole and absolute discretion and may be modified at any time as Fairway deems necessary to the operation of its business.

This conditional offer of employment may not be amended or modified except by express written agreement signed by you and a duly authorized representative of Fairway.

By accepting this conditional offer of employment, you confirm that you are able to accept this job and carry out the work involved without breaching any legal restrictions on your activities, such as restrictions imposed by a current or former employer. You also confirm that you will inform Fairway about any such restrictions and provide Fairway with as much information about such restrictions as possible, including copies of any agreements between you and your current or former employer describing such restrictions on your activities.

You further confirm that you will not remove or copy any documents or proprietary data or materials of any kind, electronic or otherwise, from your current or former employer to Fairway without written authorization from your current or former employer, not will you use or disclose any such confidential information during the course and scope of your employment with Fairway. If you have any questions about the ownership of particular documents or other information, discuss such questions with your current or former employer before removing or copying the documents or information.

Andrew, we are excited about the prospect of you joining Fairway and hope you will accept this conditional offer of employment. If you have any questions, please call me at +1 (469) 217-8919.

Sincerely,
Brie Litz
Compensation and Offers Specialist Team Lead

*If you accept the terms and conditions of this conditional offer of employment, please sign below and return within three (3) business days from the date of this letter. If you do not sign and return this letter within three (3) business days, it will be deemed withdrawn.*

I accept this conditional offer of employment as described above:

Name: Andrew Aiello

DocuSign Envelope ID: 47790A7E-1320-4B44-A77A-95C1BED54D18

Signature:

Today's date:

*The Form I-9 list of acceptable documents can be found on the U.S. Citizenship and Immigration Services' website at: https://www.uscis.gov/i-9-central/acceptable-documents*

**STATE OF NEW YORK**
**SUPREME COURT**             **ALBANY COUNTY**

---

**HOMESTEAD FUNDING CORP.**

                    **Plaintiff,**

                                        **CORRECTIVE AFFIDAVIT**
–against–                               **OF PERSONAL SERVICE**
                                        Index No: 904554-22

**FAIRWAY INDEPENDENT MORTGAGE**
**CORPORATION**

                    **Defendant.**

---

| | |
|---|---|
| **STATE OF NEW YORK** | ) |
| | **ss.:** |
| **COUNTY OF ALBANY** | ) |

Joni Zucker, being duly sworn, deposes and says:

1. Deponent is over the age of eighteen years and is not a party to this action. On June 16, 2022 at approximately 2:30 P. M., at the place of employment of Amy Lesch, 99 Washington Avenue, Albany N.Y., I served the **SUMMONS & VERIFIED COMPLAINT** in the within action, upon **FAIRWAY INDEPENDENT MORTGAGE CORPORATION,** a Defendant to this action, by personally delivering to and leaving with the said **AMY LESCH**, an agent of The Secretary of State and the State of New York authorized to accept such service on behalf of the defendant, copies thereof, at the aforesaid time and place.

2.. Deponent knew the person so served to be by the following description:

   Approximate age - 40;

   Approximate weight – 160lbs;

   Approximate height -5' 5"

   Sex - [ ] Male [X] Female;

   Color of skin - White;

Color of hair – Brown;

3. That at the aforesaid time and place, I asked the said **AMY LESCH** if she was, in fact, **AMY**

**LESCH,** Agent of The Secretary of State and New York State, and she responded in the

affirmative. At that time, I served the above referenced documents on her, and she took same

in hand.

John Zucker

Sworn to before me this 17th day
Of June, 2022.

NOTARY PUBLIC STATE OF NEW YORK
Commission expires: 9-20-25.

MATTHEW J. MILLEA
Notary Public, State of New York
Registration No. 02MI6422467
Qualified in Albany County
Commission Expires September 20, 20 25

# EXHIBIT A-2

At the IAS Part of the Supreme
Court of the State of New York for
Albany County at the Albany County
Courthouse, located on Eagle Street,
Albany, New York, on the ___ day
of August 2022

P R E S E N T:

HON. RICHARD M. PLATKIN

Acting Justice, Supreme Court

_____

HOMESTEAD FUNDING CORP.

Plaintiff,

–against–

**ORDER TO SHOW CAUSE and
TEMPORARY RESTRAINING ORDER**
Index No.

FAIRWAY INDEPENDENT MORTGAGE
CORPORATION

Defendant.

_____

Upon reading the Affidavit of Michael G. Rutherford, President of the Plaintiff, duly sworn to on the 9th day of August 2022, the Attorney Affirmation of Justin M. Rutherford, Esq., dated August 9th, 2022, and the exhibits attached thereto, and the Plaintiff's Memorandum of Law in support of the relief requested herein, and upon reading the Summons and Verified Complaint previously filed herein, it is hereby

ORDERED, that Defendant Fairway Independent Mortgage Corporation show cause at a hearing before this Court at the Albany County Courthouse located at Eagle Street, Albany, New York, to be held in and for the County of Albany on the _____ day of _____, 2022, at _____ a.m./p.m. or as soon thereafter as counsel can be heard, why a preliminary injunction pursuant to CPLR 6301 and 6311 should not be entered herein restraining, enjoining and prohibiting Defendant Fairway Independent Mortgage Corporation and its employees, representatives and agents from the following: (1) Tortiously interfering with the employment agreements signed by Homestead's loan originators by approaching, soliciting, initiating communication with or otherwise seeking to encourage a discussion with a current Homestead employee about going to work for Fairway or any affiliates thereof and/or taking any other steps in furtherance of encouraging or soliciting Homestead employees to breach their employment agreements in order to work for Fairway or any affiliate thereof; and (2) Seeking to induce Homestead loan originators to breach their employment agreements with Homestead in any other manner; and

**Exhibit A-2**

It being alleged by the Plaintiff in its Verified Complaint that it possesses valid causes of action against Defendant Fairway Independent Mortgage Corporation due to its efforts to induce Homestead employees, and specifically Andrew Aiello, a Homestead loan originator subject to a contract of employment for a definite term, to breach his employment agreement with Homestead, and said Defendant, in furtherance of a plan or scheme and as an ongoing, continuous and intentional pattern of tortious interference with contract, seeks to have additional Homestead loan originators who are under contract with Homestead breach their respective employment agreements with the Plaintiff, and come to work for the Defendant, a competing mortgage lender, which Plaintiff alleges has and is causing incalculable and irreparable harm to the Plaintiff; and sufficient cause appearing therefor, it is

ORDERED, that pending the hearing scheduled herein, Defendant Fairway Independent Mortgage Corporation is hereby restrained, enjoined and prohibited from: 1. approaching, soliciting, initiating communication with or otherwise seeking to encourage a discussion with a current Homestead loan originator about going to work for Fairway Independent Mortgage Corporation or any affiliates thereof and/or taking any other steps in furtherance of encouraging or soliciting Homestead employees working under an employment contract to go to work for Fairway Independent Mortgage Corporation or any affiliate thereof; and 2. Otherwise seeking to induce any of Homestead's loan originators to breach their employment agreements in any other manner, in order to maintain the status quo ante prior to the hearing; and it is further

ORDERED that personal service upon Defendant or its attorney(s) of this Order to Show Cause and the papers upon which it is based made on or before the ___ day of _____, 2022 shall be deemed to be good and sufficient service; and it is further

ORDERED, that pursuant to CPLR 2214 (b), all responsive papers shall be served at least seven days before the hearing herein, and Plaintiff shall be entitled to serve Reply Papers at least one day prior to the hearing.

ENTER,

_____
Hon. Richard M. Platkin, Acting J.S.C.

**STATE OF NEW YORK**
**SUPREME COURT**       **ALBANY COUNTY**

_____

**HOMESTEAD FUNDING CORP.**

**Plaintiff,**

**–against–**                         **SUPPORTING AFFIRMATION**
                                       **Index No.  904554-22**

**FAIRWAY INDEPENDENT MORTGAGE**
**CORPORATION**

**Defendant.**

_____

Justin M. Rutherford, Esq., an attorney duly licensed to practice law in the State of New York, hereby states and affirms as follows:

1.       That Your Affirmant is an attorney licensed in the State of New York, employed by Homestead Funding Corp. (hereinafter "Homestead") in the capacity of Vice President, Business & Legal Affairs, and as such I am fully familiar with the facts surrounding this matter, and the request for temporary injunctive relief.

2.       Your Affirmant makes this Affirmation in support of Homestead's application for temporary injunctive relief in this matter, restraining, enjoining and prohibiting Defendant Fairway Independent Mortgage Corporation (hereinafter "Fairway"), from continuing its efforts to raid Homestead's loan originators as requested in the Order to Show Cause and instead, through the grant of such temporary injunctive relief, to retain the status quo and to prevent irreparable harm to Homestead's legitimate business interests.

3.     Homestead has expended considerable resources to technology to assist its loan originators in the performance of their efforts to originate loans. One of Your Affirmant's responsibilities at Homestead is to serve as its Chief Information Security Officer and in this capacity, I am fully aware of all of the significant investment made by Homestead to promote and enhance the productivity and connectivity of Homestead loan originators.

4.     Affirmant is personally aware Homestead maintains a confidential customer list of its borrowers, which contains non-public information regarding its borrowers, including their social security numbers, dates of birth, cell phone numbers and email addresses, which would be extremely difficult, if not impossible to replicate. This information is contained in Encompass, the loan origination software system utilized by Homestead and is also contained in Insellerate, which is a customer relationship management application, and Simple Nexus, which is a Point-of-Sale system. Homestead treats this confidential information as secret.

5.     Shortly after Homestead learned of the efforts by Fairway to induce Homestead loan originators to breach their employment agreements and come to work for Fairway, I prepared correspondence addressed to Fairway, in an effort to notify Fairway that all Homestead loan originators are subject to an employment agreement for a set term and to discourage Fairway from continuing its recruiting efforts, as such efforts, if successful, would constitute tortious interference with contract.

6.     On May 19th, 2022, I sent a Cease-and-Desist Letter to Fairway, addressed to its legal department, by UPS overnight mail, which letter is attached hereto and made a part hereof as Exhibit A.

7.     This overnight mail envelope was delivered to Fairway on Friday, May 20th, 2022. A copy of the delivery receipt for the UPS overnight envelope containing the Cease-and-Desist Letter is attached hereto and made a part hereof as Exhibit B.

8.     This letter makes clear that all Homestead loan originators are subject to employment agreements for a set term with Homestead. This letter warned that the continuation of recruiting efforts by Fairway, if successful in causing a breach of an employment agreement by one of Homestead's loan originators, would constitute tortious interference with contract and that Homestead would protect its legitimate business interests through appropriate legal action to prevent such raiding of Homestead loan originators by Fairway.

9.     On or about May 24th, 2022, I spoke via phone to one of Fairway's attorneys indicating that he was in receipt of the Cease-and-Desist Letter that I had sent. This is salient in that it confirms that the Cease-and-Desist Letter was received by Fairway and had found its way into the hands of its legal department.

10.    During the ensuing conversation, I elaborated on the terms of Homestead's employment agreements for loan originators and in particular, emphasized to him that it was unique for the mortgage industry as the employment agreement was a contract for a set term, and did not provide for "at will" employment, as was customary. This distinction, and its importance on the legal consequences of Fairway's recruiting efforts, was also discussed.

11.    I highlighted in this telephone conversation that insofar as Homestead's employment agreements provide for a definite term, if Fairway was successful at recruiting one of Homestead's loan originators, it would constitute the tort of tortious interference with contract under applicable New York State law. In this event, I assured Fairway's attorney that Homestead would take legal action to protect its legitimate business interests.

12.     The conversation ended with Fairway's attorney stating that Fairway's recruiting efforts in the Albany area were concluding so he did not expect there to be any occasion for further contact.

13.     On June 14th, 2022, I became aware that Andrew Aiello ("Aiello") had resigned.

14.     Upon information and belief, the following day (June 15th, 2022), I became aware that Aiello had sent a broadcast text to many Homestead originators announcing his termination of employment with Homestead and his new employment with Fairway.

15.     This June 15th Aiello text was perceived by Homestead's legal department to be intended as a clever way to solicit Homestead loan originators by seeking to initiate contact with Aiello regarding his termination, as a proxy for the more nefarious purpose of opening initiating a recruiting conversation without appearing to actually come right out and openly solicit.

16.     Once we became aware that Aiello did not intend to honor the non-solicitation covenant contained in his Employment Agreement (which agreement was technically still in effect but which covenant would survive the termination of the agreement in any event), I sent a letter to Aiello, summarizing the salient portions of his employment agreement, and following that, at his request, sent him a copy of his signed employment agreement.

17.     On that same day, (June 15th, 2022) I also sent Fairway a copy of Aiello's employment agreement with Homestead, advising Fairway of some of the salient provisions contained in this agreement. A copy of this letter is attached hereto and made a part hereof as Exhibit C.

18.     It was my hope that notification of Fairway of Aiello's contractual obligations would ensure that Fairway would advise Aiello of the risk he was running in violating his

restrictive covenants and Fairway would counsel Aiello to avoid taking any further action that would violate his covenants with Homestead.

19.     Unfortunately, Fairway's subsequent actions reveal that it is committed to continuing its efforts to raid Homestead's loan originators.

20.     On or about July 12, 2022, Lou Ann Daprato ("Daprato"), another Homestead loan originator, notified Homestead that she was terminating her employment agreement with Homestead and going to work for Fairway, further confirming Fairway's efforts to raid Homestead's sales force.

21.     Sometime subsequent to her termination, while your Affirmant was on a phone conversation with attorneys for Fairway, they implicitly confirmed to your Affirmant that Daprato was coming to work for Fairway.

22.     However, Homestead has subsequently learned that Daprato did not start work at Fairway as expected and is now listed on the Nationwide Multistate Licensing System ("NMLS") registry as employed by Movement Mortgage, LLC.

23.     Your Affirmant is not presently aware of the circumstances that caused Daprato to change her plans. This change, occurring after she was induced by the intentional and improper efforts of Fairway to breach her employment agreement, in no way lessens Fairway's culpability for its deliberate procurement of her breach. Fairway has through its actions involving Daprato, committed tortious inference with contract.

24.     The day Daprato gave her termination, the legal department uncovered evidence that Daprato had violated her fiduciary duty of utmost loyalty she owed to Homestead as an employee in that she had misappropriated and exfiltrated Homestead's confidential and proprietary information, including trade secrets.

25.     This unscrupulous behavior on the part of Daprato appears to have been aided and abetted by Fairway, and further reinforces the need for temporary injunctive relief in this action.

26.     As recently as this past week other Homestead loan originators have been solicited by Fairway, as is related in the Affidavit of Michael Rutherford.

27.     In light of the foregoing, your Affirmant seeks to have an immediate temporary restraining order signed by the Court, at the Court's earliest opportunity, which would hopefully be supplanted by a preliminary injunction following a hearing, restraining, enjoining and prohibiting Fairway and its employees and agents from inducing or attempting to induce, directly or indirectly, any employee or other representative or associate of Homestead bound by an employment agreement to come to work for Fairway or to terminate a contractual relationship with Homestead, or in any way, directly or indirectly, interfere with such relationship or a relationship between Homestead and any of its employees that are parties to an employment agreement for a set term, which includes all Homestead loan originators.

28.     I would also request that a hearing be scheduled thereafter at the Court's convenience, so that arguments could be heard on the issue of whether a preliminary injunction should be granted during the pendency of this action, to preserve the status quo and prevent irreparable harm to Homestead.

29.     Homestead has demonstrated a likelihood of ultimate success on the merits in this action against Fairway under the facts present here. Homestead has made out a prima facie case of tortious interference with contract against Fairway. Specifically, Homestead had an enforceable employment contract for a definite term with both Aiello and Daprato; Fairway was notified of the existence of a contract for a definite term in writing on May 20th, 2022, which was followed by a phone conference with an attorney for Fairway a few days later which reinforced this knowledge

of Homestead's enforceable contracts with its LOs by Fairway; despite having this knowledge, Fairway continued its efforts to induce Aiello and Daprato to breach their contracts, successfully procuring breaches of same; and Fairway's actions in procuring these breaches have caused incalculable damages and irreparable harm to Homestead.

30.     Injunctive relief is necessary to preserve the status quo and protect Homestead from Fairway's raiding as Fairway has continued its recruiting efforts to the present time and has signaled its intention to continue to raid Homestead's LOs.

31.     Balancing the equities in this case, the grant of the requested injunctive relief would preserve the status quo and protect Homestead, which would otherwise be irreparably damaged.

32.     Not granting the requested relief, on the other hand, would permit Fairway to benefit from its tortious conduct and continue its raiding of Homestead loan originators.

33.     Considering the above calculus, I would submit that the balance of equities weighs heavily in favor of Homestead and granting the requested preliminary injunctive relief to protect Homestead during the pendency of this action.

34.     If Fairway is not prevented from continuing its predatory corporate behavior through the grant of preliminary injunctive relief, Homestead will suffer incalculable damages and irreparable harm.

35.     No prior request for the same or similar relief has been made by the Plaintiff to this or any other Court of competent jurisdiction.

36.     Homestead possesses clean hands, and under the circumstances present here, is not guilty of laches, and your Affirmant submits that Homestead is entitled to the grant of equitable relief in the form of a temporary restraining order, and a preliminary injunction following the hearing.

37.     Homestead is prepared to comply with whatever the Court determines, in its sound discretion, to be the appropriate amount of undertaking in this action, in the event a preliminary injunction is granted.

38.     Homestead has no adequate remedy at law. If Fairway is allowed to continue to prey on Homestead's LOs, it will significantly injure Homestead's goodwill causing irreparable harm.

39.     That based on all of the foregoing, your Affirmant prays for temporary injunctive relief which is necessary to prevent irreparable harm during the intervening period prior to the hearing on the preliminary injunction, and following the hearing, grant a preliminary injunction maintaining the status quo pending a determination of this matter on the merits.

WHEREFORE, your Affirmant respectfully requests that the relief requested in the Order to Show Cause be granted by the Court, along with such other, further and different relief as the Court deems just, equitable and proper.

Albany, New York
August 9, 2022

Justin M. Rutherford, Esq.

Exhibit A



8 Airline Drive • Albany, NY 12205
Office (518) 464-1100 • Fax (518) 464-1141

May 19, 2022

To:     Fairway Independent Mortgage Corporation ("Fairway")
        Attn: General Counsel / Legal Department

Re:     Employment Solicitation / Tortious Interference with Contract

To Whom It May Concern:

Please be advised that I am corporate counsel for Homestead Funding Corp.
("Homestead"). My office has been provided with documentation regarding the
recruiting and solicitation efforts of Chris Lowis, Business Development for Fairway
toward Homestead employees including Loan Originators and / or Branch Managers
(see attached screenshots). This letter is advising you to cease all such communications
and recruitment efforts or risk legal action.

Please allow this communication to serve as formal notice that all of Homestead's Loan
Originators and Branch Managers are covered by an employment agreement for a set
term. Therefore, continued attempts to solicit any of these Homestead employees with
employment opportunities at Fairway would constitute tortious interference with
contract.

To the extent that all Loan Originators and Branch Managers are signatories of such
employment agreements, you are hereby advised to CEASE AND DESIST ANY
FURTHER SOLICITATION EFFORTS IN VIOLATION OF THESE CONTRACTUAL
RIGHTS. Such notice is given with a full reservation of rights to prosecute any prior or
future torts.

Additionally, the dishonest and subversive tactics employed by Mr. Lowis to imply that
there is a factual basis to believe that Homestead employees are considering leaving the
organization, and thus the target of the solicitation should consider the same, is a bad
faith tactic that violates even the minimum standard of business ethics.

Any future attempt by you or any representatives or agents acting on behalf of Fairway
to recruit a Homestead Loan Originator or Branch Manager by any means, electronic,
telephonic or otherwise, will be construed by Homestead as an act of tortious
interference with the employment agreement and would be actionable in an
appropriate legal proceeding.

Any recruitment efforts by Fairway will cause Homestead to suffer irreparable damages and Homestead intends, in this event, to seek appropriate redress through the courts for these solicitation efforts in violation of the contractual rights that are in place including, if the circumstances warrant it, seeking immediate injunctive relief restraining and enjoining further tortious actions by Fairway as well as to seek appropriate money damages.

Please confirm your intention to comply with this demand within ten (10) days of receipt of this communication. Should evidence of such conduct continue, Homestead will not hesitate to initiate legal action. I would encourage you to contact my office if you have any questions or concerns regarding this correspondence.

Best,

Justin M. Rutherford, Esq., LL.M.
Vice President, Business & Legal Affairs
Homestead Funding Corporation

Exhibit B

# Proof of Delivery

Dear Customer,

This notice serves as proof of delivery for the shipment listed below.

**Tracking Number**

1ZX054800195261339

**Weight**

0.10 LBS

**Service**

UPS Next Day Air®

**Shipped / Billed On**

05/19/2022

**Delivered On**

05/20/2022 9:40 A.M.

**Delivered To**

4750 S BILTMORE LN
MADISON, WI, 53718, US

**Received By**

SABRIN



**Left At**

Dock

**Reference Number(s)**

JM RUTHERFORD, 110

Thank you for giving us this opportunity to serve you. Details are only available for shipments delivered within the last 120 days. Please print for your records if you require this information after 120 days.

Sincerely,

UPS

Tracking results provided by UPS: 07/27/2022 2:29 P.M. EST

Exhibit C



# HOMESTEAD FUNDING CORP.

June 15, 2022

Via UPS:  Fairway Independent Mortgage Corporation
Attn: Legal Department
4750 S. Biltmore Lane
Madison, Wisconsin 53718

Via Email:  Benl@fairwaymc.com

Re:  Andrew Aiello, Employment Agreement/Restrictive Covenants

To Whom It May Concern:

Please be advised that I am corporate counsel for Homestead Funding Corp. (hereinafter "Homestead"). It is my understanding that, effective on or about June 14, 2022, Andrew Aiello has resigned his position as a Loan Originator with Homestead and accepted a position with Fairway Independent Mortgage Corporation (hereinafter "Fairway").

This letter is to provide notice of Homestead's Loan Originator Employment Agreement (hereinafter "The Agreement") entered into between Mr. Aiello and Homestead on January 1, 2019, which I have attached for reference. Pursuant to paragraph 10 of the Agreement, Mr. Aiello is required to provide Homestead a sixty (60) day notice of his intention to terminate his contract before being released. As of his resignation on June 14, 2022, this notice had not previously been given.

It is our expectation that Mr. Aiello will honor this provision of the Agreement. Pursuant to your conditional offer letter to Mr. Aiello, dated June 10, 2022, your organization requires that Mr. Aiello "confirm(s) that [he] is able to accept this job and carry out the work involved without breaching any legal restrictions on [his] activities, such as restrictions imposed by a current or former employer".

Please allow this communication to serve as notice of the fact that Mr. Aiello is not able to accept this position and carry out the work involved without breaching any legal restrictions imposed by his duly executed employment agreement. He is required under the terms of the Agreement to remain in Homestead's employ for sixty (60) days from his resignation.

Accordingly, Homestead hereby demands that Fairway cease and desist from moving forward with Mr. Aiello's employment during this notice period, including sponsoring his

licenses in the NMLS. Mr. Aiello owes a contractual duty of loyalty to Homestead during this period and Fairway's assent to hiring and sponsoring Mr. Aiello would be aiding and abetting the breach of these contractual covenants.

Additionally, under the terms of the Agreement, for a period of one year (1) after termination of employment, Mr. Aiello is prohibited from contacting, soliciting or otherwise engaging existing employees for the purposes of offering employment at a competing mortgage lender.

Further, all confidential information and proprietary data are the property of Homestead and unauthorized use or misappropriation of customer lists, loan files, CRM records or other such similar information is expressly forbidden under the terms of The Agreement.

It is Homestead's expectation that your organization will not aid, assist, encourage or facilitate any violation of The Agreement. Any violations of The Agreement will cause Homestead to suffer irreparable damage and Homestead intends, in this event, to seek appropriate redress though the courts, including, if the circumstances warrant, seeking immediate injunctive relief restraining and enjoining further tortious actions, as well as to seek appropriate money damages.

It is our sincerest hope that none of the foregoing will be necessary and Mr. Aiello will honor his employment covenants as he moves forward with your organization once his obligations to Homestead have been satisfied.

Please feel free to contact my office with any questions or concerns regarding this correspondence. I am best reached by contacting Kelly Sanford, Director of Legal Operations at ksanford@homesteadfunding.com or by phone (518) 407-3015.

Best,

Justin M. Rutherford, Esq., LL.M.

Vice President, Business & Legal Affairs
Homestead Funding Corp.


cc:     Kelly Sanford, Director of Legal Operations
        Richard C. Miller, Jr., Esq., Outside Counsel
        Anthony Felitte, COO



**Loan Originator Employment Agreement
And Associated Documents**

This booklet explains the essential and universal components of the Homestead Funding Corp. (hereinafter "Homestead") Loan Originator Compensation Plan for Loan Originators. This Employment Agreement may be supplemented and modified by the terms of an employment offer letter, job description or other written document outlining the employment terms, if such a letter job description or other written document is provided to the Loan Originator. If an employment offer letter, job description or other written document outlining the employment terms was provided to the Loan Originator, it will be incorporated herein by reference and is thereby made a material part of this Employment Agreement, to be read together with and reconciled with the language of the Employment Agreement, to the extent possible.

The purpose of this Loan Originator Employment Agreement is to provide a comprehensive, universal and consistent employment relationship for all Homestead Loan Originators. It is hoped that this will serve as the foundation for all legal understandings between Homestead and the Loan Originator.

For the purposes of this entire Agreement, "Loan Originator" applies to all Loan Originators, regardless of whether they are considered Outside Sales or Inside Sales. In cases where there is differentiation between Outside Loan Originators and Inside Loan Originators, they will be referred to thusly.

**HOMESTEAD FUNDING CORP. IS AN
EQUAL OPPORTUNITY EMPLOYER**

Initials

Loan Orig.

HFC

# TABLE OF CONTENTS

Page 1         EMPLOYMENT AGREEMENT

**APPENDIX**

SCHEDULE A:   LOAN ORIGINATOR COMPENSATION PLAN

SCHEDULE B:   LOAN ORIGINATOR RESPONSIBILITIES

SCHEDULE C:   ADDENDUM TO EMPLOYMENT AGREEMENT

Ver. 01-01-2019

Initials

Loan Orig

HFC

# EMPLOYMENT AGREEMENT

THIS AGREEMENT (hereinafter referred to as "Employment Agreement") made and entered into as of 1/1/2019 by and between Homestead Funding Corp., (hereinafter "Homestead"), with a principal place of business at 8 Airline Drive, Albany, NY and Andrew Aiello residing at 2 Towline Lane Clifton Park NY 12065 (hereinafter "Loan Originator").

## WITNESSETH:

WHEREAS, Homestead is duly licensed in the State of New York and various other states as a mortgage banker and as a mortgage broker to originate, service and sell residential mortgage loans and desires to retain the services of Loan Originator to originate residential mortgage loans on behalf of Homestead; and

WHEREAS, the Loan Originator desires to be employed by Homestead in the capacity of a Loan Originator and to originate residential mortgage loans on behalf of Homestead in accordance with the provisions of this Employment Agreement;

NOW, THEREFORE, and in consideration of the promises and mutual covenants hereinafter contained, and other good and valuable consideration, it is mutually agreed by and between the parties as follows:

1. <u>Loan Programs</u>. Homestead agrees to make available to the Loan Originator all current loan programs and mortgage products available to the particular department or branch in which the Loan Originator is employed. It is understood that Homestead's various departments and branches may provide different mortgage programs and products to offer to its customers, and only the programs and products available to the Loan Originator's specific department or branch will be available to him/her, as the same may change from time to time. Homestead agrees to assist the Loan Originator in his/her work by providing advice and instruction from Homestead management, which seeks to provide its full cooperation to help facilitate the Loan Originator's success.

2. <u>Exclusive Best Efforts to Homestead</u>. Loan Originator agrees to work diligently and utilizing his/her best efforts to originate residential mortgage loans solely on behalf of Homestead, and agrees that during the term of this Agreement, he/she will work exclusively for Homestead.

3. <u>Conduct</u>. Loan Originator and Homestead each agree to conduct their business and regulate their habits and working hours so as to maintain and to increase the good will, business, profits and reputation of both Homestead and Loan Originator. The parties agree to conform to and abide by all laws, rules, regulations, and code of ethics that are binding on, or applicable to, Mortgage Bankers and Mortgage Brokers (when a loan is taken as a brokered product), in all jurisdictions in which Homestead originates loans. It is expressly understood that the Loan Originator shall guard, at all times, against even the appearance of impropriety or the perpetration of fraud, forgery or misrepresentation by the Loan Originator or others. The Loan Originator agrees to promote and enhance Homestead's reputation and standing within the local community in general as well as within the local mortgage community by serving the public in mortgage loan transactions, to the end that each of the parties may derive the greatest possible benefit through repeat customers and strong referral business.

Initials

Loan Orig

HFC

4. <u>Regulatory Compliance</u>. It is expressly understood and agreed that both Homestead and the Loan Originator are subject to regulation by the governing regulatory agencies of all states in which Homestead is authorized to originate mortgage loans as well as the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development, the Veterans Affairs Administration, the Consumer Finance Protection Bureau ("CFPB"), the Federal Reserve Board, Federal Trade Commission and other regulatory oversight agencies. Loan Originator agrees to be governed by all applicable statutes and implementing rules and regulations promulgated by these agencies affecting his/her duties as a Loan Originator for Homestead.

5. <u>Compensation Plan Attached</u>. The terms of the Loan Originator Compensation Plan are attached to this Employment Agreement as Schedule A which is expressly made a part hereof and are subject to change at any time with or without notice to the Loan Originator at the sole discretion of Homestead. The goal of the Plan is to maximize the productivity, quality and volume of mortgage originations produced by Homestead's sales force through a compensation program that encourages the Loan Originator to increase his/her sales, productivity and overall quality of originated loans.

6. <u>Duration of Agreement</u>. This Employment Agreement shall be valid and effective for a set term of one-year, subject to the provisions of Section 10 herein. This Employment Agreement will be automatically renewed for five additional one-year terms.

7. <u>Membership Dues</u>. Loan Originator shall pay his/her own expenses and dues for membership in professional organizations, unless otherwise specifically agreed in writing by the parties.

8. <u>No Authority</u>. Loan Originator acknowledges and agrees that he/she has no authority to enter into agreements on behalf of Homestead of any kind or nature; all agreements to which Homestead is to be a party must be reviewed by Homestead upper management and signed by an authorized Homestead officer in order to be valid and effective. Loan Originator may not hold himself/herself out to vendors, landlords or others as possessing any actual or apparent authority to enter into agreements on behalf of Homestead or otherwise legally bind Homestead to the terms of any agreements or other documents.

9. <u>Proprietary Rights</u>. It is expressly agreed by the parties, as a material part of this Employment Agreement, that all loan applications taken, appraisals, credit reports, correspondence received, copies of all correspondence written, plans, memoranda, files, photos, reports, confidential customer lists, legal opinions, accounting information, mortgage pricing systems and pricing information, sales and marketing plans, strategies and practices, Homestead's training manual and training procedures, and any and all other instruments, documents or information of any nature whatsoever concerning loan transactions handled by Homestead or by Loan Originator or jointly are and shall remain the sole and exclusive property of Homestead, and the Loan Originator acknowledges that he/she has no proprietary right to any of the foregoing.

10. <u>Nature of Employment Relationship</u>. Both parties agree that Loan Originator will be employed by Homestead for the duration of this Employment Agreement, starting with the effective date of this Agreement and continuing for a one-year term. Either party may, however, terminate this Employment Agreement upon providing the other party 60-days advance notice in writing of their intention to terminate the Employment Agreement for any reason. This

Initials

HFC

Employment Agreement will be automatically renewed for five additional one-year terms unless either party provides the other with 60-days advance written notice of their intention not to renew the Employment Agreement. The parties may, however, shorten or lengthen the time period from the date notice is given to date of actual termination by mutual agreement, so long as it is put in writing and signed by both parties.

It is specifically agreed between the parties hereto that the Loan Originator will receive his/her commissions in accordance with this Employment Agreement for the 60-day period following the date written notice of either party's intent to terminate this agreement is delivered to the other party, (unless otherwise agreed to by the parties in writing at the time), provided the Loan Originator abides by the relevant terms of this Employment Agreement during the termination transition and assists, as may be requested by Homestead, with facilitating the processing and closing of his/her pipeline of mortgage loans. Compensation paid to the Loan Originator during the above referenced 60-day notice period will be limited to his/her commission only. Commissions for loans that close after the expiration of the 60-day notice period are not payable to the Loan Originator.

Homestead shall have the right to immediately terminate the Employment Agreement for reasonable cause, however, at any time. Reasonable cause, as used in this Employment Agreement, shall mean what is often referred to in labor employment settings as "just cause" and would include (merely as illustrations, but not intended to be an exhaustive or comprehensive list), the following situations or conditions:

a) Evidence that the Loan Originator has knowledge of, participated in, or otherwise engaged in collusive activities with a borrower, appraiser, Realtor or others towards the submittal of a fraudulent loan or any aspect of a fraudulent loan application;

b) The breach of the Loan Originator's fiduciary duty of loyalty and utmost fidelity to Homestead as his/her employer;

c) An instance of gross dereliction of duties by the Loan Originator in any respect;

d) An unintentional material violation on the part of the Loan Originator to follow regulatory compliance mandates exposing Homestead to regulatory oversight consequences, (whether or not the act or omission was known by the Loan Originator to be a material violation, as the Loan Originator is expected to be fully conversant with all applicable regulatory compliance mandates and comply with them) and/or an intentional violation, (whether material or not);

e) With regard to the following forms: Application for Employment; Background Investigation Consent Form; Employment Screening Form; and the Annual Background Certification Form, any information provided by the Loan Originator that is found to be false, intentionally incomplete or misrepresented in any respect, will be sufficient cause to immediately discharge the Loan Originator from Homestead's service, whenever it is discovered. In addition, certain criminal convictions will prohibit the Loan Originator from employment in the field of mortgage banking. These convictions vary from state-to- state. Other criminal convictions, which do not automatically bar the Loan Originator from employment in the field of mortgage banking and/or information submitted about the Loan Originator by a consumer



Initials ______ Loan Orig ______ HFC

reporting agency or by former employers or others, will be evaluated on a case-by-case basis by Homestead. If Homestead deems, in its sole discretion, that the other criminal conviction(s) and/or information provided by the Loan Originator's former employers or by a consumer reporting agency or others is such that he/she is not suited for a position with Homestead, the Loan Originator's employment will be subject to immediate termination;

f) other similar instances of misconduct, including a violation of Homestead company policies and/or the provisions of the Homestead Employment Policy Handbook.

11. Oral Commitments. Homestead has made no oral commitments to the Loan Originator outside of this Employment Agreement. No one at Homestead is authorized to make oral commitments regarding employment – either now or in the future.

12. Fiduciary Obligation. During his/her employment, Loan Originator shall use his/her best efforts solely to advance the interests of Homestead. In this regard, Loan Originator commits to exercise his/her best good faith efforts in the performance of his/her loan originator responsibilities, which requires a strict fiduciary obligation of loyalty to Homestead as his/her employer. Loan Originator agrees that he/she will not be associated with any other commercial or business duties or pursuits without first obtaining the written approval of Homestead management. The Loan Originator acknowledges that he/she must sign a HUD Prohibited Outside Employment Policy Statement. Any employment (which term shall include acting as an officer, employee, independent contractor, consultant or in any other capacity whatsoever) or ownership interest in another employer in either the mortgage lending or real estate industry or in any other related field is strictly prohibited under any circumstances and will constitute grounds for immediate termination of the Loan Originator under this Employment Agreement. If the Loan Originator obtains prior written approval from Homestead management for non-prohibited outside employment, such employment must not interfere or conflict with the interests of Homestead. Further, such employment must not adversely affect the quality or quantity of work performed for Homestead as might result from undue fatigue or in placing employment with Homestead secondary to outside employment.

13. Class, Collective and Multi-Party Action Waiver. Loan Originator further waives and gives up any right to become a participant in any class, collective or multi-party action against Homestead. As part of this waiver, Loan Originator promises not to join or consent to join or participate in any case against Homestead asserting class, collective or multi-party claims against Homestead that are related in any way to Loan Originator's employment or the termination of Loan Originator's employment with Homestead. If, without Loan Originator's prior knowledge and consent, Loan Originator is made a member of a class in any proceeding, Loan Originator agrees to opt out of the class at the first opportunity to do so. This waiver applies to all claims arising out of Loan Originator's employment or termination from employment including claims brought under federal or state wage laws, federal or state laws against discrimination or any other claim against Homestead.

14. Indemnification. Loan Originator hereby agrees to indemnify and hold Homestead, its shareholders, directors, officers, managers, successors and assigns, harmless against any and all claims, liabilities and obligations, of every kind and description, including reasonable attorney fees and court costs arising out of or related to: (a) any failure by the Loan Originator to duly perform or strictly observe any term, provision, covenant, or condition contained herein; and (b) the breach

of any other term, provision, covenant, condition or promise set forth herein. This indemnification and hold harmless agreement does not extend to any recovery against a Loan Originator related to loans originated by a Loan Originator or lawsuits commenced against Homestead as a result of the acts or omissions of a Loan Originator.

15. Confidentiality. Loan Originator acknowledges that, during his/her employment with Homestead, he/she may come into possession of confidential and proprietary information of Homestead, including trade secrets, (all of which are referred to in this Agreement as "Proprietary Information"), which includes, among other things, information about:

a) Existing or planned business ventures, acquisitions, mergers, or initiatives, if treated as secret by Homestead;

b) All of Homestead's accounting and business information, including documents addressing its financial condition and net worth, or the results of any external or internal audits;

c) Details regarding Homestead's method of pricing mortgage loans, which is agreed to be unique and proprietary, which is and will always be kept secret by Homestead;

d) Homestead's and/or its affiliates' business, mortgage marketing and/or solicitation strategies / techniques, if treated as secret by Homestead and/or its affiliates;

e) A Borrower's non-public personal information;

f) Proposals designed to meet borrower's needs or requirements if it involves confidential information;

g) The resolution of a particular borrower's problems, if it involves confidential information of the borrower;

h) The names of and other details concerning Homestead's customers, including any confidential customer lists of Homestead, including present or former borrowers of Homestead;

i) The resumes of and other information concerning officers, managers, loan originators, employees, agents, or contractors who are or may be employed by Homestead, under any terms, to meet the needs of Homestead's borrowers.

j) Both parties to this Employment Agreement acknowledge and agree that the above Proprietary Information is kept secret by Homestead and is protected by Homestead as secret in order to satisfy the "trade secret" threshold recognized by the courts.

Loan Originator acknowledges that the foregoing types of Proprietary Information are only illustrative of some of the kinds of highly confidential information that he/she may become aware of during his/her employment with Homestead, and the foregoing list is not meant to be a complete and exhaustive compilation of all of the types of confidential information Loan Originator may have the opportunity to obtain while in the employ of Homestead. Loan Originator also acknowledges that much of the above information constitutes a trade secret of Homestead; that it

Initials

Loan Orig                    HFC

is a valuable resource of Homestead that was developed by Homestead through the investments of significant managerial effort and the expenditures of considerable sums of money, and is consistently reviewed, improved and refined by Homestead, and is unique and proprietary to Homestead and treated as such at all times. These trade secrets provide a competitive advantage to Homestead and would not be easily obtained or duplicated by others who have not been able to acquire such information other than through employment with Homestead.

16. Non-Disclosure. As a consequence of the above and in consideration for his/her employment, Loan Originator agrees that, unless he/she first obtains the prior written consent of Homestead, he/she shall not communicate, disclose, release, take, transfer or give (either directly or indirectly) to any person or firm, or use at any time, (either during or subsequent to his/her employment with Homestead), any of Homestead's Proprietary Information to which he/she has access during his/her employment with Homestead, whether or not such information was developed or obtained by Loan Originator, except insofar as Loan Originator may, where authorized and approved, use such information in the furtherance of his/her employment duties with Homestead. Loan Originator shall retain all such information in strict confidence for the sole benefit of Homestead, and shall surrender, to Homestead, all loan applications, confidential customer lists, documents, papers, data bases, etc., containing any of such Proprietary Information or trade secrets upon the termination of employment with Homestead, including all such information contained in any electronic format. The parties acknowledge and agree that the disclosure or unauthorized use of any of the above described Proprietary Information and trade secrets would cause irreparable harm to Homestead and the parties acknowledge that immediate injunctive relief, including a temporary restraining order and a preliminary injunction, restraining the use and/or disclosure of such information is necessary and appropriate, and the Loan Originator states that he/she understands that such equitable relief will be sought by Homestead and agrees that the grant of such relief is consistent with the unique and proprietary nature of this information and its importance to Homestead.

17. Non-Solicitation. Likewise, Loan Originator further agrees, as a material part of this Employment Agreement, and in consideration for his/her employment by Homestead, that during his/her employment with Homestead, or for one year following the termination of such employment, Loan Originator will not approach, solicit, initiate or otherwise seek or encourage a discussion with a present Homestead loan originator, manager and/or employee about going to work for another mortgage lender, mortgage banker or mortgage broker, or take any other steps in furtherance of encouraging or soliciting a present Homestead loan originator, manager and/or employee to go to work for any other mortgage lender, mortgage banker or mortgage broker. The parties acknowledge and agree that any solicitation of Homestead loan originators, managers and/or employees to go to work for any other competing mortgage lender, mortgage banker or mortgage broker would cause irreparable harm to Homestead and the parties acknowledge that immediate injunctive relief, including a temporary restraining order and a preliminary injunction, restraining such solicitation is necessary and appropriate.

18. Information Security. Loan Originator hereby acknowledges that he/she has received a copy of Homestead's comprehensive written information security plan or policy (hereinafter "WISP"). Loan Originator further acknowledges and agrees that he/she must comply with the provisions of the WISP and that any non-conforming use of personal information during or after employment is prohibited; and further that mandatory disciplinary action will be taken for violations of the security provisions of the WISP, pursuant to the discipline policy described in the Homestead Employment Policy Handbook.

Initials ___ Loan Orig

HFC

Personal Information, as used in this Employment Agreement, shall include, (merely as illustrations, but not intended to be an exhaustive or comprehensive list), the following information: A Homestead customer or consumer's first name and last name or first initial and last name in combination with one or more of the following data elements that relate to such customer or consumer:

a)  Social Security Number;
b)  Driver's License Number;
c)  State-Issued Identification Card Number;
d)  Financial Account Number;
e)  Credit Card Number; or
f)  Debit Card Number.

Personal Information does not include information that is lawfully obtained from publicly available information or from federal, state or local government records lawfully made available to the general public.

19. Licensing is Mandatory. The Loan Originator hereby states and affirms that he/she is already licensed as a loan originator in the jurisdictions in which he/she will originate loans; or if not, that he/she has accurately informed Homestead of his/her licensing status and will expeditiously obtain all necessary licenses prior to discussing loan terms or performing any other origination duties with a borrower in all jurisdictions in which he/she will originate loans and will not originate loans until and unless the appropriate license is obtained. In the event that any occurrence causes the Loan Originator to have his/her license threatened to be suspended or revoked, the Loan Originator agrees to immediately notify Homestead. Under no circumstances shall a Loan Originator originate a loan in any jurisdiction unless he/she is licensed in that jurisdiction. Any violation of this paragraph is grounds for immediate termination.

20. Mandatory Mediation/Arbitration. Any disputes arising out of or relating to this Employment Agreement, the LO's employment with Homestead or termination from employment (hereinafter "Dispute") shall be resolved exclusively by mandatory mediation under the rules of the American Arbitration Association. In the event that any Dispute cannot be fully resolved through mediation, the parties agree that the Dispute shall then be exclusively resolved by final and binding arbitration on an individual basis before one neutral arbitrator through the rules of the American Arbitration Association. Any type of class; collective claims; or multi-party claims are expressly prohibited, and the arbitrator will have no authority to alter the parties' agreement in this regard. Any such arbitration shall be held in the county in which the Loan Originator last worked unless otherwise stipulated by the parties and pursuant to the Model Rules for Arbitration of Employment Disputes of the American Arbitration Association ("AAA") then in effect.

The parties voluntarily and irrevocably waive any and all rights to have any Dispute heard or resolved in any forum other than through arbitration. This waiver specifically includes, but is not limited to, a jury trial. This does not limit the right of either party to apply to a court of competent jurisdiction for any provisional remedy pending the completion of arbitration consistent with applicable law. In any arbitration held pursuant to this Agreement, Employer shall bear all fees and costs unique to arbitration, including the Arbitrator's fee. Each party shall pay for its own attorneys' fees and costs, if any. However, the Arbitrator may award reasonable attorneys' fees to the prevailing party in accordance with this Agreement or applicable law. The parties shall be

entitled to any remedy which would have been available in court. Any award of the arbitrator shall be in writing. Either party may bring an action in any court of competent jurisdiction to compel arbitration under this Agreement and / or to enforce an arbitration award. If, in any action to enforce this Agreement, a court of competent jurisdiction rules that any portion of the parties' agreement to arbitrate is not enforceable, then the parties agree that such provision be severed, and the remainder of the Employment Agreement be enforced. Nothing herein prevents the Loan Originator from filing a charge with an administrative agency including but not limited to the NLRB or the EEOC.

21. Controlling Law. This Employment Agreement shall be governed by the applicable laws of the state in which such Loan Originator is employed and Loan Originator consents to the personal jurisdiction of any court in a state in which Homestead is conducting business, including, specifically, New York State, for the determination of any questions of interpretation or enforcement of any provision of this Employment Agreement.

22. Severability. In case any one or more of the provisions hereof shall be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Employment Agreement, (or its collateral agreements), but this agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

23. Survival of Covenants. All representations, warranties, covenants, and agreements of the parties hereto shall survive the termination of this Employment Agreement and the termination of employment of the Loan Originator.

24. Amendment. This Employment Agreement may not be amended orally. It may only be amended by way of a writing designated as an amendment to this agreement that is executed by the parties hereto.

25. Entire Agreement. This Employment Agreement supersedes any previous written or oral agreements, understandings or representations existing between the parties. There are no promises, understandings or agreements except as set forth expressly in writing in the Loan Originator Employment Agreement and Associated Documents. The parties expressly understand and agree that the Introduction, Employment Offer Letter, (if any), and Loan Originator Compensation Plan attached as Schedule A are incorporated by reference herein. However, in the event of a conflict between any provisions of these documents, the terms and conditions of the Employment Agreement and Loan Originator Compensation Plan attached as Schedule A shall control.

26. Full Knowledge. Loan Originator expressly warrants and represents to Homestead that before executing this Employment Agreement he/she was fully informed of the terms, contents, conditions and effect of this Employment Agreement; that the Loan Originator has relied solely on his/her own judgment in executing this Employment Agreement; and that he/she has had the opportunity to seek and obtain the advice of legal counsel before entering into this Agreement.

27. Interpretation. No provision in this Agreement shall be interpreted for or against any party because that party or that party's legal representative drafted the provision.

28. Headings. The headings used in this Employment Agreement are for the convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Employment Agreement.

Initials

Loan Orig

HFC

29. Counterparts. This Agreement may be executed in two counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

30. Job Description. This Employment Agreement may be immediately terminated at the option of Homestead in the event that any statute, regulation or judicial decision results in a determination by Homestead that the duties and obligations of Homestead's Loan Originators do not qualify for the applicable Exemption. (This paragraph applies exclusively to Outside Sales Loan Originators).

31. Situs. This Employment Agreement shall be construed in accordance with the laws of the State of New York, except as provided for herein to the contrary herein or if contrary to applicable law. The parties consent to jurisdiction and venue of all matters arising out of the interpretation or enforcement of this Employment Agreement being vested exclusively in Albany County Supreme Court, in the State of New York.

IN WITNESS WHEREOF, the parties hereto cause this Employment Agreement to be duly executed and delivered as of the day and year first above written.

Homestead Funding Corp.

By:

_____

Andrew Aiello
Loan Originator

By:

_____

Jeffrey N. Mason
Authorized Representative

Initials

Loan Orig          HFC

<u>SCHEDULE A</u>

## Loan Originator Compensation Plan ("Plan")

Applies to all loans locked on or after January 1, 2019

[See attached Plan]

Initials

Loan Orig

HFC

<div align="center">

### SCHEDULE B
### LOAN ORIGINATOR RESPONSIBILITIES

</div>

The Loan Originator will be responsible for complying with the specific requirements, duties and responsibilities of the loan originator position, as the same may be modified or supplemented by Homestead over the course of the employment; which includes obtaining all necessary licenses to originate loans in all of the jurisdictions in which they originate loans and properly maintaining these licenses (once obtained) at all times they are employees of Homestead This also includes compliance with Homestead's Employment Policy Handbook, Homestead's Exclusive Employment Policy, Homestead's Pricing Policy, Homestead's Fair Lending Policy, Homestead's Privacy Policy, Homestead's Information Security Policy and other mandates as may be adopted by Homestead from time-to- time. This obligation also includes compliance with all relevant and applicable statutes and regulations governing the mortgage industry including satisfactorily meeting the legal and regulatory requirements applying to the origination of mortgage loans by loan originators, including the Truth in Lending Act ("TILA"), Regulation Z and HOEPA; Equal Credit Opportunity Act ("ECOA") and Regulation B; Real Estate Settlement Procedures Act ("RESPA") and Regulation X; the Fair Credit Reporting Act, ("FCRA") as amended and supplemented by the Fair and Accurate Credit Transactions Act ("FACTA"); the Gramm-Leach-Bliley Act ("GLBA"); the Telemarketing and Consumer Fraud and Abuse Prevention Act and the Telemarketing Sales Rule; the Home Mortgage Disclosure Act ("HMDA") and Regulation C; the Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE") as well as all other Fair Lending laws that may be applicable including those which are not, as of this time, enacted or effective but which will become effective during the course of this Employment Agreement; the U.S. Patriots' Act of 2001, as it may be extended and modified; and any other federal, state or local laws and regulations pertaining to or restricting predatory, high-cost or abusive lending; and all other similar federal, state or local laws and regulations as may be in effect at this time, or as they may be amended from time-to-time. Consistent with the foregoing obligations, Loan Originators are forbidden from offering or receiving any "thing of value" for the referral of mortgage loans (RESPA Section 8) or from accepting any form of compensation or gratuities such as game tickets or other perks from any borrower (Reg. Z Prohibition on Dual Compensation).

The Outside Loan Originator's duties include marketing and promoting themselves to potential borrowers, (both purchase and refinance) directly, and also to real estate agents, accountants, lawyers, financial planners, builders, bank personnel, etc., (who all constitute a referral source of potential borrowers for Loan Originators and are hereinafter described herein as "Referral Sources"). The foregoing duties involve meeting with borrowers in their homes, real estate brokers' offices, banks, builders' offices and other public places, to persuade the borrower that the loan products offered by Homestead would be the best alternative for the borrower and that he/she would be the best loan originator to take and oversee the mortgage loan application. The Loan Originator's duties would also include calling on the Referral Sources both in person at their places of business, restaurants and/or other public places; as well as by telephone, email, direct mail, marketing brochures, and the use of Homestead approved internet social media, etc.

Outside Loan Originators are free to determine independently how they wish to arrange their work schedule, how to schedule their loan applicant interviews and applications, what means and efforts they choose to market themselves and promote their outside sales business and all other facets of their outside sales positions and sales efforts.

Initials _____  _____
        Loan Orig   HFC

The Inside Loan Originator will work at an assigned Homestead office, under the direct supervision of his / her manager, originating investment quality residential mortgage loans (Bankered; Brokered; FHA; VA; RHS; Conventional; Jumbo; Reverse; Second) by prospecting and following up on Company provided leads via phone in a timely manner. Company provided leads are obtained from Internet sources, direct mail campaigns, referrals or other special marketing campaigns. All Company provided leads are owned by Homestead and the Inside Loan Originator acknowledges they are the proprietary information of Homestead and agrees to only utilize those leads and related information during employment with Homestead.

Should the Inside Loan Originator wish to develop his / her own loan referral sources they may, with the prior approval of management in Albany NY, also undertake the following activities normally associated with outside sales: directly marketing and promoting themselves to potential borrowers (both purchase and refinance), and also to real estate agents, accountants, lawyers, financial planners, builders, bank personnel, etc., (who all constitute a referral source of potential borrowers for loan originators engaged in outside sales activities and are hereinafter referred to as "Referral Sources"). The foregoing loan origination duties involve meeting with borrowers in their homes, real estate brokers' offices, bank branches, builders' offices and other public places, to persuade the borrower that the loan products offered by Homestead would be the best alternative for the borrower and that he / she would be the best loan originator to take and oversee the mortgage loan application. The loan originator's duties would also include calling on the Referral Sources both in person at their places of business, restaurants and/or other public places; as well as by telephone, email, direct mail, marketing brochures, and the use of Homestead approved Internet marketing efforts, Social Media, etc.

Once the Loan Originator has sold the borrower on using him/her and Homestead for their mortgage, the Loan Originator's duties also include obtaining the necessary financial information from the borrowers, the accurate completion of residential mortgage loan applications, and counseling borrowers to identify the loan product(s) that best meet the borrowers' needs. The Loan Originator's marketing and promotion of themselves, solicitation of loan applications and the negotiation of loan terms must be performed in a manner consistent with Homestead's Privacy, Information Security, Fair Lending and Pricing Policies. The Loan Originator is responsible for communicating with applicants throughout the entire loan production process from origination through processing, underwriting, closing and (if necessary) post-closing of the originated transaction.

The Loan Originator will assist in facilitating the resolution of issues that may arise throughout the entire loan production process. Such assistance may include, but is not limited to, such tasks as the correction or collection of documents necessary to make the loan suitable for sale in the secondary market. The Loan Originator is also responsible for keeping up-to-date with changes in existing loan products and internal lending procedures; the introduction of new loan products and new mortgage lending procedures; and keeping current with the changing regulatory environment affecting the mortgage industry. Attendance at sales meetings, when scheduled, is mandatory.

The contents of this Employment Agreement and Loan Originator Compensation Plan, as supplemented with the details contained within an employment offer letter, job description or other written document, if such a letter, description or document was provided, shall constitute the entire understanding existing between the parties, and there are no other promises, understandings or agreements existing between the parties, unless provided for in writing outside of this agreement.

Ver. 01-01-2019                                    initials _____    _____
                                                    Loan Orig    HFC

The Loan Originator hereby states and affirms that he/she is already licensed as a loan originator in the jurisdictions in which he/she will originate loans; or if not, that he/she has accurately informed Homestead of his/her licensing status and will expeditiously obtain all necessary licenses prior to discussing loan terms or performing any other origination duties with a borrower in all jurisdictions in which he/she will originate loans, and will not originate any loans until and unless the appropriate license is obtained. In the event that any occurrence causes the Loan Originator to have his/her license threatened to be suspended or revoked, the Loan Originator agrees to immediately notify Homestead. Under no circumstances shall a Loan Originator originate a loan in any jurisdiction unless he/she is licensed in that jurisdiction. Any violation of this paragraph is grounds for immediate termination.

Homestead Funding Corp.

By:

By:

Andrew Aiello
Loan Originator

Jeffrey N. Mason
Authorized Representative

Initials:

Loan Orig

HFC

## SCHEDULE C

## ADDENDUM TO EMPLOYMENT AGREEMENT
### Regarding Existence of Restrictive Covenants from a
### Prior Employer Employment Agreement

### Please sign Section(s) A, B and C as applicable to you

The undersigned hereby acknowledges the execution of an Employment Agreement (hereinafter "Agreement") with Homestead Funding Corp. (hereinafter "Homestead") commencing an employment relationship with Homestead. The Agreement contains several understandings and covenants made with Homestead that the employment relationship is predicated upon.

Set forth below are three different provisions relating to the status of a Loan Originator as this Employment Agreement is signed, which are mutually exclusive. If a Loan Originator is not subject to any restrictive covenants emanating out of any previous employment agreement with a prior employer, Section A applies. In this case, please sign at the end of Section A affirming that you are not presently bound by any restrictive covenant arising out of any previous employment agreement. If a Loan Originator is bound by restrictive covenants emanating out of a previous employment agreement with a prior employer, (other than 1st Priority Mortgage, Inc. which is hereinafter referred to as 1st Priority"), Section B applies. In this case, please sign at the end of Section B affirming that you are subject to restrictive covenants arising out of a previous employment agreement and that you agree to fully comply with these restrictive covenants. Finally, if you were previously an employee of 1st Priority, and you are bound by the terms of restrictive covenants from your employment agreement with 1st Priority, please sign Section C.

### Section A - Undersigned Not Bound by Restrictive Covenants

The undersigned states that he/she is not bound under the terms of a previous employment agreement with his/her prior employer, and that there are no restrictive covenants that apply to the undersigned.

This Addendum shall be incorporated by reference into the Employment Agreement and made a part thereof and the undersigned agrees to be bound by the terms of this Addendum.

IN WITNESS WHEREOF, the parties hereto cause this Addendum to Employment Agreement to be duly executed and delivered as of the date of the Employment Agreement.

By:                                                By:          Homestead Funding Corp.

Andrew Aiello                                      Jeffrey N. Mason
Loan Originator                                    Authorized Representative

Ver. 01-01-2019                                    Initials    Loan Orig          HFC

## Section B - Undersigned Bound by Restrictive Covenants

The undersigned states that he/she is bound under the terms of a previous employment agreement with his/her previous employer, which included restrictive covenants that were by their terms intended to survive the termination of employment with this previous employer. As a condition of employment at Homestead, the undersigned agrees that he/she will comply with all legally enforceable provisions of the previous employment agreement for so long as those terms remain in effect.

This Addendum shall be incorporated by reference into the Employment Agreement and made a part thereof and the undersigned agrees to be bound by the terms of this Addendum.

IN WITNESS WHEREOF, the parties hereto cause this Addendum to Employment Agreement to be duly executed and delivered as of the date of the Employment Agreement.

Homestead Funding Corp.

By: _____    By: _____

Andrew Aiello                          Jeffrey N. Mason
Loan Originator                        Authorized Representative

## Section C - Undersigned Was Previously Employed by 1st Priority and Is Bound by Restrictive Covenants

This Addendum is applicable to the undersigned because of the previous employment with 1st Priority, which is a mortgage lender that competes with Homestead. This Addendum is made a part of your new employment package with Homestead. Homestead wants to emphasize to you that your employment agreement with 1st Priority contains certain restrictive covenants that by their terms survive the termination of employment at 1st Priority and would, if enforceable, affect what you may do while the restrictive covenants remain in effect.

Homestead anticipates that you will comply with these provisions of your previous employment agreement. It should be noted that Homestead is taking no position regarding the validity or enforceability of these provisions as written, and instead recommends that you seek the advice of independent legal counsel in the event you have any questions regarding these covenants.

Homestead Funding Corp.

By: _____    By: _____

Andrew Aiello                          Jeffrey N. Mason
Loan Originator                        Authorized Representative

Initials [Loan Orig]    [HFC]

Ver. 01-01-2019

**STATE OF NEW YORK**
**SUPREME COURT**          **ALBANY COUNTY**

_____

**HOMESTEAD FUNDING CORP.**

**Plaintiff,**

   **–against–**                                    **SUPPORTING AFFIDAVIT**
                                                          **Index No.  904554-22**

**FAIRWAY INDEPENDENT MORTGAGE**
**CORPORATION**

**Defendant.**

_____

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss: |
| COUNTY OF ALBANY | ) |

Michael G. Rutherford, being duly sworn, deposes and says:

    1.    That I am the President of Homestead Funding Corp., (sometimes hereinafter referred to herein as Plaintiff or "Homestead"), in the above-entitled action and as such am fully familiar with the facts surrounding this matter.

    2.    I make this Affidavit in support of Homestead's application for temporary injunctive relief in the form of a temporary restraining order and after a hearing herein, for a preliminary injunction pursuant to CPLR 6301 and 6311 restraining, enjoining and prohibiting Defendant Fairway Independent Mortgage Corporation (hereinafter "Fairway") from the following actions: (1) Tortiously interfering with the employment agreements signed by Homestead's loan originators by approaching, soliciting, initiating communication with or

otherwise seeking to encourage a discussion with a current Homestead employee about going to work for Fairway or any affiliates thereof and/or taking any other steps in furtherance of encouraging or soliciting Homestead employees to breach their employment agreements in order to work for Fairway or any affiliate thereof; and (2) Seeking to induce Homestead loan originators to breach their employment agreements with Homestead in any other manner.

3.     Homestead is a licensed mortgage bank which has been operating since 1994 in the upstate region of New York, and now operates in most of the states throughout the United States.

4.     Fairway is a mortgage lender domiciled in the State of Wisconsin that is, upon information and belief, seeking to develop a larger market presence in the greater Capital District by seeking to raid loan originators from other established mortgage lenders. The nature of Fairway's mortgage business operations would make it a direct competitor with Homestead.

5.     Upon information and belief, sometime in early May 2022 Fairway began to contact Homestead employees, to solicit and recruit them to come to work for Fairway.

6.     A text message was sent by Fairway in May of 2022 to Maureen Ginter Grabowski, Peter Tull, Eric Johnson, Patrick Wolf, (who are all loan originators at Homestead), and possibly other Homestead loan originators that I am not aware of, seeking to initiate communication with these Homestead loan originators ostensibly about terminating their employment with Homestead and coming to work for Fairway.

7.     The text message sent by Fairway employee Christopher Lowis falsely claimed that he "heard a rumor that a group from [Homestead] is thinking about a change", implying Homestead loan originators were thinking about leaving Homestead's employ, and seeking to determine if the loan originator was "keeping their options open". A copy of this text message is attached hereto and made a part hereof as Exhibit A.

8.     The text message sent by Fairway was inaccurate and untrue when sent, to such an extent that it was a misrepresentation of relevant circumstances existing at Homestead as of that time and constituted the use of "wrongful means" on the part of Fairway.

9.     No Homestead retail loan originator, as of the date of the text message, had recently left Homestead and to the best of my knowledge and belief, no retail loan originator was contemplating leaving Homestead's employ in the immediate future as of the date the text message was sent, yet this is exactly what the text message alluded to.

10.     Upon information and belief, this text message sent by Fairway was specifically designed to instill a sense of fear and uncertainty as to the stability of Homestead on the part of the recipients, which included numerous Homestead loan originators, who are all signatories to an employment agreement for a set term with Homestead.

11.     I want to underscore this point for the benefit of the Court: every Homestead loan originator signs an employment agreement for a definite term, so that any attempt by Fairway to deliberately induce a Homestead loan originator to breach his or her employment agreement to work for Fairway would, if successful, constitute tortious interference with contract.

12.     Upon information and belief, there were other recruiting efforts undertaken by representatives of Fairway regarding Homestead loan originators that I am not aware of, in addition to the text message attached as Exhibit A, including telephone calls made to Homestead loan originators and other text messages sent to Homestead loan originators.

13.     In an effort to notify Fairway that all Homestead loan originators are subject to an employment agreement for a definite term and to discourage Fairway from continuing its ongoing recruiting efforts, Homestead sent a Cease-and-Desist Letter on May 19, 2022, by UPS overnight mail, which letter is attached hereto and made a part hereof as Exhibit B. A copy of the delivery

receipt for the UPS overnight envelope containing the Cease-and-Desist Letter is attached hereto and made a part hereof as Exhibit C.

14. This Cease-and Desist Letter makes clear that any recruiting efforts directed towards Homestead loan originators who have signed employment agreements for a set term with Homestead (which includes all of Homestead's loan originators) would, if successful in procuring a breach, constitute tortious interference with contract and that Homestead would take appropriate action to protect its legitimate business interests against such raiding of its loan originators by Fairway.

15. Subsequent to the receipt of the Cease-and-Desist Letter by Fairway, a member of the legal department of Fairway reached out to Justin M. Rutherford, Esq., Homestead's Vice President, Business and Legal Affairs (hereinafter "Attorney Rutherford") and the author of the Cease-and-Desist Letter, to discuss the contents of the letter.

16. During this telephone conversation, as related in Attorney Rutherford's accompanying Attorney Affirmation, Attorney Rutherford reiterated to Fairway's legal representative that all Homestead loan originators had signed employment agreements with Homestead for a definite term, and therefore intentional efforts by Fairway and its employees and agents directed at inducing Homestead loan originators to breach their employment agreements and commence employment with Fairway would, if successful, constitute the tort of tortious interference with contract under applicable New York State law.

17. Notwithstanding Fairway's full awareness that all Homestead loan originators were subject to employment agreements for a definite term, Fairway continued its intentional and improper efforts to procure a breach of these employment agreements by Homestead loan originators

18. Upon information and belief, and in contravention of Homestead's Cease-and-Desist letter, on June 10, 2022, Fairway prepared and sent a "conditional offer of employment" to Andrew Aiello (hereinafter "Aiello"), a seasoned loan originator who possesses twelve (12) years of institutional knowledge and experience working as a loan originator at Homestead. Aiello was one of Homestead's top loan originators at Homestead, customarily producing around $40,000,000.00 in closed mortgage volume over the course of the most recent years. Attached hereto and made a part hereof as Exhibit D is the "conditional offer of employment" that Fairway sent to Aiello.

19. As the Court will note from a review of Aiello's Employment Agreement with Homestead attached as Exhibit E, he is subject to an employment agreement for a definite duration, which Fairway was made aware of based on the previous communication sent to Fairway by Homestead attached as Exhibit B. This Employment Agreement has a one-year term of duration, although either party could terminate the Employment Agreement upon 60 days' prior written notice.

20. As a result of his years of experience and training as a loan originator, Aiello possesses unique and specialized skills, and is a highly compensated employee, earning more than $500,000.00 a year in commissions over the course of the last two years at Homestead.

21. Based on the terms of the "conditional offer of employment" offered to Mr. Aiello by Fairway (discussed in greater detail below), Fairway offered a significant bonus ($500,000.00) to Mr. Aiello if he is able to develop a branch office that can produce $200,000,000.00 in mortgage volume in the first two years of his employment with Fairway.

22. This offer clearly incentivizes Mr. Aiello to recruit loan originators, and the ones he knows the best are the ones he worked with at Homestead for the last twelve years, which

underscores the irreparable harm Homestead will suffer and the need for a temporary restraining order and preliminary injunction to protect its legitimate business interest.

23. There are many aspects of this "conditional offer of employment" that are troubling. Foremost among them is that Fairway, with a clear understanding that Aiello was subject to an enforceable employment agreement for a definite term, nonetheless offered Aiello $600,000.00 as a signing bonus payable in the first two months of his employment with Fairway as an incentive to breach his employment agreement with Homestead and came to work for Fairway.

24. This "conditional offer of employment" also provides, as mentioned above, an additional production bonus of $500,000.00 to Aiello if his "branch" produces over $200,000,000.00 in closed mortgage volume in the first two years of his employment with Fairway.

25. As noted above, this production bonus could only be achieved if Aiello were to recruit other loan originators to come to work for Fairway under him in his capacity as branch manager. Given his twelve years with Homestead, Aiello's contacts in the mortgage business are largely other Homestead loan originators, and they would constitute the likely source of candidates to recruit for his branch.

26. On June 14th, 2022, Aiello tendered his resignation, seeking to terminate his employment agreement with Homestead immediately, in violation of the 60-day termination clause contained in his employment agreement.

27. Aiello's termination of his employment with Homestead has resulted in significant damages for Homestead, the full extent of which is difficult, if not impossible to calculate.

28. However, incalculable damage would occur to Homestead if Fairway were able to exploit Aiello's defection to Fairway to induce more Homestead loan originators to breach their

respective employment agreements, in furtherance of Fairway's attempt to raid Homestead's sales force in service of establishing a larger presence in the Capital Region market.

29.     On the morning of June 15th, 2022, the day after Aiello terminated his employment, he sent a text message to many of his former colleagues at Homestead, including, upon information and belief, some Homestead loan originators whom Aiello knew were bound by employment agreements for a set term, announcing his decision to terminate his employment agreement with Homestead and go to work for Fairway

30.     Having known and worked with Aiello for the twelve years since Aiello joined Homestead, I received many texts from Aiello, and I know his writing style. The text that was sent on June 15th, 2022, was not consistent with Aiello's style of writing, and instead, appeared to have been crafted by someone at Fairway. I posit that Fairway intended to use the text message as a vehicle for soliciting Homestead loan originators to reach out to Aiello and initiate a conversation about coming to work for Fairway, constituting a violation of a restrictive covenant contained in his employment agreement, which prohibits Aiello from soliciting Homestead employees to work for a competitor.

31.     Shortly after Aiello's text message was sent to some of his fellow Homestead colleagues, including, upon information and belief, some of Homestead's loan originators on June 15th, 2022, Attorney Rutherford sent a letter to Aiello by email to Aiello's personal email account advising Aiello of some of the key provisions of his employment agreement with Homestead. Aiello's employment agreement was still in force and effect, including the prohibition on soliciting Homestead employees to come to work for a competitor. A copy of this letter to Aiello dated June 15th, 2022, is attached hereto and made a part hereof as Exhibit F.

32. Receipt of the email containing Attorney Rutherford's letter by Aiello was acknowledged by Aiello when he immediately responded to request a copy of his employment agreement, which was promptly forwarded to him by Kelly Sanford, Homestead's Director of Legal Operations. Attached hereto and made a part hereof as Exhibit G is Aiello's email following his receipt of Attorney Rutherford's letter requesting a copy of his employment agreement.

33. Later that same day (June 15th, 2022), Attorney Rutherford also sent a letter to Fairway accompanied by a copy of Aiello's employment agreement with Homestead, advising Fairway of some of the salient provisions contained in this agreement. A copy of this letter is attached hereto and made a part hereof as Exhibit H.

34. Upon information and belief, on June 16th, 2022, despite being notified multiple times that all Homestead loan originators had signed an employment agreement with Homestead for a set term, Fairway sent text messages to some of Aiello's former colleagues at Homestead, including some of its loan originators announcing that Aiello had "made a move to Fairway." The text message from Fairway continued by saying: "We are enthusiastic and humble about our growth in the region and would love to share with you why Fairway can be a great fit for you too my friend! Please let me know if your [sic] open to doing a zoom call and we can catch up!" A copy of this text message is attached hereto and made a part hereof as Exhibit I.

35. This text was sent to many of Homestead's loan originators by Fairway and confirms Fairway's intentional and improper efforts to raid Homestead's loan originators to come to work for Fairway by exploiting Aiello's breach of his employment agreement, which was likewise procured as a direct result of the intentional and improper actions of Fairway to induce a breach by Aiello of his employment agreement with Homestead.

36.     As the Court can see from the litany of intentional and improper actions taken by Fairway described above, irreparable harm was and is being suffered by Homestead as a result of the actions of Fairway, including in inducing Mr. Aiello to come to work for Fairway

37.     Upon information and belief, these deliberate efforts by Fairway, interfering with the contractual relationship that Homestead has with Aiello, were the direct cause for Aiello to terminate his employment with Homestead, breaching the terms of his employment agreement.

38.     Fairway compounded its tortious conduct in its further intentional and improper efforts to induce other Homestead loan originators to similarly breach their employment agreements following Aiello's termination of his employment agreement, by seeking to exploit Aiello's defection through solicitations, first in the form of Aiello's initial text, followed soon thereafter by the text from Fairway attached as Exhibit I, and its intentional and improper efforts to procure breaches of contracts by other Homestead loan originators is continuing to this day.

39.     On or about July 12th, 2022, LouAnn Daprato ("Daprato"), another Homestead loan originator, notified Homestead that she was terminating her employment agreement with Homestead and going to work for Fairway, and gave her 60-day notice to terminate, confirming Fairway's efforts to raid Homestead's sales force.

40.     Your deponent has since learned that after Daprato gave her notice terminating her employment with Homestead, (stating she was intending to start employment at Fairway), there was apparently a change in plans, either because of some issue that arose in Fairway's vetting process of Daprato or due to a change of heart on Daprato's part. She is now listed on the NMLS as working for Movement Mortgage, LLC.

41.     Following Daprato's notification of termination, Homestead began an investigation of Daprato's actions immediately prior to her providing Homestead with her 60 days' notice to terminate her employment agreement.

42.     This investigation of Daprato's actions revealed that Daprato had misappropriated portions of Homestead's confidential customer list, and surreptitiously forwarded the names and contact information of Homestead borrowers and potential borrowers to her personal email address, in violation of her duty of utmost loyalty she owed as an employee to her employer. Copies of some of these emails sent by Daprato to her personal email address are collectively attached hereto and made a part hereof as Exhibit J.

43.     The misappropriation and exfiltration by Daprato of Homestead's confidential and proprietary information including trade secrets in the days leading up to her giving her notice constitutes a breach of her employment agreement as well as a breach of her duty of utmost loyalty owed to Homestead as her employer.

44.     Upon information and belief based on this investigation by Homestead, it appears as though Daprato's efforts to misappropriate and exfiltrate to her own personal email address Homestead's confidential customer list and other confidential and proprietary information including trade secrets while Daprato was employed by Homestead was encouraged, aided and abetted by representatives of Fairway.

45.     Upon information and belief, based on Homestead's investigation to date, Fairway is aiding and abetting Aiello and Daprato in the various actions they have taken in direct violation of the covenants contained in their respective employment agreements, along with the misappropriation and exfiltration of Homestead's confidential and proprietary information by Daprato.

46.     Fairway's efforts to induce Homestead loan originators who are subject to an employment agreement for a definite term to breach their employment agreements and come to work for Fairway continues unabated, even up to texts sent to loan originators as recently as July 25th. A copy of one such text is attached hereto and made a part hereof as Exhibit K.

47.     In light of the foregoing, your deponent seeks to have an immediate temporary restraining order granted by the Court, at the Court's earliest opportunity, which would hopefully be supplanted by a preliminary injunction following a hearing, restraining, enjoining and prohibiting Fairway and its employees and agents from inducing or attempting to induce, directly or indirectly, any employee or other representative or associate of Homestead bound by an employment agreement to come to work for Fairway or to terminate a contractual relationship with Homestead, or in any way, directly or indirectly, interfere with such relationship or a relationship between Homestead and any of its employees that are parties to an employment agreement for a set term, which includes all Homestead loan originators.

48.     Your deponent respectfully submits that the Plaintiff has demonstrated a likelihood of ultimate success on the merits in this action against Fairway under the facts present here.

49.     Your deponent states that Homestead has presented to the Court in this Affidavit evidence of a pattern of behavior by Fairway towards Homestead loan originators which constitutes sharp and unfair business practices, including sending text messages that contained false information intending to mislead Homestead loan originators who are parties to an employment agreement for a definite term, in an effort to induce these loan originators to breach their employment agreements with Homestead.

50.     Upon information and belief, Homestead loan originators are being actively recruited by Fairway, and offered positions with Fairway, and in some cases, being offered

significant signing bonuses and other incentives if they were to come to work for Fairway, even though Fairway is well aware that all of these Homestead loan originators are subject to an employment agreement for a definite term and the breach of these employment agreements would constitute the tort of tortious interference with contract.

51.     Your deponent submits that based on its actions, Fairway simply does not care that its efforts to induce a breach of an employment agreement for a set term by Homestead loan originators constitutes a tort, if it is successful and results in a breach by a Homestead loan originator.

52.     An illustration of the foregoing sharp and unfair business practice is evident from a review of the "conditional offer of employment" attached as Exhibit D, in that it offers Aiello, after documented notification that he is bound by an employment agreement for a definite term, a signing bonus of $600,000.00, if he breached his employment agreement with Homestead and came to work for Fairway.

53.     As further evidence of the sharp and unfair business practices of Fairway, the "conditional offer of employment" provides for an additional bonus of $500,000.00 to Aiello if he recruits other loan originators and their collective mortgage volume exceeds $200,000,000.00.

54.     Based on the significant incentives built into the "conditional offer of employment" to grow a branch and recruit other loan originators to work for Fairway, Homestead anticipates that Aiello will seek to induce other Homestead loan originators similarly bound by employment agreements for a definite term with Homestead to breach their employment agreements.

55.     Your deponent does not presently know the extent of Aiello's involvement in inducing Daprato to breach her employment agreement, but it is clear that both he and Fairway

made a conspicuous and noisy effort to exploit Aiello's migration to Fairway to recruit other Homestead loan originators to defect and go to work for Fairway.

56.     Balancing the equities in this case, the grant of the requested injunctive relief would preserve the status quo and protect Homestead, which would otherwise be irreparably damaged; while not granting the requested relief would permit Fairway to benefit from its tortious conduct and unscrupulous corporate behavior, which your deponent submits would not be consistent with equitable principles. The balance of equities weighs heavily in favor of granting the requested preliminary injunctive relief to protect Homestead during the pendency of this action.

57.     If Fairway is not prevented from continuing its predatory corporate behavior through the grant of preliminary injunctive relief, Homestead will suffer incalculable damages and irreparable harm.

58.     No prior request for the same or similar relief has been made by the Plaintiff to this or any other Court of competent jurisdiction.

59.     The Plaintiff possesses clean hands, and under the circumstances, is not guilty of laches, and your deponent submits is clearly entitled to the grant of equitable relief in the form of a temporary restraining order under the facts present here, and hopefully, a preliminary injunction following the hearing.

60.     Your deponent recognizes that an undertaking will be required for a preliminary injunction and is prepared to comply with the Court's directives in this regard.

61.     The Plaintiff has and is suffering irreparable injury as a result of the tortious actions by Fairway, and it has no adequate remedy at law.

62.     That based on all of the foregoing, your deponent prays for the immediate injunctive relief required to prevent irreparable harm during the intervening period prior to the

hearing on the preliminary injunction through the grant of a temporary restraining order maintaining the status quo.

63.     That based on all of the foregoing, your deponent further prays for the Court to grant a preliminary injunction following a hearing in this matter to prevent irreparable harm from occurring during the pendency of this action.

WHEREFORE, your deponent respectfully requests that the relief requested in the Order to Show Cause be granted by the Court, along with such other, further and different relief as the Court deems just, equitable and proper.

Michael G. Rutherford

Sworn to before me this
9th day of August, 2022.

Notary Public

KELLY A. SANFORD
Notary Public, State of New York
Registration No. 01SA6398130
Qualified in Schenectady County
Commission Expires 09/23/2023

Exhibit A



**(401) 662-05...**
Mobile

Hi Maureen

Chris Lowis with Fairway Mortgage here, hope you are well and had a great 2020 all things considered... Curious if you're keeping your options open in 2021?

We opened an office in Rochester this summer as well as Saratoga, and coming soon in White Plains... Let's catch up soon!

Tuesday 10:54 AM

Hi Maureen, heard a rumor that a group from your company is thinking about a change and was curious if you were keeping your options open?

Tuesday 12:10 PM

No but thank you reaching

Exhibit B



**LEGAL AFFAIRS**

8 Airline Drive • Albany, NY 12205
Office (518) 464-1100 • Fax (518) 464-1141

May 19, 2022

To:     Fairway Independent Mortgage Corporation ("Fairway")
        Attn: General Counsel/Legal Department

Re:     Employment Solicitation/Tortious Interference with Contract

To Whom It May Concern:

Please be advised that I am corporate counsel for Homestead Funding Corp. ("Homestead"). My office has been provided with documentation regarding the recruiting and solicitation efforts of Chris Lowis, Business Development for Fairway toward Homestead employees including Loan Originators and/or Branch Managers (see attached screenshots). This letter is advising you to cease all such communications and recruitment efforts or risk legal action.

Please allow this communication to serve as formal notice that all of Homestead's Loan Originators and Branch Managers are covered by an employment agreement for a set term. Therefore, continued attempts to solicit any of these Homestead employees with employment opportunities at Fairway would constitute tortious interference with contract.

To the extent that all Loan Originators and Branch Managers are signatories of such employment agreements, you are hereby advised to CEASE AND DESIST ANY FURTHER SOLICITATION EFFORTS IN VIOLATION OF THESE CONTRACTUAL RIGHTS. Such notice is given with a full reservation of rights to prosecute any prior or future torts.

Additionally, the dishonest and subversive tactics employed by Mr. Lowis to imply that there is a factual basis to believe that Homestead employees are considering leaving the organization, and thus the target of the solicitation should consider the same, is a bad faith tactic that violates even the minimum standard of business ethics.

Any future attempt by you or any representatives or agents acting on behalf of Fairway to recruit a Homestead Loan Originator or Branch Manager by any means, electronic, telephonic or otherwise, will be construed by Homestead as an act of tortious interference with the employment agreement and would be actionable in an appropriate legal proceeding.

Any recruitment efforts by Fairway will cause Homestead to suffer irreparable damages and Homestead intends, in this event, to seek appropriate redress through the courts for these solicitation efforts in violation of the contractual rights that are in place including, if the circumstances warrant it, seeking immediate injunctive relief restraining and enjoining further tortious actions by Fairway as well as to seek appropriate money damages.

Please confirm your intention to comply with this demand within ten (10) days of receipt of this communication. Should evidence of such conduct continue, Homestead will not hesitate to initiate legal action. I would encourage you to contact my office if you have any questions or concerns regarding this correspondence.

Best,

Justin M. Rutherford, Esq., LL.M.
Vice President, Business & Legal Affairs
Homestead Funding Corporation

Exhibit C

# · Proof of Delivery

Dear Customer,

This notice serves as proof of delivery for the shipment listed below.

**Tracking Number**

1ZX054800195261339

**Weight**

0.10 LBS

**Service**

UPS Next Day Air®

**Shipped / Billed On**

05/19/2022

**Delivered On**

05/20/2022 9:40 A.M.

**Delivered To**

4750 S BILTMORE LN
MADISON, WI, 53718, US

**Received By**

SABRIN



**Left At**

Dock

**Reference Number(s)**

JM RUTHERFORD, 110

Thank you for giving us this opportunity to serve you. Details are only available for shipments delivered within the last 120 days. Please print for your records if you require this information after 120 days.

Sincerely,

UPS

Tracking results provided by UPS: 07/27/2022 2:29 P.M. EST

Exhibit D



June 10, 2022

Andrew Aiello

## Re: Conditional Offer of Employment

Dear Andrew:

On behalf of Fairway Independent Mortgage Corporation ("Fairway"), I am pleased to present you a conditional offer of employment for the position of Producing Branch Manager (Branch TBD) with a start date ofJune 13, 2022 . This is a full-time position, with the expectation that you will work 40 hours per week. In your position, you will perform duties and responsibilities that are reasonable and consistent with such position and as may be assigned to you from time to time. You will report to Susan Howe. You agree to devote your full business time, attention, and best efforts to the performance of your duties and the furtherance of Fairway's interests.

In consideration for your services, you will receive a salary at the minimum salary requirement in effect in your state of employment; except where the federal, state, and local laws have different minimum salary rates, then the highest minimum salary rate applies so long as you remain employed, payable in accordance with Fairway's standard payroll practices and subject to all withholdings and deductions as required by law.

This position is an exempt position, meaning you will not be paid overtime. Your compensation will be outlined in your Producing Branch Manager Compensation Plan. Your general compensation will be as follows:

Within your first 30 days of employment, you shall meet with Fairway's Legal and Compliance Departments to discuss loan originator compensation options and licensing regulations, in addition to any other questions you may have.

- o You will receive a sign-on bonus in the amount of **$600,000.00**, which will not be offset by Total Compensation. The sign-on bonus will be paid in two (2) installments of $300,000.00, with the first installment payable on the first regularly scheduled pay period of your employment with Fairway and the second installment payable on the first regularly scheduled pay period of your second full calendar month of employment, so long as you are employed on each payroll date in which the sign-on bonus is scheduled to be paid. *In the event you voluntarily terminate employment or are terminated, with or without cause, within twenty-four (24) months of receiving the sign-on bonus, you will be obligated to repay a pro-rated portion of the sign-on*

*bonus to Fairway. Specifically, the sign-on bonus will be reduced by one-twelfth (1/24) for each month you remain employed after receiving the sign-on bonus (i.e., if you remain employed for twelve (12) months, you will be obligated to repay twelve (12) months, or one-half (1/2), of the sign-on bonus. As permitted by applicable law, the applicable sum will be withheld from your final paycheck; any overage of the applicable repayment amount will be due to Fairway within thirty (30) calendar days.*

- You will receive **100 bps** multiplied by the loan amount of each self-generated closed-end loan and **50 bps** multiplied by the loan amount of each company-generated closed-end loan you personally originate.
- You will receive **50 bps** multiplied by the loan amount of each brokered loan you personally originate.
- You will receive **50%** of Branch Revenue for each reverse open-end loan you personally originate. Branch Revenue is the difference between (a) a consumer's price and the branch price, as determined by Fairway and (b) non-third party fees paid by a consumer that are not required to be collected by Fairway or you as non-compensable revenue, including, but not limited to, origination fees; (c) less a $995 per loan administration fee (for exempt reverse mortgage loans only).
- You will receive **50%** of Branch Revenue for each non-reverse open-end loan you personally originate. Branch Revenue is the difference between (a) a consumer's price and the branch price, as determined by Fairway and (b) non-third party fees paid by a consumer that are not required to be collected by Fairway or you as non-compensable revenue, including, but not limited to, origination fees; (c) less a $995 per loan administration fee (for exempt reverse mortgage loans only).

- You will receive a one-time **volume bonus** in the amount of **$500,000.00** if your Branch closes and funds a minimum of $200 million during your first two (2) years (based on hire date) of employment with Fairway. This bonus will be paid out in two (2) installments over two (2) months, $250.000.00 per month. Second liens, employee loans, company-generated loans, open-end reverse loans, HELOCs, brokered loans, and construction loans, are excluded from the performance bonus. You must be employed by Fairway for the entire bonus period or the bonus is forfeited. No pro-rated or partial bonus payments will be made in the event you leave employment, whether voluntarily or involuntarily, prior to the end of the bonus period.

During employment and for twelve (12) months following termination of employment for any reason, whether voluntary or involuntary, you shall not, directly or indirectly, whether on behalf of yourself or for any other person or entity, solicit, recruit, or promote the solicitation or recruitment of any current Fairway employee or consultant in order to encourage such employee or consultant to leave Fairway's employ or sever an agreement for services. By signing this conditional offer of employment, you agree that the restrictions outlined herein are reasonable in length of time and scope, necessary to protect Fairway's legitimate business interests and confidential information, and will not hinder your ability to find employment without violating such restrictions. This non-solicitation provision will also be outlined in your compensation plan upon commencing employment with Fairway.

This conditional offer of employment is contingent upon satisfactory completion of a background investigation; verification of employment; completion of an application and other required employment forms; the completion of an employment agreement/compensation plan, if applicable; verification of your right to work in the United States, as demonstrated by your completion of Form I-9 **on your first day of hire** and your submission of acceptable documentation (as noted on the Form I-9; a list of acceptable documents is also noted on the U.S. Citizenship and Immigration Services' website*) verifying your identity and work authorization **within three (3) days** of starting employment; and all other forms and requirements of Fairway. Additionally, this conditional offer of employment is contingent upon the understanding that you fully disclose any and all secondary employment/business activities, ownership stake/involvement, including domestic partner/spousal ownership stake/involvement, and outside, industry-related licenses, including, but not limited to, real estate, insurance, and securities licenses. Failure to disclose such secondary employment, ownership stake, or licenses prior to accepting employment with Fairway may cancel further consideration of your employment and constitutes sufficient grounds to terminate your employment whenever it is discovered. Moreover, if you wish to hold secondary employment, engage in outside business activities, hold ownership stake/involvement, including domestic partner/spousal ownership stake/involvement, or obtain an industry-related license after becoming employed with Fairway, you must first contact Fairway's Legal Department to ensure there is no conflict of interest. This offer may be withdrawn if any of the conditions above are not satisfied.

This position meets the definition of a "mortgage loan originator" under the Secure and Fair Enforcement for Mortgage Licensing (SAFE) Act of 2008. As such, you are required to obtain and/or transfer an active state mortgage license to sponsorship with Fairway in at least one state where you do business within thirty (30) calendar days of hire, which must include your home/branch state. Under no circumstances will you be allowed to work as a mortgage loan originator without obtaining the required state license and timely completing your continued education requirements. If your license is not obtained or transferred (as approved by the state) within the thirty (30) day timeframe, your employment may be terminated.

Fairway offers its employees a competitive benefits package. Your coverage under Fairway's benefit programs begins on the first day of the month following or coinciding with your 30th day of employment, if you elect to participate. If you are a PTO-eligible employee, the amount of paid time off you are eligible for is outlined in the Employee Handbook. The benefit plans offered may be changed from time to time at Fairway's sole discretion.

Your employment with Fairway is "at will," meaning either you or Fairway may terminate your employment at any time and for any reason, with or without cause, or advance notice. Nothing in this conditional offer of employment, nor any other communication by a Fairway representative or any other employee, whether written or oral, is intended in any

way to create a contract of employment, unless specifically approved in writing by a member of Fairway's Executive Committee with a chief officer title. Any contrary representations are superseded by this conditional offer of employment.

Upon employment, you will be subject to all applicable employment rules and other policies of Fairway, as outlined in the Employee Handbook and elsewhere. The terms, conditions, and duties of your employment are within Fairway's sole and absolute discretion and may be modified at any time as Fairway deems necessary to the operation of its business.

This conditional offer of employment may not be amended or modified except by express written agreement signed by you and a duly authorized representative of Fairway.

By accepting this conditional offer of employment, you confirm that you are able to accept this job and carry out the work involved without breaching any legal restrictions on your activities, such as restrictions imposed by a current or former employer. You also confirm that you will inform Fairway about any such restrictions and provide Fairway with as much information about such restrictions as possible, including copies of any agreements between you and your current or former employer describing such restrictions on your activities.

You further confirm that you will not remove or copy any documents or proprietary data or materials of any kind, electronic or otherwise, from your current or former employer to Fairway without written authorization from your current or former employer, not will you use or disclose any such confidential information during the course and scope of your employment with Fairway. If you have any questions about the ownership of particular documents or other information, discuss such questions with your current or former employer before removing or copying the documents or information.

Andrew, we are excited about the prospect of you joining Fairway and hope you will accept this conditional offer of employment. If you have any questions, please call me at +1 (469) 217-8919.

Sincerely,
Brie Litz
Compensation and Offers Specialist Team Lead

*If you accept the terms and conditions of this conditional offer of employment, please sign below and return within three (3) business days from the date of this letter. If you do not sign and return this letter within three (3) business days, it will be deemed withdrawn.*

I accept this conditional offer of employment as described above:

Name: Andrew Aiello

DocuSign Envelope ID: 47790A7E-1320-4B44-A77A-95C1BED54D18

Signature:

Today's date:


*The Form I-9 list of acceptable documents can be found on the U.S. Citizenship and Immigration Services' website at: https://www.uscis.gov/i-9-central/acceptable-documents*

Exhibit E



# HOMESTEAD
## FUNDING CORP.

**Loan Originator Employment Agreement**
**And Associated Documents**

This booklet explains the essential and universal components of the Homestead Funding Corp. (hereinafter "Homestead") Loan Originator Compensation Plan for Loan Originators. This Employment Agreement may be supplemented and modified by the terms of an employment offer letter, job description or other written document outlining the employment terms, if such a letter job description or other written document is provided to the Loan Originator. If an employment offer letter, job description or other written document outlining the employment terms was provided to the Loan Originator, it will be incorporated herein by reference and is thereby made a material part of this Employment Agreement, to be read together with and reconciled with the language of the Employment Agreement, to the extent possible.

The purpose of this Loan Originator Employment Agreement is to provide a comprehensive, universal and consistent employment relationship for all Homestead Loan Originators. It is hoped that this will serve as the foundation for all legal understandings between Homestead and the Loan Originator.

For the purposes of this entire Agreement, "Loan Originator" applies to all Loan Originators, regardless of whether they are considered Outside Sales or Inside Sales. In cases where there is differentiation between Outside Loan Originators and Inside Loan Originators, they will be referred to thusly.

**HOMESTEAD FUNDING CORP. IS AN**
**EQUAL OPPORTUNITY EMPLOYER**

Initials

Loan Org.

HFC

# TABLE OF CONTENTS

<u>Page 1</u>        EMPLOYMENT AGREEMENT

**APPENDIX**

<u>SCHEDULE A</u>:    LOAN ORIGINATOR COMPENSATION PLAN

<u>SCHEDULE B</u>:    LOAN ORIGINATOR RESPONSIBILITIES

<u>SCHEDULE C</u>:    ADDENDUM TO EMPLOYMENT AGREEMENT

Ver. 01-01-2019

Initials

Loan Orig.

HFC

## EMPLOYMENT AGREEMENT

THIS AGREEMENT (hereinafter referred to as "Employment Agreement") made and entered into as of 1/1/2019 by and between Homestead Funding Corp., (hereinafter "Homestead"), with a principal place of business at 8 Airline Drive, Albany, NY and Andrew Aiello residing at 2 Towline Lane Clifton Park NY 12065 (hereinafter "Loan Originator").

### WITNESSETH:

WHEREAS, Homestead is duly licensed in the State of New York and various other states as a mortgage banker and as a mortgage broker to originate, service and sell residential mortgage loans and desires to retain the services of Loan Originator to originate residential mortgage loans on behalf of Homestead; and

WHEREAS, the Loan Originator desires to be employed by Homestead in the capacity of a Loan Originator and to originate residential mortgage loans on behalf of Homestead in accordance with the provisions of this Employment Agreement;

NOW, THEREFORE, and in consideration of the promises and mutual covenants hereinafter contained, and other good and valuable consideration, it is mutually agreed by and between the parties as follows:

1. <u>Loan Programs</u>. Homestead agrees to make available to the Loan Originator all current loan programs and mortgage products available to the particular department or branch in which the Loan Originator is employed. It is understood that Homestead's various departments and branches may provide different mortgage programs and products to offer to its customers, and only the programs and products available to the Loan Originator's specific department or branch will be available to him/her, as the same may change from time to time. Homestead agrees to assist the Loan Originator in his/her work by providing advice and instruction from Homestead management, which seeks to provide its full cooperation to help facilitate the Loan Originator's success.

2. <u>Exclusive Best Efforts to Homestead</u>. Loan Originator agrees to work diligently and utilizing his/her best efforts to originate residential mortgage loans solely on behalf of Homestead, and agrees that during the term of this Agreement, he/she will work exclusively for Homestead.

3. <u>Conduct</u>. Loan Originator and Homestead each agree to conduct their business and regulate their habits and working hours so as to maintain and to increase the good will, business, profits and reputation of both Homestead and Loan Originator. The parties agree to conform to and abide by all laws, rules, regulations, and code of ethics that are binding on, or applicable to, Mortgage Bankers and Mortgage Brokers (when a loan is taken as a brokered product), in all jurisdictions in which Homestead originates loans. It is expressly understood that the Loan Originator shall guard, at all times, against even the appearance of impropriety or the perpetration of fraud, forgery or misrepresentation by the Loan Originator or others. The Loan Originator agrees to promote and enhance Homestead's reputation and standing within the local community in general as well as within the local mortgage community by serving the public in mortgage loan transactions, to the end that each of the parties may derive the greatest possible benefit through repeat customers and strong referral business.

Initials

Loan Orig

HFC

4. Regulatory Compliance. It is expressly understood and agreed that both Homestead and the Loan Originator are subject to regulation by the governing regulatory agencies of all states in which Homestead is authorized to originate mortgage loans as well as the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development, the Veterans Affairs Administration, the Consumer Finance Protection Bureau ("CFPB"), the Federal Reserve Board, Federal Trade Commission and other regulatory oversight agencies. Loan Originator agrees to be governed by all applicable statutes and implementing rules and regulations promulgated by these agencies affecting his/her duties as a Loan Originator for Homestead.

5. Compensation Plan Attached. The terms of the Loan Originator Compensation Plan are attached to this Employment Agreement as Schedule A which is expressly made a part hereof and are subject to change at any time with or without notice to the Loan Originator at the sole discretion of Homestead. The goal of the Plan is to maximize the productivity, quality and volume of mortgage originations produced by Homestead's sales force through a compensation program that encourages the Loan Originator to increase his/her sales, productivity and overall quality of originated loans.

6. Duration of Agreement. This Employment Agreement shall be valid and effective for a set term of one-year, subject to the provisions of Section 10 herein. This Employment Agreement will be automatically renewed for five additional one-year terms.

7. Membership Dues. Loan Originator shall pay his/her own expenses and dues for membership in professional organizations, unless otherwise specifically agreed in writing by the parties.

8. No Authority. Loan Originator acknowledges and agrees that he/she has no authority to enter into agreements on behalf of Homestead of any kind or nature; all agreements to which Homestead is to be a party must be reviewed by Homestead upper management and signed by an authorized Homestead officer in order to be valid and effective. Loan Originator may not hold himself/herself out to vendors, landlords or others as possessing any actual or apparent authority to enter into agreements on behalf of Homestead or otherwise legally bind Homestead to the terms of any agreements or other documents.

9. Proprietary Rights. It is expressly agreed by the parties, as a material part of this Employment Agreement, that all loan applications taken, appraisals, credit reports, correspondence received, copies of all correspondence written, plans, memoranda, files, photos, reports, confidential customer lists, legal opinions, accounting information, mortgage pricing systems and pricing information, sales and marketing plans, strategies and practices, Homestead's training manual and training procedures, and any and all other instruments, documents or information of any nature whatsoever concerning loan transactions handled by Homestead or by Loan Originator or jointly are and shall remain the sole and exclusive property of Homestead, and the Loan Originator acknowledges that he/she has no proprietary right to any of the foregoing.

10. Nature of Employment Relationship. Both parties agree that Loan Originator will be employed by Homestead for the duration of this Employment Agreement, starting with the effective date of this Agreement and continuing for a one-year term. Either party may, however, terminate this Employment Agreement upon providing the other party 60-days advance notice in writing of their intention to terminate the Employment Agreement for any reason. This

Initials _____ Loan Orig.    _____ HFC

Employment Agreement will be automatically renewed for five additional one-year terms unless either party provides the other with 60-days advance written notice of their intention not to renew the Employment Agreement. The parties may, however, shorten or lengthen the time period from the date notice is given to date of actual termination by mutual agreement, so long as it is put in writing and signed by both parties.

It is specifically agreed between the parties hereto that the Loan Originator will receive his/her commissions in accordance with this Employment Agreement for the 60-day period following the date written notice of either party's intent to terminate this agreement is delivered to the other party, (unless otherwise agreed to by the parties in writing at the time), provided the Loan Originator abides by the relevant terms of this Employment Agreement during the termination transition and assists, as may be requested by Homestead, with facilitating the processing and closing of his/her pipeline of mortgage loans. Compensation paid to the Loan Originator during the above referenced 60-day notice period will be limited to his/her commission only. Commissions for loans that close after the expiration of the 60-day notice period are not payable to the Loan Originator.

Homestead shall have the right to immediately terminate the Employment Agreement for reasonable cause, however, at any time. Reasonable cause, as used in this Employment Agreement, shall mean what is often referred to in labor employment settings as "just cause" and would include (merely as illustrations, but not intended to be an exhaustive or comprehensive list), the following situations or conditions:

> a) Evidence that the Loan Originator has knowledge of, participated in, or otherwise engaged in collusive activities with a borrower, appraiser, Realtor or others towards the submittal of a fraudulent loan or any aspect of a fraudulent loan application;
>
> b) The breach of the Loan Originator's fiduciary duty of loyalty and utmost fidelity to Homestead as his/her employer;
>
> c) An instance of gross dereliction of duties by the Loan Originator in any respect;
>
> d) An unintentional material violation on the part of the Loan Originator to follow regulatory compliance mandates exposing Homestead to regulatory oversight consequences, (whether or not the act or omission was known by the Loan Originator to be a material violation, as the Loan Originator is expected to be fully conversant with all applicable regulatory compliance mandates and comply with them) and/or an intentional violation, (whether material or not);
>
> e) With regard to the following forms: Application for Employment; Background Investigation Consent Form; Employment Screening Form; and the Annual Background Certification Form, any information provided by the Loan Originator that is found to be false, intentionally incomplete or misrepresented in any respect, will be sufficient cause to immediately discharge the Loan Originator from Homestead's service, whenever it is discovered. In addition, certain criminal convictions will prohibit the Loan Originator from employment in the field of mortgage banking. These convictions vary from state-to- state. Other criminal convictions, which do not automatically bar the Loan Originator from employment in the field of mortgage banking and/or information submitted about the Loan Originator by a consumer

Initials [signature] / [initials]
Loan Orig.        HFC

reporting agency or by former employers or others, will be evaluated on a case-by-case basis by Homestead. If Homestead deems, in its sole discretion, that the other criminal conviction(s) and/or information provided by the Loan Originator's former employers or by a consumer reporting agency or others is such that he/she is not suited for a position with Homestead, the Loan Originator's employment will be subject to immediate termination;

f) other similar instances of misconduct, including a violation of Homestead company policies and/or the provisions of the Homestead Employment Policy Handbook.

11. Oral Commitments. Homestead has made no oral commitments to the Loan Originator outside of this Employment Agreement. No one at Homestead is authorized to make oral commitments regarding employment – either now or in the future.

12. Fiduciary Obligation. During his/her employment, Loan Originator shall use his/her best efforts solely to advance the interests of Homestead. In this regard, Loan Originator commits to exercise his/her best good faith efforts in the performance of his/her loan originator responsibilities, which requires a strict fiduciary obligation of loyalty to Homestead as his/her employer. Loan Originator agrees that he/she will not be associated with any other commercial or business duties or pursuits without first obtaining the written approval of Homestead management. The Loan Originator acknowledges that he/she must sign a HUD Prohibited Outside Employment Policy Statement. Any employment (which term shall include acting as an officer, employee, independent contractor, consultant or in any other capacity whatsoever) or ownership interest in another employer in either the mortgage lending or real estate industry or in any other related field is strictly prohibited under any circumstances and will constitute grounds for immediate termination of the Loan Originator under this Employment Agreement. If the Loan Originator obtains prior written approval from Homestead management for non-prohibited outside employment, such employment must not interfere or conflict with the interests of Homestead. Further, such employment must not adversely affect the quality or quantity of work performed for Homestead as might result from undue fatigue or in placing employment with Homestead secondary to outside employment.

13. Class, Collective and Multi-Party Action Waiver. Loan Originator further waives and gives up any right to become a participant in any class, collective or multi-party action against Homestead. As part of this waiver, Loan Originator promises not to join or consent to join or participate in any case against Homestead asserting class, collective or multi-party claims against Homestead that are related in any way to Loan Originator's employment or the termination of Loan Originator's employment with Homestead. If, without Loan Originator's prior knowledge and consent, Loan Originator is made a member of a class in any proceeding, Loan Originator agrees to opt out of the class at the first opportunity to do so. This waiver applies to all claims arising out of Loan Originator's employment or termination from employment including claims brought under federal or state wage laws, federal or state laws against discrimination or any other claim against Homestead.

14. Indemnification. Loan Originator hereby agrees to indemnify and hold Homestead, its shareholders, directors, officers, managers, successors and assigns, harmless against any and all claims, liabilities and obligations, of every kind and description, including reasonable attorney fees and court costs arising out of or related to: (a) any failure by the Loan Originator to duly perform or strictly observe any term, provision, covenant, or condition contained herein; and (b) the breach

Initials _____
Loan Orig

HFC

of any other term, provision, covenant, condition or promise set forth herein. This indemnification and hold harmless agreement does not extend to any recovery against a Loan Originator related to loans originated by a Loan Originator or lawsuits commenced against Homestead as a result of the acts or omissions of a Loan Originator.

15. Confidentiality. Loan Originator acknowledges that, during his/her employment with Homestead, he/she may come into possession of confidential and proprietary information of Homestead, including trade secrets, (all of which are referred to in this Agreement as "Proprietary Information"), which includes, among other things, information about:

      a) Existing or planned business ventures, acquisitions, mergers, or initiatives, if treated as secret by Homestead;

      b) All of Homestead's accounting and business information, including documents addressing its financial condition and net worth, or the results of any external or internal audits;

      c) Details regarding Homestead's method of pricing mortgage loans, which is agreed to be unique and proprietary, which is and will always be kept secret by Homestead;

      d) Homestead's and/or its affiliates' business, mortgage marketing and/or solicitation strategies / techniques, if treated as secret by Homestead and/or its affiliates;

      e) A Borrower's non-public personal information;

      f) Proposals designed to meet borrower's needs or requirements if it involves confidential information;

      g) The resolution of a particular borrower's problems, if it involves confidential information of the borrower;

      h) The names of and other details concerning Homestead's customers, including any confidential customer lists of Homestead, including present or former borrowers of Homestead;

      i) The resumes of and other information concerning officers, managers, loan originators, employees, agents, or contractors who are or may be employed by Homestead, under any terms, to meet the needs of Homestead's borrowers.

      j) Both parties to this Employment Agreement acknowledge and agree that the above Proprietary Information is kept secret by Homestead and is protected by Homestead as secret in order to satisfy the "trade secret" threshold recognized by the courts.

Loan Originator acknowledges that the foregoing types of Proprietary Information are only illustrative of some of the kinds of highly confidential information that he/she may become aware of during his/her employment with Homestead, and the foregoing list is not meant to be a complete and exhaustive compilation of all of the types of confidential information Loan Originator may have the opportunity to obtain while in the employ of Homestead. Loan Originator also acknowledges that much of the above information constitutes a trade secret of Homestead; that it

is a valuable resource of Homestead that was developed by Homestead through the investments of significant managerial effort and the expenditures of considerable sums of money, and is consistently reviewed, improved and refined by Homestead, and is unique and proprietary to Homestead and treated as such at all times. These trade secrets provide a competitive advantage to Homestead and would not be easily obtained or duplicated by others who have not been able to acquire such information other than through employment with Homestead.

16. Non-Disclosure. As a consequence of the above and in consideration for his/her employment, Loan Originator agrees that, unless he/she first obtains the prior written consent of Homestead, he/she shall not communicate, disclose, release, take, transfer or give (either directly or indirectly) to any person or firm, or use at any time, (either during or subsequent to his/her employment with Homestead), any of Homestead's Proprietary Information to which he/she has access during his/her employment with Homestead, whether or not such information was developed or obtained by Loan Originator, except insofar as Loan Originator may, where authorized and approved, use such information in the furtherance of his/her employment duties with Homestead. Loan Originator shall retain all such information in strict confidence for the sole benefit of Homestead, and shall surrender, to Homestead, all loan applications, confidential customer lists, documents, papers, data bases, etc., containing any of such Proprietary Information or trade secrets upon the termination of employment with Homestead, including all such information contained in any electronic format. The parties acknowledge and agree that the disclosure or unauthorized use of any of the above described Proprietary Information and trade secrets would cause irreparable harm to Homestead and the parties acknowledge that immediate injunctive relief, including a temporary restraining order and a preliminary injunction, restraining the use and/or disclosure of such information is necessary and appropriate, and the Loan Originator states that he/she understands that such equitable relief will be sought by Homestead and agrees that the grant of such relief is consistent with the unique and proprietary nature of this information and its importance to Homestead.

17. Non-Solicitation. Likewise, Loan Originator further agrees, as a material part of this Employment Agreement, and in consideration for his/her employment by Homestead, that during his/her employment with Homestead, or for one year following the termination of such employment, Loan Originator will not approach, solicit, initiate or otherwise seek or encourage a discussion with a present Homestead loan originator, manager and/or employee about going to work for another mortgage lender, mortgage banker or mortgage broker, or take any other steps in furtherance of encouraging or soliciting a present Homestead loan originator, manager and/or employee to go to work for any other mortgage lender, mortgage banker or mortgage broker. The parties acknowledge and agree that any solicitation of Homestead loan originators, managers and/or employees to go to work for any other competing mortgage lender, mortgage banker or mortgage broker would cause irreparable harm to Homestead and the parties acknowledge that immediate injunctive relief, including a temporary restraining order and a preliminary injunction, restraining such solicitation is necessary and appropriate.

18. Information Security. Loan Originator hereby acknowledges that he/she has received a copy of Homestead's comprehensive written information security plan or policy (hereinafter "WISP"). Loan Originator further acknowledges and agrees that he/she must comply with the provisions of the WISP and that any non-conforming use of personal information during or after employment is prohibited; and further that mandatory disciplinary action will be taken for violations of the security provisions of the WISP, pursuant to the discipline policy described in the Homestead Employment Policy Handbook.

Initials [signature] Loan Orig          [initials] HFC

Personal Information, as used in this Employment Agreement, shall include, (merely as illustrations, but not intended to be an exhaustive or comprehensive list), the following information: A Homestead customer or consumer's first name and last name or first initial and last name in combination with one or more of the following data elements that relate to such customer or consumer:

a) Social Security Number;
b) Driver's License Number;
c) State-Issued Identification Card Number;
d) Financial Account Number;
e) Credit Card Number; or
f) Debit Card Number.

Personal Information does not include information that is lawfully obtained from publicly available information or from federal, state or local government records lawfully made available to the general public.

19. Licensing is Mandatory. The Loan Originator hereby states and affirms that he/she is already licensed as a loan originator in the jurisdictions in which he/she will originate loans; or if not, that he/she has accurately informed Homestead of his/her licensing status and will expeditiously obtain all necessary licenses prior to discussing loan terms or performing any other origination duties with a borrower in all jurisdictions in which he/she will originate loans and will not originate loans until and unless the appropriate license is obtained. In the event that any occurrence causes the Loan Originator to have his/her license threatened to be suspended or revoked, the Loan Originator agrees to immediately notify Homestead. Under no circumstances shall a Loan Originator originate a loan in any jurisdiction unless he/she is licensed in that jurisdiction. Any violation of this paragraph is grounds for immediate termination.

20. Mandatory Mediation/Arbitration. Any disputes arising out of or relating to this Employment Agreement, the LO's employment with Homestead or termination from employment (hereinafter "Dispute") shall be resolved exclusively by mandatory mediation under the rules of the American Arbitration Association. In the event that any Dispute cannot be fully resolved through mediation, the parties agree that the Dispute shall then be exclusively resolved by final and binding arbitration on an individual basis before one neutral arbitrator through the rules of the American Arbitration Association. Any type of class; collective claims; or multi-party claims are expressly prohibited, and the arbitrator will have no authority to alter the parties' agreement in this regard. Any such arbitration shall be held in the county in which the Loan Originator last worked unless otherwise stipulated by the parties and pursuant to the Model Rules for Arbitration of Employment Disputes of the American Arbitration Association ("AAA") then in effect.

The parties voluntarily and irrevocably waive any and all rights to have any Dispute heard or resolved in any forum other than through arbitration. This waiver specifically includes, but is not limited to, a jury trial. This does not limit the right of either party to apply to a court of competent jurisdiction for any provisional remedy pending the completion of arbitration consistent with applicable law. In any arbitration held pursuant to this Agreement, Employer shall bear all fees and costs unique to arbitration, including the Arbitrator's fee. Each party shall pay for its own attorneys' fees and costs, if any. However, the Arbitrator may award reasonable attorneys' fees to the prevailing party in accordance with this Agreement or applicable law. The parties shall be

Initials [signature] Loan Orig   [signature] HFC

entitled to any remedy which would have been available in court. Any award of the arbitrator shall be in writing. Either party may bring an action in any court of competent jurisdiction to compel arbitration under this Agreement and / or to enforce an arbitration award. If, in any action to enforce this Agreement, a court of competent jurisdiction rules that any portion of the parties' agreement to arbitrate is not enforceable, then the parties agree that such provision be severed, and the remainder of the Employment Agreement be enforced. Nothing herein prevents the Loan Originator from filing a charge with an administrative agency including but not limited to the NLRB or the EEOC.

21. Controlling Law. This Employment Agreement shall be governed by the applicable laws of the state in which such Loan Originator is employed and Loan Originator consents to the personal jurisdiction of any court in a state in which Homestead is conducting business, including, specifically, New York State, for the determination of any questions of interpretation or enforcement of any provision of this Employment Agreement.

22. Severability. In case any one or more of the provisions hereof shall be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Employment Agreement, (or its collateral agreements), but this agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

23. Survival of Covenants. All representations, warranties, covenants, and agreements of the parties hereto shall survive the termination of this Employment Agreement and the termination of employment of the Loan Originator.

24. Amendment. This Employment Agreement may not be amended orally. It may only be amended by way of a writing designated as an amendment to this agreement that is executed by the parties hereto.

25. Entire Agreement. This Employment Agreement supersedes any previous written or oral agreements, understandings or representations existing between the parties. There are no promises, understandings or agreements except as set forth expressly in writing in the Loan Originator Employment Agreement and Associated Documents. The parties expressly understand and agree that the Introduction, Employment Offer Letter, (if any), and Loan Originator Compensation Plan attached as Schedule A are incorporated by reference herein. However, in the event of a conflict between any provisions of these documents, the terms and conditions of the Employment Agreement and Loan Originator Compensation Plan attached as Schedule A shall control.

26. Full Knowledge. Loan Originator expressly warrants and represents to Homestead that before executing this Employment Agreement he/she was fully informed of the terms, contents, conditions and effect of this Employment Agreement; that the Loan Originator has relied solely on his/her own judgment in executing this Employment Agreement; and that he/she has had the opportunity to seek and obtain the advice of legal counsel before entering into this Agreement.

27. Interpretation. No provision in this Agreement shall be interpreted for or against any party because that party or that party's legal representative drafted the provision.

28. Headings. The headings used in this Employment Agreement are for the convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Employment Agreement.

Initials  Loan Orig        HFC

29. Counterparts. This Agreement may be executed in two counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

30. Job Description. This Employment Agreement may be immediately terminated at the option of Homestead in the event that any statute, regulation or judicial decision results in a determination by Homestead that the duties and obligations of Homestead's Loan Originators do not qualify for the applicable Exemption. (This paragraph applies exclusively to Outside Sales Loan Originators).

31. Situs. This Employment Agreement shall be construed in accordance with the laws of the State of New York, except as provided for herein to the contrary herein or if contrary to applicable law. The parties consent to jurisdiction and venue of all matters arising out of the interpretation or enforcement of this Employment Agreement being vested exclusively in Albany County Supreme Court, in the State of New York.

IN WITNESS WHEREOF, the parties hereto cause this Employment Agreement to be duly executed and delivered as of the day and year first above written.

Homestead Funding Corp.

By:

By:

Andrew Aiello
Loan Originator

Jeffrey N. Mason
Authorized Representative

Initials

Loan Orig

HFC

<u>SCHEDULE A</u>

## Loan Originator Compensation Plan ("Plan")

Applies to all loans locked on or after January 1, 2019

[See attached Plan]

Initials

Loan Orig

HFC

## SCHEDULE B
## LOAN ORIGINATOR RESPONSIBILITIES

The Loan Originator will be responsible for complying with the specific requirements, duties and responsibilities of the loan originator position, as the same may be modified or supplemented by Homestead over the course of the employment; which includes obtaining all necessary licenses to originate loans in all of the jurisdictions in which they originate loans and properly maintaining these licenses (once obtained) at all times they are employees of Homestead This also includes compliance with Homestead's Employment Policy Handbook, Homestead's Exclusive Employment Policy, Homestead's Pricing Policy, Homestead's Fair Lending Policy, Homestead's Privacy Policy, Homestead's Information Security Policy and other mandates as may be adopted by Homestead from time-to- time. This obligation also includes compliance with all relevant and applicable statutes and regulations governing the mortgage industry including satisfactorily meeting the legal and regulatory requirements applying to the origination of mortgage loans by loan originators, including the Truth in Lending Act ("TILA"), Regulation Z and HOEPA; Equal Credit Opportunity Act ("ECOA") and Regulation B; Real Estate Settlement Procedures Act ("RESPA") and Regulation X; the Fair Credit Reporting Act, ("FCRA") as amended and supplemented by the Fair and Accurate Credit Transactions Act ("FACTA"); the Gramm-Leach-Bliley Act ("GLBA"); the Telemarketing and Consumer Fraud and Abuse Prevention Act and the Telemarketing Sales Rule; the Home Mortgage Disclosure Act ("HMDA") and Regulation C; the Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE") as well as all other Fair Lending laws that may be applicable including those which are not, as of this time, enacted or effective but which will become effective during the course of this Employment Agreement; the U.S. Patriots' Act of 2001, as it may be extended and modified; and any other federal, state or local laws and regulations pertaining to or restricting predatory, high-cost or abusive lending; and all other similar federal, state or local laws and regulations as may be in effect at this time, or as they may be amended from time-to-time. Consistent with the foregoing obligations, Loan Originators are forbidden from offering or receiving any "thing of value" for the referral of mortgage loans (RESPA Section 8) or from accepting any form of compensation or gratuities such as game tickets or other perks from any borrower (Reg. Z Prohibition on Dual Compensation).

The Outside Loan Originator's duties include marketing and promoting themselves to potential borrowers, (both purchase and refinance) directly, and also to real estate agents, accountants, lawyers, financial planners, builders, bank personnel, etc., (who all constitute a referral source of potential borrowers for Loan Originators and are hereinafter described herein as "Referral Sources"). The foregoing duties involve meeting with borrowers in their homes, real estate brokers' offices, banks, builders' offices and other public places, to persuade the borrower that the loan products offered by Homestead would be the best alternative for the borrower and that he/she would be the best loan originator to take and oversee the mortgage loan application. The Loan Originator's duties would also include calling on the Referral Sources both in person at their places of business, restaurants and/or other public places; as well as by telephone, email, direct mail, marketing brochures, and the use of Homestead approved internet social media, etc.

Outside Loan Originators are free to determine independently how they wish to arrange their work schedule, how to schedule their loan applicant interviews and applications, what means and efforts they choose to market themselves and promote their outside sales business and all other facets of their outside sales positions and sales efforts.

Initials

Loan Orig

HFC

The Inside Loan Originator will work at an assigned Homestead office, under the direct supervision of his / her manager, originating investment quality residential mortgage loans (Bankered; Brokered; FHA; VA; RHS; Conventional; Jumbo; Reverse; Second) by prospecting and following up on Company provided leads via phone in a timely manner. Company provided leads are obtained from Internet sources, direct mail campaigns, referrals or other special marketing campaigns. All Company provided leads are owned by Homestead and the Inside Loan Originator acknowledges they are the proprietary information of Homestead and agrees to only utilize those leads and related information during employment with Homestead.

Should the Inside Loan Originator wish to develop his / her own loan referral sources they may, with the prior approval of management in Albany NY, also undertake the following activities normally associated with outside sales: directly marketing and promoting themselves to potential borrowers (both purchase and refinance), and also to real estate agents, accountants, lawyers, financial planners, builders, bank personnel, etc., (who all constitute a referral source of potential borrowers for loan originators engaged in outside sales activities and are hereinafter referred to as "Referral Sources"). The foregoing loan origination duties involve meeting with borrowers in their homes, real estate brokers' offices, bank branches, builders' offices and other public places, to persuade the borrower that the loan products offered by Homestead would be the best alternative for the borrower and that he / she would be the best loan originator to take and oversee the mortgage loan application. The loan originator's duties would also include calling on the Referral Sources both in person at their places of business, restaurants and/or other public places; as well as by telephone, email, direct mail, marketing brochures, and the use of Homestead approved Internet marketing efforts, Social Media, etc.

Once the Loan Originator has sold the borrower on using him/her and Homestead for their mortgage, the Loan Originator's duties also include obtaining the necessary financial information from the borrowers, the accurate completion of residential mortgage loan applications, and counseling borrowers to identify the loan product(s) that best meet the borrowers' needs. The Loan Originator's marketing and promotion of themselves, solicitation of loan applications and the negotiation of loan terms must be performed in a manner consistent with Homestead's Privacy, Information Security, Fair Lending and Pricing Policies. The Loan Originator is responsible for communicating with applicants throughout the entire loan production process from origination through processing, underwriting, closing and (if necessary) post-closing of the originated transaction.

The Loan Originator will assist in facilitating the resolution of issues that may arise throughout the entire loan production process. Such assistance may include, but is not limited to, such tasks as the correction or collection of documents necessary to make the loan suitable for sale in the secondary market. The Loan Originator is also responsible for keeping up-to-date with changes in existing loan products and internal lending procedures; the introduction of new loan products and new mortgage lending procedures; and keeping current with the changing regulatory environment affecting the mortgage industry. Attendance at sales meetings, when scheduled, is mandatory.

The contents of this Employment Agreement and Loan Originator Compensation Plan, as supplemented with the details contained within an employment offer letter, job description or other written document, if such a letter, description or document was provided, shall constitute the entire understanding existing between the parties, and there are no other promises, understandings or agreements existing between the parties, unless provided for in writing outside of this agreement.

The Loan Originator hereby states and affirms that he/she is already licensed as a loan originator in the jurisdictions in which he/she will originate loans; or if not, that he/she has accurately informed Homestead of his/her licensing status and will expeditiously obtain all necessary licenses prior to discussing loan terms or performing any other origination duties with a borrower in all jurisdictions in which he/she will originate loans, and will not originate any loans until and unless the appropriate license is obtained. In the event that any occurrence causes the Loan Originator to have his/her license threatened to be suspended or revoked, the Loan Originator agrees to immediately notify Homestead. Under no circumstances shall a Loan Originator originate a loan in any jurisdiction unless he/she is licensed in that jurisdiction. Any violation of this paragraph is grounds for immediate termination.

Homestead Funding Corp.

By:

Andrew Aiello
Loan Originator

By:

Jeffrey N. Mason
Authorized Representative

Initials

Loan Orig    HFC

## SCHEDULE C

### ADDENDUM TO EMPLOYMENT AGREEMENT
Regarding Existence of Restrictive Covenants from a
Prior Employer Employment Agreement

### Please sign Section(s) A, B and C as applicable to you

The undersigned hereby acknowledges the execution of an Employment Agreement (hereinafter "Agreement") with Homestead Funding Corp. (hereinafter "Homestead") commencing an employment relationship with Homestead. The Agreement contains several understandings and covenants made with Homestead that the employment relationship is predicated upon.

Set forth below are three different provisions relating to the status of a Loan Originator as this Employment Agreement is signed, which are mutually exclusive. If a Loan Originator is not subject to any restrictive covenants emanating out of any previous employment agreement with a prior employer, Section A applies. In this case, please sign at the end of Section A affirming that you are not presently bound by any restrictive covenant arising out of any previous employment agreement. If a Loan Originator is bound by restrictive covenants emanating out of a previous employment agreement with a prior employer, (other than 1st Priority Mortgage, Inc. which is hereinafter referred to as 1st Priority"), Section B applies. In this case, please sign at the end of Section B affirming that you are subject to restrictive covenants arising out of a previous employment agreement and that you agree to fully comply with these restrictive covenants. Finally, if you were previously an employee of 1st Priority, and you are bound by the terms of restrictive covenants from your employment agreement with 1st Priority, please sign Section C.

### Section A - Undersigned Not Bound by Restrictive Covenants

The undersigned states that he/she is not bound under the terms of a previous employment agreement with his/her prior employer, and that there are no restrictive covenants that apply to the undersigned.

This Addendum shall be incorporated by reference into the Employment Agreement and made a part thereof and the undersigned agrees to be bound by the terms of this Addendum.

IN WITNESS WHEREOF, the parties hereto cause this Addendum to Employment Agreement to be duly executed and delivered as of the date of the Employment Agreement.

By: _____

Andrew Aiello
Loan Originator

By: Homestead Funding Corp.

_____

Jeffrey N. Mason
Authorized Representative

Initials: Loan Orig / HFC

Ver. 01-01-2019

## Section B - Undersigned Bound by Restrictive Covenants

The undersigned states that he/she is bound under the terms of a previous employment agreement with his/her previous employer, which included restrictive covenants that were by their terms intended to survive the termination of employment with this previous employer. As a condition of employment at Homestead, the undersigned agrees that he/she will comply with all legally enforceable provisions of the previous employment agreement for so long as those terms remain in effect.

This Addendum shall be incorporated by reference into the Employment Agreement and made a part thereof and the undersigned agrees to be bound by the terms of this Addendum.

IN WITNESS WHEREOF, the parties hereto cause this Addendum to Employment Agreement to be duly executed and delivered as of the date of the Employment Agreement.

By: _____

Andrew Aiello
Loan Originator

Homestead Funding Corp.

By: _____

Jeffrey N. Mason
Authorized Representative

## Section C - Undersigned Was Previously Employed by 1st Priority and Is Bound by Restrictive Covenants

This Addendum is applicable to the undersigned because of the previous employment with 1st Priority, which is a mortgage lender that competes with Homestead. This Addendum is made a part of your new employment package with Homestead. Homestead wants to emphasize to you that your employment agreement with 1st Priority contains certain restrictive covenants that by their terms survive the termination of employment at 1st Priority and would, if enforceable, affect what you may do while the restrictive covenants remain in effect.

Homestead anticipates that you will comply with these provisions of your previous employment agreement. It should be noted that Homestead is taking no position regarding the validity or enforceability of these provisions as written, and instead recommends that you seek the advice of independent legal counsel in the event you have any questions regarding these covenants.

By: _____

Andrew Aiello
Loan Originator

Homestead Funding Corp.

By: _____

Jeffrey N. Mason
Authorized Representative

Initials _____   _____
            Loan Orig.   HFC

Ver. 01-01-2019

Exhibit F

| From: | Kelly Sanford on behalf of Justin Rutherford |
|---|---|
| Sent: | Wednesday, June 15, 2022 11:47 AM |
| To: | aiellodrew@gmail.com |
| Cc: | Legal |
| Subject: | Letter on behalf of Justin M. Rutherford, General Counsel |

Dear Drew,

As you are aware, I am corporate counsel to Homestead Funding Corp. ("Homestead"). If you are represented by counsel in this matter, please forward this communication to your attorney and advise my office of such representation.

I have been informed of your email to Michael Rutherford, Peter Tull, Daniela Bigalli and Tony Felitte indicating your intention to resign your position with Homestead, effective immediately. I am writing to outline the organization's position on your responsibilities under your employment agreement (the "Agreement") and encourage you to abide by such terms in your transition to your new employer. Failure to comply with these requirements exposes you to the risk of litigation and other legal consequences as a result of your actions.

Most critically, you have agreed under the terms of the Agreement, specifically Paragraph 10- Nature of Employment Relationship, that any voluntary termination of the Agreement requires 60-days' notice to either party. It is Homestead's expectation that you will abide by this notice requirement and remain in the employ of Homestead for the next 60 days prior to your formal termination. Should you seek to violate this requirement, the organization will seek injunctive relief to prevent this breach of your Agreement.

Additionally, Paragraph 17- Non-Solicitation specifically prohibits any attempts on your part to "approach, solicit, initiate or otherwise seek or encourage a discussion with a present Homestead loan originator, manager and/or employee about going to work for another mortgage lender, mortgage banker, or mortgage broker" for a period of one (1) year after termination."

However, as all Homestead loan originators are employed under an employment agreement for a set term, any solicitation or other recruiting activity of loan originators, even after the one-year term of the covenant not to solicit contained in your employment agreement, would constitute tortious interference with contract. This conduct would expose you to legal consequences if such loan originators are solicited while they are under contract, regardless of the timing requirements of this paragraph.

During this 60-day period and after your termination, I would call your attention to the following responsibilities, many of which will remain enforceable after you are no longer employed with the organization:

Paragraph 2- Exclusive Best Efforts to Homestead. You are required during the 60-day notice period to continue to utilize your best efforts to work diligently *solely* on behalf of Homestead. Additionally, you will work *exclusively* for Homestead. Any attempts to steer loans or speak to customers on behalf of Fairway would constitute a material breach of the Agreement.

1

Paragraph 3- Conduct. You are required, in such a way, to "maintain and to increase the good will, business, profits and reputation of" Homestead. Additionally, you have agreed to "promote and enhance Homestead's reputation and standing within the local community". Any discussions regarding or promotions of Fairway to Homestead's detriment during this time, to present or former customers, realtors or other referral sources, or any disparagement of Homestead, would constitute a material breach of the Agreement.

Paragraph 9- Proprietary Rights. Please be advised that "all loan applications taken, appraisals, credit reports, correspondence received, copies of all correspondence written, plans, memoranda, files, photos, reports, confidential customer lists, legal opinions, accounting information, mortgage pricing systems and pricing information, sales and marketing plans, strategies and practices, Homestead's training manual and training procedures, and any and all other instruments, documents or information of any nature whatsoever concerning loan transactions handled by Homestead or by Loan Originator or jointly are and shall remain the sole and exclusive property of Homestead". This provision would survive your termination. Removing, sharing or otherwise misappropriating any of this information for use at Fairway would constitute a material breach of the Agreement.

Paragraph 12- Fiduciary Obligation. During the 60-day notice period, you are required to abide by this paragraph, specifically that you "shall use [your] best efforts solely to advance the interests of Homestead. In this regard, Loan Originator commits to exercise [your] best good faith efforts in the performance of [your] loan originator responsibilities, which requires a strict fiduciary obligation of loyalty to Homestead as [your] employer. Loan Originator agrees that [you] will not be associated with any other commercial or business duties or pursuits without first obtaining the written approval of Homestead management". A violation of this provision would constitute a material breach of the Agreement.

Paragraph 15/16- Confidentiality/Disclosure. Similar to the responsibilities contained in Paragraph 9, you have come into knowledge and possibly possession of Confidential Information during the course of your employment. Misappropriation of this information, which includes, but is not limited to, customer lists and customer data or other proprietary information of Homestead constitutes a material breach of the Agreement.

As a final note, under Paragraph 14- Indemnification, any breach of this Agreement would expose you to the provisions of this paragraph, including holding Homestead harmless and indemnifying Homestead for damages arising out of such breach. This would include reasonable attorney's fees and other costs.

Please let me know if you or your attorney has any questions regarding this correspondence. I would encourage you to abide by the requirements set forth above to avoid any unnecessary legal action and minimize the difficulty of the termination process.

Justin M. Rutherford, Esq., LL.M.
Vice President, Business & Legal Affairs
Homestead Funding Corp. (NMLS 3232)
8 Airline Drive
Albany, New York 12205
Direct: 518.407.3010





3

Exhibit G

Can you send me the agreement that I signed please?

Drew Aiello
518-573-2435
Private Fax: 518-486-8034

> On Jun 15, 2022, at 11:46 AM, Justin Rutherford <jrutherford@homesteadfunding.com> wrote:

Dear Drew,

As you are aware, I am corporate counsel to Homestead Funding Corp. ("Homestead"). If you are represented by counsel in this matter, please forward this communication to your attorney and advise my office of such representation.

I have been informed of your email to Michael Rutherford, Peter Tull, Daniela Bigalli and Tony Felitte indicating your intention to resign your position with Homestead, effective immediately. I am writing to outline the organization's position on your responsibilities under your employment agreement (the "Agreement") and encourage you to abide by such terms in your transition to your new employer. Failure to comply with these requirements exposes you to the risk of litigation and other legal consequences as a result of your actions.

Most critically, you have agreed under the terms of the Agreement, specifically Paragraph 10- Nature of Employment Relationship, that any voluntary termination of the Agreement requires 60-days' notice to either party. It is Homestead's expectation that you will abide by this notice requirement and remain in the employ of Homestead for the next 60 days prior to your formal termination. Should you seek to violate this requirement, the organization will seek injunctive relief to prevent this breach of your Agreement.

Additionally, Paragraph 17- Non-Solicitation specifically prohibits any attempts on your part to "approach, solicit, initiate or otherwise seek or encourage a discussion with a present Homestead loan originator, manager and/or employee about going to work for another mortgage lender, mortgage banker, or mortgage broker" for a period of one (1) year after termination."

However, as all Homestead loan originators are employed under an employment agreement for a set term, any solicitation or other recruiting activity of loan originators, even after the one-year term of the covenant not to solicit contained in your employment agreement, would constitute tortious interference with contract. This

1

conduct would expose you to legal consequences if such loan originators are solicited while they are under contract, regardless of the timing requirements of this paragraph.

During this 60-day period and after your termination, I would call your attention to the following responsibilities, many of which will remain enforceable after you are no longer employed with the organization:

Paragraph 2- <u>Exclusive Best Efforts to Homestead</u>.  You are required during the 60-day notice period to continue to utilize your best efforts to work diligently *solely* on behalf of Homestead.  Additionally, you will work *exclusively* for Homestead.  Any attempts to steer loans or speak to customers on behalf of Fairway would constitute a material breach of the Agreement.

Paragraph 3- <u>Conduct</u>.  You are required, in such a way, to "maintain and to increase the good will, business, profits and reputation of" Homestead.  Additionally, you have agreed to "promote and enhance Homestead's reputation and standing within the local community".  Any discussions regarding or promotions of Fairway to Homestead's detriment during this time, to present or former customers, realtors or other referral sources, or any disparagement of Homestead, would constitute a material breach of the Agreement.

Paragraph 9- <u>Proprietary Rights</u>. Please be advised that "all loan applications taken, appraisals, credit reports, correspondence received, copies of all correspondence written, plans, memoranda, files, photos, reports, confidential customer lists, legal opinions, accounting information, mortgage pricing systems and pricing information, sales and marketing plans, strategies and practices, Homestead's training manual and training procedures, and any and all other instruments, documents or information of any nature whatsoever concerning loan transactions handled by Homestead or by Loan Originator or jointly are and shall remain the sole and exclusive property of Homestead". This provision would survive your termination.  Removing, sharing or otherwise misappropriating any of this information for use at Fairway would constitute a material breach of the Agreement.

Paragraph 12- <u>Fiduciary Obligation</u>.  During the 60-day notice period, you are required to abide by this paragraph, specifically that you "shall use [your] best efforts solely to advance the interests of Homestead. In this regard, Loan Originator commits to exercise [your] best good faith efforts in the performance of [your] loan originator responsibilities, which requires a strict fiduciary obligation of loyalty to Homestead as [your] employer. Loan Originator agrees that [you] will not be associated with any other commercial or business duties or pursuits without first obtaining the written approval of Homestead management". A violation of this provision would constitute a material breach of the Agreement.

Paragraph 15/16- <u>Confidentiality/Disclosure</u>.  Similar to the responsibilities contained in Paragraph 9, you have come into knowledge and possibly possession of Confidential Information during the course of your employment.  Misappropriation of this information, which includes, but is not limited to, customer lists and customer data or other proprietary information of Homestead constitutes a material breach of the Agreement.

As a final note, under Paragraph 14- <u>Indemnification</u>, any breach of this Agreement would expose you to the provisions of this paragraph, including holding Homestead

harmless and indemnifying Homestead for damages arising out of such breach. This would include reasonable attorney's fees and other costs.

Please let me know if you or your attorney has any questions regarding this correspondence. I would encourage you to abide by the requirements set forth above to avoid any unnecessary legal action and minimize the difficulty of the termination process.

Justin M. Rutherford, Esq., LL.M.
Vice President, Business & Legal Affairs
Homestead Funding Corp. (NMLS 3232)
8 Airline Drive
Albany, New York 12205
Direct: 518.407.3010



**No Employee will ever ask you to wire funds or provide you with wiring instructions to use to wire funds. Please rely exclusively on the verbal directions from your closing attorney or settlement agent for instructions regarding closing funds.** This electronic message contains information that may be legally confidential and/or privileged. The information is intended solely for the individual or entity named above and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution (by electronic means or otherwise), or use of the contents of this transmission in strictly prohibited. If you have received this electronic message in error, please reply immediately to the sender that you have received this message in error, and delete it. **The confidentiality of Internet e-mail cannot be guaranteed. Information you send us over Internet e-mail could be viewed by persons other than the intended recipients. Therefore, you should not include your account numbers, credit card numbers, passwords, home address or other private information in your e-mail messages. Please send all information to us through our secure portal or in an encrypted format. If you are unable to encrypt documents, please e-mail me and I will send you a link.** This information is being sent to you for your information or at your request. If you do not wish to receive any further information using an email medium, please send a reply email so stating or call your contact to confirm your desire to use a different method of communication.

Exhibit H



## HOMESTEAD FUNDING CORP.

### LEGAL AFFAIRS

8 AIRLINE DRIVE • ALBANY, NY 12205
LEGAL@HOMESTEADFUNDING.COM

June 15, 2022

Via UPS:   Fairway Independent Mortgage Corporation
Attn: Legal Department
4750 S. Biltmore Lane
Madison, Wisconsin 53718

Via Email:   Benl@fairwaymc.com

Re:   Andrew Aiello, Employment Agreement/Restrictive Covenants

To Whom It May Concern:

Please be advised that I am corporate counsel for Homestead Funding Corp. (hereinafter "Homestead"). It is my understanding that, effective on or about June 14, 2022, Andrew Aiello has resigned his position as a Loan Originator with Homestead and accepted a position with Fairway Independent Mortgage Corporation (hereinafter "Fairway").

This letter is to provide notice of Homestead's Loan Originator Employment Agreement (hereinafter "The Agreement") entered into between Mr. Aiello and Homestead on January 1, 2019, which I have attached for reference. Pursuant to paragraph 10 of the Agreement, Mr. Aiello is required to provide Homestead a sixty (60) day notice of his intention to terminate his contract before being released. As of his resignation on June 14, 2022, this notice had not previously been given.

It is our expectation that Mr. Aiello will honor this provision of the Agreement. Pursuant to your conditional offer letter to Mr. Aiello, dated June 10, 2022, your organization requires that Mr. Aiello "confirm(s) that [he] is able to accept this job and carry out the work involved without breaching any legal restrictions on [his] activities, such as restrictions imposed by a current or former employer".

Please allow this communication to serve as notice of the fact that Mr. Aiello is not able to accept this position and carry out the work involved without breaching any legal restrictions imposed by his duly executed employment agreement. He is required under the terms of the Agreement to remain in Homestead's employ for sixty (60) days from his resignation.

Accordingly, Homestead hereby demands that Fairway cease and desist from moving forward with Mr. Aiello's employment during this notice period, including sponsoring his

licenses in the NMLS. Mr. Aiello owes a contractual duty of loyalty to Homestead during this period and Fairway's assent to hiring and sponsoring Mr. Aiello would be aiding and abetting the breach of these contractual covenants.

Additionally, under the terms of the Agreement, for a period of one year (1) after termination of employment, Mr. Aiello is prohibited from contacting, soliciting or otherwise engaging existing employees for the purposes of offering employment at a competing mortgage lender.

Further, all confidential information and proprietary data are the property of Homestead and unauthorized use or misappropriation of customer lists, loan files, CRM records or other such similar information is expressly forbidden under the terms of The Agreement.

It is Homestead's expectation that your organization will not aid, assist, encourage or facilitate any violation of The Agreement. Any violations of The Agreement will cause Homestead to suffer irreparable damage and Homestead intends, in this event, to seek appropriate redress though the courts, including, if the circumstances warrant, seeking immediate injunctive relief restraining and enjoining further tortious actions, as well as to seek appropriate money damages.

It is our sincerest hope that none of the foregoing will be necessary and Mr. Aiello will honor his employment covenants as he moves forward with your organization once his obligations to Homestead have been satisfied.

Please feel free to contact my office with any questions or concerns regarding this correspondence. I am best reached by contacting Kelly Sanford, Director of Legal Operations at ksanford@homesteadfunding.com or by phone (518) 407-3015.

Best,

Justin M. Rutherford, Esq., LL.M.

Vice President, Business & Legal Affairs
Homestead Funding Corp.


cc:     Kelly Sanford, Director of Legal Operations
        Richard C. Miller, Jr., Esq., Outside Counsel
        Anthony Felitte, COO



**Loan Originator Employment Agreement
And Associated Documents**

This booklet explains the essential and universal components of the Homestead Funding Corp. (hereinafter "Homestead") Loan Originator Compensation Plan for Loan Originators. This Employment Agreement may be supplemented and modified by the terms of an employment offer letter, job description or other written document outlining the employment terms, if such a letter job description or other written document is provided to the Loan Originator. If an employment offer letter, job description or other written document outlining the employment terms was provided to the Loan Originator, it will be incorporated herein by reference and is thereby made a material part of this Employment Agreement, to be read together with and reconciled with the language of the Employment Agreement, to the extent possible.

The purpose of this Loan Originator Employment Agreement is to provide a comprehensive, universal and consistent employment relationship for all Homestead Loan Originators. It is hoped that this will serve as the foundation for all legal understandings between Homestead and the Loan Originator.

For the purposes of this entire Agreement, "Loan Originator" applies to all Loan Originators, regardless of whether they are considered Outside Sales or Inside Sales. In cases where there is differentiation between Outside Loan Originators and Inside Loan Originators, they will be referred to thusly.

**HOMESTEAD FUNDING CORP. IS AN
EQUAL OPPORTUNITY EMPLOYER**

Initials

Loan Orig

HFC

# TABLE OF CONTENTS

Page 1      EMPLOYMENT AGREEMENT

**APPENDIX**

SCHEDULE A:   LOAN ORIGINATOR COMPENSATION PLAN

SCHEDULE B:   LOAN ORIGINATOR RESPONSIBILITIES

SCHEDULE C:   ADDENDUM TO EMPLOYMENT AGREEMENT

Initials

Loan Orig.

HFC

## EMPLOYMENT AGREEMENT

THIS AGREEMENT (hereinafter referred to as "Employment Agreement") made and entered into as of 1/1/2019 by and between Homestead Funding Corp., (hereinafter "Homestead"), with a principal place of business at 8 Airline Drive, Albany, NY and Andrew Aiello residing at 2 Towline Lane Clifton Park NY 12065 (hereinafter "Loan Originator").

### WITNESSETH:

WHEREAS, Homestead is duly licensed in the State of New York and various other states as a mortgage banker and as a mortgage broker to originate, service and sell residential mortgage loans and desires to retain the services of Loan Originator to originate residential mortgage loans on behalf of Homestead; and

WHEREAS, the Loan Originator desires to be employed by Homestead in the capacity of a Loan Originator and to originate residential mortgage loans on behalf of Homestead in accordance with the provisions of this Employment Agreement;

NOW, THEREFORE, and in consideration of the promises and mutual covenants hereinafter contained, and other good and valuable consideration, it is mutually agreed by and between the parties as follows:

1. <u>Loan Programs</u>. Homestead agrees to make available to the Loan Originator all current loan programs and mortgage products available to the particular department or branch in which the Loan Originator is employed. It is understood that Homestead's various departments and branches may provide different mortgage programs and products to offer to its customers, and only the programs and products available to the Loan Originator's specific department or branch will be available to him/her, as the same may change from time to time. Homestead agrees to assist the Loan Originator in his/her work by providing advice and instruction from Homestead management, which seeks to provide its full cooperation to help facilitate the Loan Originator's success.

2. <u>Exclusive Best Efforts to Homestead</u>. Loan Originator agrees to work diligently and utilizing his/her best efforts to originate residential mortgage loans solely on behalf of Homestead, and agrees that during the term of this Agreement, he/she will work exclusively for Homestead.

3. <u>Conduct</u>. Loan Originator and Homestead each agree to conduct their business and regulate their habits and working hours so as to maintain and to increase the good will, business, profits and reputation of both Homestead and Loan Originator. The parties agree to conform to and abide by all laws, rules, regulations, and code of ethics that are binding on, or applicable to, Mortgage Bankers and Mortgage Brokers (when a loan is taken as a brokered product), in all jurisdictions in which Homestead originates loans. It is expressly understood that the Loan Originator shall guard, at all times, against even the appearance of impropriety or the perpetration of fraud, forgery or misrepresentation by the Loan Originator or others. The Loan Originator agrees to promote and enhance Homestead's reputation and standing within the local community in general as well as within the local mortgage community by serving the public in mortgage loan transactions, to the end that each of the parties may derive the greatest possible benefit through repeat customers and strong referral business.

Initials

Loan Orig     HFC

4. Regulatory Compliance. It is expressly understood and agreed that both Homestead and the Loan Originator are subject to regulation by the governing regulatory agencies of all states in which Homestead is authorized to originate mortgage loans as well as the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development, the Veterans Affairs Administration, the Consumer Finance Protection Bureau ("CFPB"), the Federal Reserve Board, Federal Trade Commission and other regulatory oversight agencies. Loan Originator agrees to be governed by all applicable statutes and implementing rules and regulations promulgated by these agencies affecting his/her duties as a Loan Originator for Homestead.

5. Compensation Plan Attached. The terms of the Loan Originator Compensation Plan are attached to this Employment Agreement as Schedule A which is expressly made a part hereof and are subject to change at any time with or without notice to the Loan Originator at the sole discretion of Homestead. The goal of the Plan is to maximize the productivity, quality and volume of mortgage originations produced by Homestead's sales force through a compensation program that encourages the Loan Originator to increase his/her sales, productivity and overall quality of originated loans.

6. Duration of Agreement. This Employment Agreement shall be valid and effective for a set term of one-year, subject to the provisions of Section 10 herein. This Employment Agreement will be automatically renewed for five additional one-year terms.

7. Membership Dues. Loan Originator shall pay his/her own expenses and dues for membership in professional organizations, unless otherwise specifically agreed in writing by the parties.

8. No Authority. Loan Originator acknowledges and agrees that he/she has no authority to enter into agreements on behalf of Homestead of any kind or nature; all agreements to which Homestead is to be a party must be reviewed by Homestead upper management and signed by an authorized Homestead officer in order to be valid and effective. Loan Originator may not hold himself/herself out to vendors, landlords or others as possessing any actual or apparent authority to enter into agreements on behalf of Homestead or otherwise legally bind Homestead to the terms of any agreements or other documents.

9. Proprietary Rights. It is expressly agreed by the parties, as a material part of this Employment Agreement, that all loan applications taken, appraisals, credit reports, correspondence received, copies of all correspondence written, plans, memoranda, files, photos, reports, confidential customer lists, legal opinions, accounting information, mortgage pricing systems and pricing information, sales and marketing plans, strategies and practices, Homestead's training manual and training procedures, and any and all other instruments, documents or information of any nature whatsoever concerning loan transactions handled by Homestead or by Loan Originator or jointly are and shall remain the sole and exclusive property of Homestead, and the Loan Originator acknowledges that he/she has no proprietary right to any of the foregoing.

10. Nature of Employment Relationship. Both parties agree that Loan Originator will be employed by Homestead for the duration of this Employment Agreement, starting with the effective date of this Agreement and continuing for a one-year term. Either party may, however, terminate this Employment Agreement upon providing the other party 60-days advance notice in writing of their intention to terminate the Employment Agreement for any reason. This

Initials _____ _____
Loan Orig      HFC

Employment Agreement will be automatically renewed for five additional one-year terms unless either party provides the other with 60-days advance written notice of their intention not to renew the Employment Agreement. The parties may, however, shorten or lengthen the time period from the date notice is given to date of actual termination by mutual agreement, so long as it is put in writing and signed by both parties.

It is specifically agreed between the parties hereto that the Loan Originator will receive his/her commissions in accordance with this Employment Agreement for the 60-day period following the date written notice of either party's intent to terminate this agreement is delivered to the other party, (unless otherwise agreed to by the parties in writing at the time), provided the Loan Originator abides by the relevant terms of this Employment Agreement during the termination transition and assists, as may be requested by Homestead, with facilitating the processing and closing of his/her pipeline of mortgage loans. Compensation paid to the Loan Originator during the above referenced 60-day notice period will be limited to his/her commission only. Commissions for loans that close after the expiration of the 60-day notice period are not payable to the Loan Originator.

Homestead shall have the right to immediately terminate the Employment Agreement for reasonable cause, however, at any time. Reasonable cause, as used in this Employment Agreement, shall mean what is often referred to in labor employment settings as "just cause" and would include (merely as illustrations, but not intended to be an exhaustive or comprehensive list), the following situations or conditions:

> a) Evidence that the Loan Originator has knowledge of, participated in, or otherwise engaged in collusive activities with a borrower, appraiser, Realtor or others towards the submittal of a fraudulent loan or any aspect of a fraudulent loan application;
>
> b) The breach of the Loan Originator's fiduciary duty of loyalty and utmost fidelity to Homestead as his/her employer;
>
> c) An instance of gross dereliction of duties by the Loan Originator in any respect;
>
> d) An unintentional material violation on the part of the Loan Originator to follow regulatory compliance mandates exposing Homestead to regulatory oversight consequences, (whether or not the act or omission was known by the Loan Originator to be a material violation, as the Loan Originator is expected to be fully conversant with all applicable regulatory compliance mandates and comply with them) and/or an intentional violation, (whether material or not);
>
> e) With regard to the following forms: Application for Employment; Background Investigation Consent Form; Employment Screening Form; and the Annual Background Certification Form, any information provided by the Loan Originator that is found to be false, intentionally incomplete or misrepresented in any respect, will be sufficient cause to immediately discharge the Loan Originator from Homestead's service, whenever it is discovered. In addition, certain criminal convictions will prohibit the Loan Originator from employment in the field of mortgage banking. These convictions vary from state-to- state. Other criminal convictions, which do not automatically bar the Loan Originator from employment in the field of mortgage banking and/or information submitted about the Loan Originator by a consumer

Initials _____ Loan Orig.     HFC

reporting agency or by former employers or others, will be evaluated on a case-by-case basis by Homestead. If Homestead deems, in its sole discretion, that the other criminal conviction(s) and/or information provided by the Loan Originator's former employers or by a consumer reporting agency or others is such that he/she is not suited for a position with Homestead, the Loan Originator's employment will be subject to immediate termination;

f) other similar instances of misconduct, including a violation of Homestead company policies and/or the provisions of the Homestead Employment Policy Handbook.

11. Oral Commitments. Homestead has made no oral commitments to the Loan Originator outside of this Employment Agreement. No one at Homestead is authorized to make oral commitments regarding employment – either now or in the future.

12. Fiduciary Obligation. During his/her employment, Loan Originator shall use his/her best efforts solely to advance the interests of Homestead. In this regard, Loan Originator commits to exercise his/her best good faith efforts in the performance of his/her loan originator responsibilities, which requires a strict fiduciary obligation of loyalty to Homestead as his/her employer. Loan Originator agrees that he/she will not be associated with any other commercial or business duties or pursuits without first obtaining the written approval of Homestead management. The Loan Originator acknowledges that he/she must sign a HUD Prohibited Outside Employment Policy Statement. Any employment (which term shall include acting as an officer, employee, independent contractor, consultant or in any other capacity whatsoever) or ownership interest in another employer in either the mortgage lending or real estate industry or in any other related field is strictly prohibited under any circumstances and will constitute grounds for immediate termination of the Loan Originator under this Employment Agreement. If the Loan Originator obtains prior written approval from Homestead management for non-prohibited outside employment, such employment must not interfere or conflict with the interests of Homestead. Further, such employment must not adversely affect the quality or quantity of work performed for Homestead as might result from undue fatigue or in placing employment with Homestead secondary to outside employment.

13. Class, Collective and Multi-Party Action Waiver. Loan Originator further waives and gives up any right to become a participant in any class, collective or multi-party action against Homestead. As part of this waiver, Loan Originator promises not to join or consent to join or participate in any case against Homestead asserting class, collective or multi-party claims against Homestead that are related in any way to Loan Originator's employment or the termination of Loan Originator's employment with Homestead. If, without Loan Originator's prior knowledge and consent, Loan Originator is made a member of a class in any proceeding, Loan Originator agrees to opt out of the class at the first opportunity to do so. This waiver applies to all claims arising out of Loan Originator's employment or termination from employment including claims brought under federal or state wage laws, federal or state laws against discrimination or any other claim against Homestead.

14. Indemnification. Loan Originator hereby agrees to indemnify and hold Homestead, its shareholders, directors, officers, managers, successors and assigns, harmless against any and all claims, liabilities and obligations, of every kind and description, including reasonable attorney fees and court costs arising out of or related to: (a) any failure by the Loan Originator to duly perform or strictly observe any term, provision, covenant, or condition contained herein; and (b) the breach

Initials _____ _____
Loan Org        HFC

of any other term, provision, covenant, condition or promise set forth herein. This indemnification and hold harmless agreement does not extend to any recovery against a Loan Originator related to loans originated by a Loan Originator or lawsuits commenced against Homestead as a result of the acts or omissions of a Loan Originator.

15. Confidentiality. Loan Originator acknowledges that, during his/her employment with Homestead, he/she may come into possession of confidential and proprietary information of Homestead, including trade secrets, (all of which are referred to in this Agreement as "Proprietary Information"), which includes, among other things, information about:

  a) Existing or planned business ventures, acquisitions, mergers, or initiatives, if treated as secret by Homestead;

  b) All of Homestead's accounting and business information, including documents addressing its financial condition and net worth, or the results of any external or internal audits;

  c) Details regarding Homestead's method of pricing mortgage loans, which is agreed to be unique and proprietary, which is and will always be kept secret by Homestead;

  d) Homestead's and/or its affiliates' business, mortgage marketing and/or solicitation strategies / techniques, if treated as secret by Homestead and/or its affiliates;

  e) A Borrower's non-public personal information;

  f) Proposals designed to meet borrower's needs or requirements if it involves confidential information;

  g) The resolution of a particular borrower's problems, if it involves confidential information of the borrower;

  h) The names of and other details concerning Homestead's customers, including any confidential customer lists of Homestead, including present or former borrowers of Homestead;

  i) The resumes of and other information concerning officers, managers, loan originators, employees, agents, or contractors who are or may be employed by Homestead, under any terms, to meet the needs of Homestead's borrowers.

  j) Both parties to this Employment Agreement acknowledge and agree that the above Proprietary Information is kept secret by Homestead and is protected by Homestead as secret in order to satisfy the "trade secret" threshold recognized by the courts.

Loan Originator acknowledges that the foregoing types of Proprietary Information are only illustrative of some of the kinds of highly confidential information that he/she may become aware of during his/her employment with Homestead, and the foregoing list is not meant to be a complete and exhaustive compilation of all of the types of confidential information Loan Originator may have the opportunity to obtain while in the employ of Homestead. Loan Originator also acknowledges that much of the above information constitutes a trade secret of Homestead; that it

Ver. 01-01-2019                          Initials _____  _____
                                                 Loan Orig      HFC

is a valuable resource of Homestead that was developed by Homestead through the investments of significant managerial effort and the expenditures of considerable sums of money, and is consistently reviewed, improved and refined by Homestead, and is unique and proprietary to Homestead and treated as such at all times. These trade secrets provide a competitive advantage to Homestead and would not be easily obtained or duplicated by others who have not been able to acquire such information other than through employment with Homestead.

16. Non-Disclosure. As a consequence of the above and in consideration for his/her employment, Loan Originator agrees that, unless he/she first obtains the prior written consent of Homestead, he/she shall not communicate, disclose, release, take, transfer or give (either directly or indirectly) to any person or firm, or use at any time, (either during or subsequent to his/her employment with Homestead), any of Homestead's Proprietary Information to which he/she has access during his/her employment with Homestead, whether or not such information was developed or obtained by Loan Originator, except insofar as Loan Originator may, where authorized and approved, use such information in the furtherance of his/her employment duties with Homestead. Loan Originator shall retain all such information in strict confidence for the sole benefit of Homestead, and shall surrender, to Homestead, all loan applications, confidential customer lists, documents, papers, data bases, etc., containing any of such Proprietary Information or trade secrets upon the termination of employment with Homestead, including all such information contained in any electronic format. The parties acknowledge and agree that the disclosure or unauthorized use of any of the above described Proprietary Information and trade secrets would cause irreparable harm to Homestead and the parties acknowledge that immediate injunctive relief, including a temporary restraining order and a preliminary injunction, restraining the use and/or disclosure of such information is necessary and appropriate, and the Loan Originator states that he/she understands that such equitable relief will be sought by Homestead and agrees that the grant of such relief is consistent with the unique and proprietary nature of this information and its importance to Homestead.

17. Non-Solicitation. Likewise, Loan Originator further agrees, as a material part of this Employment Agreement, and in consideration for his/her employment by Homestead, that during his/her employment with Homestead, or for one year following the termination of such employment, Loan Originator will not approach, solicit, initiate or otherwise seek or encourage a discussion with a present Homestead loan originator, manager and/or employee about going to work for another mortgage lender, mortgage banker or mortgage broker, or take any other steps in furtherance of encouraging or soliciting a present Homestead loan originator, manager and/or employee to go to work for any other mortgage lender, mortgage banker or mortgage broker. The parties acknowledge and agree that any solicitation of Homestead loan originators, managers and/or employees to go to work for any other competing mortgage lender, mortgage banker or mortgage broker would cause irreparable harm to Homestead and the parties acknowledge that immediate injunctive relief, including a temporary restraining order and a preliminary injunction, restraining such solicitation is necessary and appropriate.

18. Information Security. Loan Originator hereby acknowledges that he/she has received a copy of Homestead's comprehensive written information security plan or policy (hereinafter "WISP"). Loan Originator further acknowledges and agrees that he/she must comply with the provisions of the WISP and that any non-conforming use of personal information during or after employment is prohibited; and further that mandatory disciplinary action will be taken for violations of the security provisions of the WISP, pursuant to the discipline policy described in the Homestead Employment Policy Handbook.

Initials ___ Loan Orig.    ___ HFC

Personal Information, as used in this Employment Agreement, shall include, (merely as illustrations, but not intended to be an exhaustive or comprehensive list), the following information: A Homestead customer or consumer's first name and last name or first initial and last name in combination with one or more of the following data elements that relate to such customer or consumer:

a)  Social Security Number;
b)  Driver's License Number;
c)  State-Issued Identification Card Number;
d)  Financial Account Number;
e)  Credit Card Number; or
f)  Debit Card Number.

Personal Information does not include information that is lawfully obtained from publicly available information or from federal, state or local government records lawfully made available to the general public.

19. Licensing is Mandatory. The Loan Originator hereby states and affirms that he/she is already licensed as a loan originator in the jurisdictions in which he/she will originate loans; or if not, that he/she has accurately informed Homestead of his/her licensing status and will expeditiously obtain all necessary licenses prior to discussing loan terms or performing any other origination duties with a borrower in all jurisdictions in which he/she will originate loans and will not originate loans until and unless the appropriate license is obtained. In the event that any occurrence causes the Loan Originator to have his/her license threatened to be suspended or revoked, the Loan Originator agrees to immediately notify Homestead. Under no circumstances shall a Loan Originator originate a loan in any jurisdiction unless he/she is licensed in that jurisdiction. Any violation of this paragraph is grounds for immediate termination.

20. Mandatory Mediation/Arbitration. Any disputes arising out of or relating to this Employment Agreement, the LO's employment with Homestead or termination from employment (hereinafter "Dispute") shall be resolved exclusively by mandatory mediation under the rules of the American Arbitration Association. In the event that any Dispute cannot be fully resolved through mediation, the parties agree that the Dispute shall then be exclusively resolved by final and binding arbitration on an individual basis before one neutral arbitrator through the rules of the American Arbitration Association. Any type of class; collective claims; or multi-party claims are expressly prohibited, and the arbitrator will have no authority to alter the parties' agreement in this regard. Any such arbitration shall be held in the county in which the Loan Originator last worked unless otherwise stipulated by the parties and pursuant to the Model Rules for Arbitration of Employment Disputes of the American Arbitration Association ("AAA") then in effect.

The parties voluntarily and irrevocably waive any and all rights to have any Dispute heard or resolved in any forum other than through arbitration. This waiver specifically includes, but is not limited to, a jury trial. This does not limit the right of either party to apply to a court of competent jurisdiction for any provisional remedy pending the completion of arbitration consistent with applicable law. In any arbitration held pursuant to this Agreement, Employer shall bear all fees and costs unique to arbitration, including the Arbitrator's fee. Each party shall pay for its own attorneys' fees and costs, if any. However, the Arbitrator may award reasonable attorneys' fees to the prevailing party in accordance with this Agreement or applicable law. The parties shall be

Initials ___  ___
                                                                    Loan Orig   HFC

entitled to any remedy which would have been available in court. Any award of the arbitrator shall be in writing. Either party may bring an action in any court of competent jurisdiction to compel arbitration under this Agreement and / or to enforce an arbitration award. If, in any action to enforce this Agreement, a court of competent jurisdiction rules that any portion of the parties' agreement to arbitrate is not enforceable, then the parties agree that such provision be severed, and the remainder of the Employment Agreement be enforced. Nothing herein prevents the Loan Originator from filing a charge with an administrative agency including but not limited to the NLRB or the EEOC.

21. Controlling Law. This Employment Agreement shall be governed by the applicable laws of the state in which such Loan Originator is employed and Loan Originator consents to the personal jurisdiction of any court in a state in which Homestead is conducting business, including, specifically, New York State, for the determination of any questions of interpretation or enforcement of any provision of this Employment Agreement.

22. Severability. In case any one or more of the provisions hereof shall be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Employment Agreement, (or its collateral agreements), but this agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

23. Survival of Covenants. All representations, warranties, covenants, and agreements of the parties hereto shall survive the termination of this Employment Agreement and the termination of employment of the Loan Originator.

24. Amendment. This Employment Agreement may not be amended orally. It may only be amended by way of a writing designated as an amendment to this agreement that is executed by the parties hereto.

25. Entire Agreement. This Employment Agreement supersedes any previous written or oral agreements, understandings or representations existing between the parties. There are no promises, understandings or agreements except as set forth expressly in writing in the Loan Originator Employment Agreement and Associated Documents. The parties expressly understand and agree that the Introduction, Employment Offer Letter, (if any), and Loan Originator Compensation Plan attached as Schedule A are incorporated by reference herein. However, in the event of a conflict between any provisions of these documents, the terms and conditions of the Employment Agreement and Loan Originator Compensation Plan attached as Schedule A shall control.

26. Full Knowledge. Loan Originator expressly warrants and represents to Homestead that before executing this Employment Agreement he/she was fully informed of the terms, contents, conditions and effect of this Employment Agreement; that the Loan Originator has relied solely on his/her own judgment in executing this Employment Agreement; and that he/she has had the opportunity to seek and obtain the advice of legal counsel before entering into this Agreement.

27. Interpretation. No provision in this Agreement shall be interpreted for or against any party because that party or that party's legal representative drafted the provision.

28. Headings. The headings used in this Employment Agreement are for the convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Employment Agreement.

Initials ___  ___  
Loan Orig    HFC

29. Counterparts. This Agreement may be executed in two counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

30. Job Description. This Employment Agreement may be immediately terminated at the option of Homestead in the event that any statute, regulation or judicial decision results in a determination by Homestead that the duties and obligations of Homestead's Loan Originators do not qualify for the applicable Exemption. (This paragraph applies exclusively to Outside Sales Loan Originators).

31. Situs. This Employment Agreement shall be construed in accordance with the laws of the State of New York, except as provided for herein to the contrary herein or if contrary to applicable law. The parties consent to jurisdiction and venue of all matters arising out of the interpretation or enforcement of this Employment Agreement being vested exclusively in Albany County Supreme Court, in the State of New York.

IN WITNESS WHEREOF, the parties hereto cause this Employment Agreement to be duly executed and delivered as of the day and year first above written.

Homestead Funding Corp.

By:

Andrew Aiello
Loan Originator

By:

Jeffrey N. Mason
Authorized Representative

Initials
Loan Orig

HFC

## SCHEDULE A

## Loan Originator Compensation Plan ("Plan")

Applies to all loans locked on or after January 1, 2019

[See attached Plan]

Initials _____
Loan Orig

_____
HFC

## SCHEDULE B
## LOAN ORIGINATOR RESPONSIBILITIES

The Loan Originator will be responsible for complying with the specific requirements, duties and responsibilities of the loan originator position, as the same may be modified or supplemented by Homestead over the course of the employment; which includes obtaining all necessary licenses to originate loans in all of the jurisdictions in which they originate loans and properly maintaining these licenses (once obtained) at all times they are employees of Homestead This also includes compliance with Homestead's Employment Policy Handbook, Homestead's Exclusive Employment Policy, Homestead's Pricing Policy, Homestead's Fair Lending Policy, Homestead's Privacy Policy, Homestead's Information Security Policy and other mandates as may be adopted by Homestead from time-to- time. This obligation also includes compliance with all relevant and applicable statutes and regulations governing the mortgage industry including satisfactorily meeting the legal and regulatory requirements applying to the origination of mortgage loans by loan originators, including the Truth in Lending Act ("TILA"), Regulation Z and HOEPA; Equal Credit Opportunity Act ("ECOA") and Regulation B; Real Estate Settlement Procedures Act ("RESPA") and Regulation X; the Fair Credit Reporting Act, ("FCRA") as amended and supplemented by the Fair and Accurate Credit Transactions Act ("FACTA"); the Gramm-Leach-Bliley Act ("GLBA"); the Telemarketing and Consumer Fraud and Abuse Prevention Act and the Telemarketing Sales Rule; the Home Mortgage Disclosure Act ("HMDA") and Regulation C; the Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE") as well as all other Fair Lending laws that may be applicable including those which are not, as of this time, enacted or effective but which will become effective during the course of this Employment Agreement; the U.S. Patriots' Act of 2001, as it may be extended and modified; and any other federal, state or local laws and regulations pertaining to or restricting predatory, high-cost or abusive lending; and all other similar federal, state or local laws and regulations as may be in effect at this time, as they may be amended from time-to-time. Consistent with the foregoing obligations, Loan Originators are forbidden from offering or receiving any "thing of value" for the referral of mortgage loans (RESPA Section 8) or from accepting any form of compensation or gratuities such as game tickets or other perks from any borrower (Reg. Z Prohibition on Dual Compensation).

The Outside Loan Originator's duties include marketing and promoting themselves to potential borrowers, (both purchase and refinance) directly, and also to real estate agents, accountants, lawyers, financial planners, builders, bank personnel, etc., (who all constitute a referral source of potential borrowers for Loan Originators and are hereinafter described herein as "Referral Sources"). The foregoing duties involve meeting with borrowers in their homes, real estate brokers' offices, banks, builders' offices and other public places, to persuade the borrower that the loan products offered by Homestead would be the best alternative for the borrower and that he/she would be the best loan originator to take and oversee the mortgage loan application. The Loan Originator's duties would also include calling on the Referral Sources both in person at their places of business, restaurants and/or other public places; as well as by telephone, email, direct mail, marketing brochures, and the use of Homestead approved internet social media, etc.

Outside Loan Originators are free to determine independently how they wish to arrange their work schedule, how to schedule their loan applicant interviews and applications, what means and efforts they choose to market themselves and promote their outside sales business and all other facets of their outside sales positions and sales efforts.

Initials

Loan Orig

HFC

The Inside Loan Originator will work at an assigned Homestead office, under the direct supervision of his / her manager, originating investment quality residential mortgage loans (Bankered; Brokered; FHA; VA; RHS; Conventional; Jumbo; Reverse; Second) by prospecting and following up on Company provided leads via phone in a timely manner. Company provided leads are obtained from Internet sources, direct mail campaigns, referrals or other special marketing campaigns. All Company provided leads are owned by Homestead and the Inside Loan Originator acknowledges they are the proprietary information of Homestead and agrees to only utilize those leads and related information during employment with Homestead.

Should the Inside Loan Originator wish to develop his / her own loan referral sources they may, with the prior approval of management in Albany NY, also undertake the following activities normally associated with outside sales: directly marketing and promoting themselves to potential borrowers (both purchase and refinance), and also to real estate agents, accountants, lawyers, financial planners, builders, bank personnel, etc., (who all constitute a referral source of potential borrowers for loan originators engaged in outside sales activities and are hereinafter referred to as "Referral Sources"). The foregoing loan origination duties involve meeting with borrowers in their homes, real estate brokers' offices, bank branches, builders' offices and other public places, to persuade the borrower that the loan products offered by Homestead would be the best alternative for the borrower and that he / she would be the best loan originator to take and oversee the mortgage loan application. The loan originator's duties would also include calling on the Referral Sources both in person at their places of business, restaurants and/or other public places; as well as by telephone, email, direct mail, marketing brochures, and the use of Homestead approved Internet marketing efforts, Social Media, etc.

Once the Loan Originator has sold the borrower on using him/her and Homestead for their mortgage, the Loan Originator's duties also include obtaining the necessary financial information from the borrowers, the accurate completion of residential mortgage loan applications, and counseling borrowers to identify the loan product(s) that best meet the borrowers' needs. The Loan Originator's marketing and promotion of themselves, solicitation of loan applications and the negotiation of loan terms must be performed in a manner consistent with Homestead's Privacy, Information Security, Fair Lending and Pricing Policies. The Loan Originator is responsible for communicating with applicants throughout the entire loan production process from origination through processing, underwriting, closing and (if necessary) post-closing of the originated transaction.

The Loan Originator will assist in facilitating the resolution of issues that may arise throughout the entire loan production process. Such assistance may include, but is not limited to, such tasks as the correction or collection of documents necessary to make the loan suitable for sale in the secondary market. The Loan Originator is also responsible for keeping up-to-date with changes in existing loan products and internal lending procedures; the introduction of new loan products and new mortgage lending procedures; and keeping current with the changing regulatory environment affecting the mortgage industry. Attendance at sales meetings, when scheduled, is mandatory.

The contents of this Employment Agreement and Loan Originator Compensation Plan, as supplemented with the details contained within an employment offer letter, job description or other written document, if such a letter, description or document was provided, shall constitute the entire understanding existing between the parties, and there are no other promises, understandings or agreements existing between the parties, unless provided for in writing outside of this agreement.

Initials

Loan Orig

HFC

The Loan Originator hereby states and affirms that he/she is already licensed as a loan originator in the jurisdictions in which he/she will originate loans; or if not, that he/she has accurately informed Homestead of his/her licensing status and will expeditiously obtain all necessary licenses prior to discussing loan terms or performing any other origination duties with a borrower in all jurisdictions in which he/she will originate loans, and will not originate any loans until and unless the appropriate license is obtained. In the event that any occurrence causes the Loan Originator to have his/her license threatened to be suspended or revoked, the Loan Originator agrees to immediately notify Homestead. Under no circumstances shall a Loan Originator originate a loan in any jurisdiction unless he/she is licensed in that jurisdiction. Any violation of this paragraph is grounds for immediate termination.

Homestead Funding Corp.

By:                                        By:

Andrew Aiello                              Jeffrey N. Mason
**Loan Originator**                        Authorized Representative

Initials
Loan Org
HFC

## SCHEDULE C

### ADDENDUM TO EMPLOYMENT AGREEMENT
Regarding Existence of Restrictive Covenants from a
Prior Employer Employment Agreement

**Please sign Section(s) A, B and C as applicable to you**

The undersigned hereby acknowledges the execution of an Employment Agreement (hereinafter "Agreement") with Homestead Funding Corp. (hereinafter "Homestead") commencing an employment relationship with Homestead. The Agreement contains several understandings and covenants made with Homestead that the employment relationship is predicated upon.

Set forth below are three different provisions relating to the status of a Loan Originator as this Employment Agreement is signed, which are mutually exclusive. If a Loan Originator is not subject to any restrictive covenants emanating out of any previous employment agreement with a prior employer, Section A applies. In this case, please sign at the end of Section A affirming that you are not presently bound by any restrictive covenant arising out of any previous employment agreement. If a Loan Originator is bound by restrictive covenants emanating out of a previous employment agreement with a prior employer, (other than 1st Priority Mortgage, Inc. which is hereinafter referred to as 1st Priority"), Section B applies. In this case, please sign at the end of Section B affirming that you are subject to restrictive covenants arising out of a previous employment agreement and that you agree to fully comply with these restrictive covenants. Finally, if you were previously an employee of 1st Priority, and you are bound by the terms of restrictive covenants from your employment agreement with 1st Priority, please sign Section C.

### Section A - Undersigned Not Bound by Restrictive Covenants

The undersigned states that he/she is not bound under the terms of a previous employment agreement with his/her prior employer, and that there are no restrictive covenants that apply to the undersigned.

This Addendum shall be incorporated by reference into the Employment Agreement and made a part thereof and the undersigned agrees to be bound by the terms of this Addendum.

IN WITNESS WHEREOF, the parties hereto cause this Addendum to Employment Agreement to be duly executed and delivered as of the date of the Employment Agreement.

By: _____

Andrew Aiello
Loan Originator

Homestead Funding Corp.

By: _____

Jeffrey N. Mason
Authorized Representative

Ver. 01-01-2019

Initials _____  _____
        Loan Orig    HFC

## Section B - Undersigned Bound by Restrictive Covenants

The undersigned states that he/she is bound under the terms of a previous employment agreement with his/her previous employer, which included restrictive covenants that were by their terms intended to survive the termination of employment with this previous employer. As a condition of employment at Homestead, the undersigned agrees that he/she will comply with all legally enforceable provisions of the previous employment agreement for so long as those terms remain in effect.

This Addendum shall be incorporated by reference into the Employment Agreement and made a part thereof and the undersigned agrees to be bound by the terms of this Addendum.

IN WITNESS WHEREOF, the parties hereto cause this Addendum to Employment Agreement to be duly executed and delivered as of the date of the Employment Agreement.

Homestead Funding Corp.

By: _____

By: _____

Andrew Aiello
Loan Originator

Jeffrey N. Mason
Authorized Representative

## Section C - Undersigned Was Previously Employed by 1st Priority and Is Bound by Restrictive Covenants

This Addendum is applicable to the undersigned because of the previous employment with 1st Priority, which is a mortgage lender that competes with Homestead. This Addendum is made a part of your new employment package with Homestead. Homestead wants to emphasize to you that your employment agreement with 1st Priority contains certain restrictive covenants that by their terms survive the termination of employment at 1st Priority and would, if enforceable, affect what you may do while the restrictive covenants remain in effect.

Homestead anticipates that you will comply with these provisions of your previous employment agreement. It should be noted that Homestead is taking no position regarding the validity or enforceability of these provisions as written, and instead recommends that you seek the advice of independent legal counsel in the event you have any questions regarding these covenants.

Homestead Funding Corp.

By: _____

By: _____

Andrew Aiello
Loan Originator

Jeffrey N. Mason
Authorized Representative

Initials _____    _____
Loan Orig    HFC

Ver. 01-01-2019



11:17 Done Photo

Hey there CC!!! Not sure if you heard but Drew Aiello has made a move to Fairway. We are enthusiastic and humble about our growth in the region and would love to share with you why Fairway can be a great fit for you too my friend! Please let me know if your open to doing a zoom call and we can catch up!

Exhibit I

Exhibit J

---

**From:** crm@homesteadfunding.com <notifications@simplenexus.com>
**Sent:** Monday, June 13, 2022 12:12 AM
**To:** LouAnn Daprato <ldaprato@homesteadfunding.com>
**Subject:** Your Weekly Statistics



# Your weekly stats

## 06/05 — 06/13

### LEAD REPORT

| | | |
|---|---|---|
| Nicholas Vales | nvales@titanacs.com | (914) 420-7116 |
| Abbie Connors | arosec15@gmail.com | (315) 567-5049 |
| Patricia Venditti | tvenditti84@gmail.com | (203) 947-9445 |
| Charlene Hamel-Louis | charlene_louis@icloud.com | (973) 462-6535 |

### APP REPORT

**3** Weekly installations
**290** All-time installations
**4** Weekly calculations

1

**191** All-time calculations

**1** Weekly loan apps

**0** Pre-Quals this week

## PARTNER REPORT

LouAnn Daprato is your top sharing partner with 290 all-time installations and 0 calculations.

**See more in your Homestead Moves dashboard**

Regards,

Homestead Moves

© SimpleNexus

If you need help please contact crm@homesteadfunding.com

Unsubscribe 8 Airline Drive , Albany, NY 12205

**No Employee will ever ask you to wire funds or provide you with wiring instructions to use to wire funds. Please rely exclusively on the verbal directions from your closing attorney or settlement agent for instructions regarding closing funds.** This electronic message contains information that may be legally confidential and/or privileged. The information is intended solely for the individual or entity named above and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution (by electronic means or otherwise), or use of the contents of this transmission in strictly prohibited. If you have received this electronic message in error, please reply immediately to the sender that you have received this message in error, and delete it. **The confidentiality of Internet e-mail cannot be guaranteed. Information you send us over Internet e-mail could be viewed by persons other than the intended recipients. Therefore, you should not include your account numbers, credit card numbers, passwords, home address or other private information in your e-mail messages. Please send all information to us through our secure portal or in an encrypted format. If you are unable to encrypt documents, please e-mail me and I will send you a link.** This information is being sent to you for your information or at your request. If you do not wish to receive any further information using an email medium, please send a reply email so stating or call your contact to confirm your desire to use a different method of communication.

| **From:** | LouAnn Daprato <ldaprato@homesteadfunding.com> |
| **Sent:** | Monday, June 27, 2022 10:39 AM |
| **To:** | LouAnn Daprato <louanndaprato@gmail.com> |
| **Subject:** | FW: Your Weekly Statistics |

**From:** crm@homesteadfunding.com <notifications@simplenexus.com>
**Sent:** Monday, June 20, 2022 12:12 AM
**To:** LouAnn Daprato <ldaprato@homesteadfunding.com>
**Subject:** Your Weekly Statistics


HOMESTEA
FUNDING CORE

# Your weekly stats

## 06/12 — 06/20

### LEAD REPORT

| Hosterianzetta Rawls | shortcakemooney77@gmail.com | (860) 356-6039 |
| Damon McClellan | allen.damonmcclellan@gmail.com | (203) 751-4624 |
| Nadia Bucknor | ash04534@gmail.com | (203) 449-1132 |
| Yailene Cruz | yailenecruz624@gmail.com | (203) 707-3769 |
| Philippe Louis | thercy1@yahoo.com | (203) 685-9558 |
| Amanda Rogers | arogers1020.ar@gmail.com | (570) 218-2048 |
| Lannita Walker | lannitabowman@yahoo.com | (203) 260-0450 |
| Simone Velasquez | simonevelasquez29@yahoo.com | (203) 449-1197 |
| Laritta Yearwood | larittayearwood35@gmail.com | (203) 726-4911 |
| Jose Torres | joseltorres1385@gmail.com | (347) 872-6622 |
| Elizabeth Louis | blouis1999@yahoo.com | (203) 685-9546 |

1

## APP REPORT

**10** Weekly installations

**300** All-time installations

**0** Weekly calculations

**191** All-time calculations

**9** Weekly loan apps

**0** Pre-Quals this week

## PARTNER REPORT

LouAnn Daprato is your top sharing partner with 300 all-time installations and 0 calculations.

**See more in your Homestead Moves dashboard**

Regards,

Homestead Moves

© SimpleNexus

If you need help please contact crm@homesteadfunding.com

Unsubscribe 8 Airline Drive , Albany, NY 12205

**No Employee will ever ask you to wire funds or provide you with wiring instructions to use to wire funds. Please rely exclusively on the verbal directions from your closing attorney or settlement agent for instructions regarding closing funds.** This electronic message contains information that may be legally confidential and/or privileged. The information is intended solely for the individual or entity named above and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution (by electronic means or otherwise), or use of the contents of this transmission in strictly prohibited. If you have received this electronic message in error, please reply immediately to the sender that you have received this message in error, and delete it. **The confidentiality of Internet e-mail cannot be guaranteed. Information you send us over Internet e-mail could be viewed by persons other than the intended recipients. Therefore, you should not include your account numbers, credit card numbers, passwords, home address**

or other private information in your e-mail messages. **Please send all information to us through our secure portal or in an encrypted format. If you are unable to encrypt documents, please e-mail me and I will send you a link.** This information is being sent to you for your information or at your request. If you do not wish to receive any further information using an email medium, please send a reply email so stating or call your contact to confirm your desire to use a different method of communication.

**From:** crm@homesteadfunding.com <notifications@simplenexus.com>
**Sent:** Monday, June 27, 2022 12:12 AM
**To:** LouAnn Daprato <ldaprato@homesteadfunding.com>
**Subject:** Your Weekly Statistics



# Your weekly stats

## 06/19 — 06/27

### LEAD REPORT

| | | |
|---|---|---|
| Daniel Alvarado | danielalvarado3712@gmail.com | (203) 617-7859 |
| Pier-Angeli James | angelijames10@gmail.com | (347) 737-6308 |
| Daniel Velasquez | dvelasquez55@yahoo.com | (203) 449-1683 |
| Bianca Noroñas | bnoronas@gmail.com | (787) 989-4350 |
| Craig Baldwin | craigbaldwin39@gmail.com | (203) 676-8054 |

### APP REPORT

**6** Weekly installations

**305** All-time installations

**2** Weekly calculations

1

**193**All-time calculations

**6** Weekly loan apps

**0** Pre-Quals this week

### PARTNER REPORT

LouAnn Daprato is your top sharing partner with 305 all-time installations and 0 calculations.

**See more in your Homestead Moves dashboard**

Regards,

Homestead Moves

© SimpleNexus

If you need help please contact crm@homesteadfunding.com

Unsubscribe 8 Airline Drive , Albany, NY 12205

**No Employee will ever ask you to wire funds or provide you with wiring instructions to use to wire funds. Please rely exclusively on the verbal directions from your closing attorney or settlement agent for instructions regarding closing funds.** This electronic message contains information that may be legally confidential and/or privileged. The information is intended solely for the individual or entity named above and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution (by electronic means or otherwise), or use of the contents of this transmission in strictly prohibited. If you have received this electronic message in error, please reply immediately to the sender that you have received this message in error, and delete it. **The confidentiality of Internet e-mail cannot be guaranteed. Information you send us over Internet e-mail could be viewed by persons other than the intended recipients. Therefore, you should not include your account numbers, credit card numbers, passwords, home address or other private information in your e-mail messages. Please send all information to us through our secure portal or in an encrypted format. If you are unable to encrypt documents, please e-mail me and I will send you a link.** This information is being sent to you for your information or at your request. If you do not wish to receive any further information using an email medium, please send a reply email so stating or call your contact to confirm your desire to use a different method of communication.

2

Exhibit K

9:48           LTE



+1 (857) 597-2234

**Siri found new contact info**
Chris +1 (857) 597-2234 add...

Text Message
Yesterday 2:09 PM

Hi Kristen, it's Chris Lowis with Fairway Mortgage. Does my name ring a bell?

STATE OF NEW YORK
SUPREME COURT          ALBANY COUNTY

_____

HOMESTEAD FUNDING CORP.

                    Plaintiff,

        –against–

                                        Index No. 904554-22

FAIRWAY INDEPENDENT MORTGAGE
CORPORATION

                    Defendant.

_____

## **MEMORANDUM OF LAW IN SUPPORT OF**
## **PLAINTIFF'S ORDER TO SHOW CAUSE**

Richard C. Miller, Jr., Esq.
LAW OFFICES OF
RICHARD C. MILLER, JR., PLLC
P.O. Box 12155
Albany, New York 12212-2155
(518) 464-9700

Attorney for Plaintiff
HOMESTEAD FUNDING CORP.

Dated: Albany, New York
        August 9, 2022

## Table of Contents

PRELIMINARY STATEMENT ................................................................................................. 5

STATEMENT OF FACTS .................................................................................................... 6

ARGUMENT ..................................................................................................................... 11

I.  PLAINTIFF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER AND
    PRELIMINARY INJUNCTION SHOULD BE GRANTED BECAUSE DEFENDANT
    CONTINUES TO RAID PLAINTIFF'S CONTRACTED EMPLOYEES WHICH IS
    CAUSING AND WILL CONTINUE TO CAUSE IMMEDIATE AND IRREPARABLE
    HARM TO PLAINTIFF'S BUSINESS ........................................................................ 11

    A. Homestead can demonstrate a probability of success on the merits ........................... 13

    B. Homestead has already suffered and risks suffering further irreparable injury if an
       injunction does not issue .......................................................................................... 14

    C. Balancing of the equities compels injunctive relief in favor of homestead ................ 18

II. PLAINTIFF POSSESSES A MERITORIOUS CLAIM AGAINST FAIRWAY FOR
    TORTIOUS INTERFERENCE WITH CONTRACT ....................................................... 20

CONCLUSION .................................................................................................................. 25

## Table of Authorities

Barbagallo v. Marcum LLP 820 F. Supp. 2d (E.D.N.Y. 2011) ...................................................... 20

Battenkill Veterinary Equine P.C. v. Cangelosi, 1 A.D.3d (3d Dep't 2003) ..................... 13, 15, 16

Business Systems, Inc. v. Specialty Business Solutions, LLC 292 A.D.2d (2d Dep't 2002) ....... 17

Cangemi v. Yeager 185 A.D.3d (4th Dep't. 2020) ................................................................ 13, 18

Carvel Corp. v. Noonan 3 N.Y.3d (2004) ............................................................................. 21, 22

Colgate Inn, LLC v. Eberhardt, LLC 206 A.D.3d (3d Dep't. 2022) ............................................. 20

Doe v. Axelrod, 73 N.Y.2d (1988) ......................................................................................... 12, 15

Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d (1959) ........................................................... 15, 18

Felix v. Brand Service Group LLC 101 A.D.3d (4th Dep't. 2012) ................................................ 18

Frank May Assocs. Inc. v. Boughton, 281 A.D.2d (3d Dep't 2001) ...................................... 12, 15

Giffords Oil Co. v. Wild 106 A.D.2d (2d Dep't 1984) ................................................................. 15

Golden v. Steam Heat, 216 A.D.2d (2d Dep't 1995)................................................................... 15

Green Harbour Homeowners' Association, Inc. v. Ermiger 67 A.D.3d (3d Dep't. 2009) ...... 12, 19

Guard-Life Corp. v. Parker Hardware Mfg. Corp. 50 N.Y.2d (1980) .................................... 21, 22

Hobler v. Hussain 111 A.D.3d (3d Dep't 2013) ......................................................................... 20

Ikon Off. Sols., Inc. v. Usherwood Off. Tech., Inc., 21 Misc. 3d 1144(A) (N.Y. Sup. 2008) ..... 15

Israel v. Wood Dodson Co. 1 N.Y. 2d (1956) ............................................................................ 20

Lama Holding Company v. Smith Barney Inc. 88 N.Y.2d (1996) ................................................ 20

Matter of Korn v. Gulotta, 72 N.Y.2d (1988)............................................................................... 15

McLaughlin, Piven, Vogel, Inc. v. W. J. Nolan & Co. 114 A.D.2d (2d Dep't 1986) ............ 13, 17

Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp., 70 A.D.2d (3d Dep't 1979) .......... 18

NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc. 87 N.Y.2d (1996) .............................. 20

Nobu Next Door, LLC, v. Fine Arts Housing, Inc. 4 N.Y.3d (2005) ............................................ 12

Perpignan v. Persaud 91 A.D.3d (2d Dep't. 2012) ........................................................................ 12

Peterson v. Corbin, 275 A.D.2d (2d Dep't 2000), lv. app. dism., 95 N.Y.2d 919 (2000) ............ 13

Prime Materials Recovery, Inc. v. J.J.R. Properties Of New York LLC 2019 WL 4805378 (N.D.

    N.Y. 2019) ..................................................................................................................... 20, 21

Ray v. Stockton 162 A.D. 3d (4th Dep't 2018) ............................................................................. 22

State of New York v. City of New York 275 A.D.2d (2d Dep't. 2000) ........................................ 14

The Lake George Association v. The NYS Adirondack Park Agency 2022 WL 2127993 (Sup. Ct.

    Warren Co. 2022) ................................................................................................................ 14

Town & Country House & Home Serv. v. Newbery 3 N.Y.2d (1958) ......................................... 17

Town of Liberty Volunteer Ambulance Corp. v. Catskill Regional Med. Ctr., 30 A.D.3d (3d Dep't

    2006) .................................................................................................................................... 15

Tucker v. Toila 54 A.D.2d (4th Dep't 1976) ............................................................................... 13

Vanderminden v. Vanderminden, 226 A.D.3d (3d Dep't 1996) .................................................. 13

Wilder v. Fresenius Medical Care Holdings, Inc. A.D.3d (1st Dept. 2019) ................................ 11

Winkler v. Kingston Hous. Auth., 238 A.D.2d (3d Dep't 1997) .................................................. 15

Xiaokang Xu v. Xiaoling Shirley He, (3d Dep't 2017) ......................................................... 15, 18

### Statutes

C.P.L.R. § 6301 ...................................................................................................................... 10, 11

### Other Authorities

David D. Siegel and Patrick M. Connors, New York Practice § 328 (6th ed.) ............................ 12

## PRELIMINARY STATEMENT

With full knowledge of the existence of employment agreements for a definite term between Homestead Funding Corp. ("Homestead") and its loan originators, Fairway Independent Mortgage Corporation ("Fairway") nonetheless set about on a campaign to raid Homestead's loan originators ("LOs"), inducing two, Andrew Aiello ("Aiello") and LouAnn Daprato ("Daprato"), to breach their employment agreements and come to work for Fairway. Fairway's actions to procure breaches of the LOs' contracts occurred after Fairway received a Cease-and-Desist Letter from Homestead providing details regarding the terms of the loan originator employment agreements, including the fact that they were for a definite term. Fairway's procurement of the breaches also followed receipt of a copy of a sample Homestead loan originator employment agreement. Even after the commencement of this legal action, Fairway has persisted in its continuing effort to deliberately induce additional Homestead loan originators to breach their employment agreements and come to work for Fairway, right up to the present time. The efforts undertaken by Fairway to induce a breach by Homestead loan originators is both audacious and spectacular - offering gargantuan signing bonuses and half-million-dollar performance bonuses to procure breaches from additional Homestead LOs and to incentivize the recently hired LOs to breach the post-employment covenants contained in their employment agreements.

It is imperative that injunctive relief issue without delay to ensure that Fairway is not permitted to continue to raid Homestead's loan originators, causing irreparable injury to Homestead through, inter alia, the loss of its goodwill and contracted employees. Preliminary injunctive relief should be granted to protect the status quo and provide protection for the future, as the evidentiary presentation in support of the requested injunctive relief demonstrates that future injury is imminent. Based on the continuous and ongoing predation of Homestead's loan originators by Fairway, who are all under a contract for a definite term, the grant of injunctive

relief is warranted and appropriate to prevent significant irreparable harm during the pendency of this action, which would otherwise render the ultimate judgment in this action ineffectual.

## STATEMENT OF FACTS

Homestead is a New York domestic corporation formed in 1994 and based in Albany, New York, with a total of 32 office locations nationwide. It has traditionally operated as a licensed mortgage bank in the upstate region of New York, and now operates in most of the United States. Homestead has built its brand over the course of nearly thirty years based largely on its customer service, professionalism, and diligence when it comes to helping borrowers obtain mortgage loans. Homestead's retail lending business is based on its team of licensed LOs, who directly interface with active and prospective customers. In support of its sales force of LOs, and through the investments of significant managerial effort and the expenditures of considerable sums of money in technology, Homestead facilitates, among other things, customer prospecting and development, sales training, advertising, and marketing, and networking opportunities.

Fairway is a Wisconsin domestic corporation (and an authorized foreign corporation in New York State) based in Madison, Wisconsin which advertises over 400 branch locations nationwide. Fairway has had a limited market presence in the greater Capital District, in no small part due to the success of Homestead in this market. Based on its recent actions, it appears that Fairway seeks to expand its loan origination force in this and other areas within Homestead's footprint by raiding Homestead's LOs.

Homestead has historically entered into employment agreements with its loan originators which provide for a definite term of one year, but which will automatically renew for additional one-year terms at the end of the term of the agreement unless either party provides sixty (60) days' notice to terminate. During the term of the agreement either party may terminate the agreement

with 60 days' prior written notice. Homestead also has the right to immediately terminate the Employment Agreement for reasonable cause, including, but not limited to: (1) breach of LO's fiduciary duty of utmost loyalty to Homestead as his/her employer; (2) an instance of gross dereliction of duties by the LO in any respect; (3) an unintentional material violation of regulatory compliance mandates which exposes Homestead to regulatory oversight consequences, and/or an intentional violation regardless of materiality; or (4) other instances of misconduct, including a violation of Homestead company policies and/or the provisions of the Homestead Employment Policy Handbook. Homestead presently has employment agreements for a definite term as described above with all of its loan originators, including the two loan originators—Aiello and Daprato—who were induced to breach said agreements to begin employment with Fairway[1].

The contract terms Homestead has with its loan originators is not typical. Most mortgage lenders, including Fairway, have only "at-will" employment contracts with their loan originators, such that each party to the employment agreement may terminate the agreement at any time. Due to the prevalence of "at-will" employment agreements in the mortgage industry, it is common for mortgage lenders to "raid" other mortgage lenders, seeking to recruit as many of the best loan originators from some other mortgage lender as possible, and they are free to do so with no legal consequence because of the at-will nature of the employment relationship.

Aiello was hired as an LO on May 24, 2010, and spent his entire tenure at Homestead's Clifton Park, New York branch. Aiello's most recent Employment Agreement and all related addenda were executed on January 1, 2019. Daprato began working for Homestead as an LO on January 6, 2020, in its Danbury, Connecticut branch. Daprato duly executed her Employment

---

[1] As noted in Mr. Rutherford's Affidavit, Homestead recently learned that although Fairway induced Daprato to breach her agreement with Homestead to work for Fairway (she told multiple representatives of Homestead that she was going to Fairway during her exit interview and her hiring by Fairway was implicitly admitted by attorneys for Fairway in subsequent discussions), sometime subsequent to her providing notice of termination to Homestead, a change of plans occurred (the genesis of which being unknown to Homestead at present), and she is now listed on the NMLS as working for Movement Mortgage, LLC.

Agreement and all related addenda on that date.

Based upon the information available to Homestead at this time, on or about May 16th, 2022, Homestead became aware that Fairway was soliciting Homestead LOs to come to work for Fairway. On May 19th, 2022, Homestead sent a Cease-and-Desist Letter by overnight mail to Fairway at its corporate headquarters, advising Fairway that all Homestead loan originators had signed employment agreements for a definite term and as such, the efforts by Fairway to induce Homestead loan originators to terminate their employment agreement would, if successful, constitute tortious interference with contract and be actionable as such [See Exhibit A of Attorney Rutherford's Affirmation]. Homestead obtained confirmation of delivery of the Cease-and-Desist Letter from UPS, and a few days later, a corporate attorney for Fairway contacted Justin M. Rutherford, Esq., Homestead's Vice President, Business & Legal Affairs, and the author of the Cease-and-Desist Letter, to discuss the matter.

During the ensuing telephone conversation, Mr. Rutherford reiterated the position advanced in the letter that every Homestead LO was a signatory to an employment agreement for a definite term and that efforts by Fairway to induce Homestead LOs to breach their agreement and come to work for Fairway would, if successful, constitute the tort of tortious interference with contract. This telephone conference confirms the receipt of the Cease-and-Desist Letter by Fairway and the transmittal of the Cease-and-Desist Letter to Fairway's legal department, which prompted a spontaneous phone call to Mr. Rutherford by corporate counsel for Fairway to discuss the contents of the letter and the underlying contractual relationships that Homestead has with each of its loan originators. There is no doubt, then, that Fairway was advised of the existence of a contract between Homestead and each of its loan originators for a definite term in mid-May and it was warned that further inducements of Homestead LOs to breach their employment agreements would be considered actionable as tortious interference with contract.

Through the intentional efforts of Fairway to procure a breach of his employment agreement and come to work for Fairway, Aiello resigned on June 14th, 2022. On the following day, upon information and belief, Aiello sent a broadcast text to many Homestead originators announcing his termination. The text was designed to invite the LOs receiving it to contact Aiello regarding the circumstances of his defection as a springboard to soliciting them to likewise breach their agreements to come to work for Fairway. A short time after Aiello sent his June 15th text, Attorney Rutherford sent a letter to Aiello addressed to his personal email address advising him of some of the salient provisions of his employment agreement, including specifically the covenant not to solicit Homestead loan originators for a period of one year following the termination of his employment with Homestead. Aiello replied by requesting a copy of his employment agreement and a copy was sent to him a short time later, on that same morning. A separate email attaching Aiello's employment agreement was also sent to Fairway later that same day. Sometime shortly thereafter, on or about June 16th, with blatant disregard for the admonition contained in the Cease-and-Desist Letter regarding Fairways' actions constituting tortious interference with contract, Fairway sent another text to Homestead employees including, upon information and belief, LOs, announcing Aiello's hiring by Fairway and inviting the employees to contact Fairway, clearly seeking to exploit Aiello's breach to recruit additional Homestead LOs.

Through the continuing deliberate efforts of Fairway to induce a breach, Daprato resigned from Homestead on July 12th, 2022, providing sixty days' notice of termination, clearly having been coached by Fairway to do so. The extent of Aiello's involvement in her decision to breach her agreement is not presently known, but what is known is that representatives of Fairway engaged in a concerted effort to procure her breach and at the time she gave her notice she told representatives of Homestead she was heading to Fairway.

Later that same day, Homestead's legal department discovered evidence that while Daprato

was an employee of Homestead, owed it a fiduciary duty of utmost loyalty, and was in active discussions with Fairway representatives to come to work there, she violated her fiduciary obligations and breached her employment agreement by misappropriating some of Homestead's proprietary and confidential information, including trade secrets, by sending this information to her personal email account. Homestead has reason to believe that this exfiltration of Homestead's proprietary and confidential information, including trade secrets, by Daprato during her last days as a Homestead employee, occurred with the knowledge and under the direction of representatives of Fairway.

Based on the discovery of this new evidence of Daprato's breach of her fiduciary duty and the misappropriation of Homestead's trade secrets subsequent to the commencement of this action, Homestead intends to amend its Complaint as of right to include additional causes of action against Fairway for aiding and abetting the breach of fiduciary duty, aiding and abetting the misappropriation of trade secrets, and unfair competition, as well as possible other claims.

Fairway's efforts to raid Homestead's loan originators has continued unabated up to the present time, even with full knowledge on Fairway's part that a legal action has already been commenced against it and that if this recruiting is successful in procuring another LO to breach his or her agreement, it would constitute yet another commission of tortious interference with contract. Based on its behavior, Fairway appears to believe it is free to continue its unscrupulous and unlawful ways with impunity and plans to continue to raid Homestead's LOs.

## ARGUMENT

I.  PLAINTIFF'S REQUEST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD BE GRANTED BECAUSE DEFENDANT CONTINUES TO RAID PLAINTIFF'S CONTRACTED EMPLOYEES WHICH IS CAUSING AND WILL CONTINUE TO CAUSE IMMEDIATE AND IRREPARABLE HARM TO PLAINTIFF'S BUSINESS.

"A temporary restraining order may be granted pending a hearing for a preliminary injunction where it appears that immediate and irreparable injury, loss or damage will result unless the defendant is restrained before the hearing can be had." C.P.L.R. § 6301. Wilder v. Fresenius Medical Care Holdings, Inc. 175 A.D.3d 406 (1st Dep't. 2019).

Upon information and belief, Fairway obtained possession of the Employment Agreement when Aiello requested a copy via email on June 15, 2022 and was promptly provided the same by email that day, which is attached as Exhibit E to Mr. Rutherford's Affidavit. Therefore, Fairway knew that Homestead LOs are subject to employment agreements for a definite term and are not "at-will" employees by at least two forms of notice: first, as of the delivery of the Cease-and Desist Letter on May 20th, 2022; and second, incontrovertibly as of June 15th, 2022, when it came into possession of an actual copy of the agreement. Accordingly, Fairway's recruiting efforts subsequent to it having knowledge of the existence of these employment agreements, by seeking to procure a breach of their agreements by Homestead originators, would, if successful, undoubtedly constitute tortious interference with contract under applicable New York law. The fact that Fairway persisted in this intentional and improper corporate behavior despite being warned demonstrates its disregard for corporate norms. What's more, Homestead has evidence that suggests that Fairway is/was aiding and abetting Aiello and Daprato in numerous violations of the relevant provisions of the Employment Agreement, which are detailed at length in the Mr. Rutherford's Affidavit and Attorney Rutherford's Affirmation that accompany this Memorandum

of Law.

It is indisputable that Aiello and Daprato already agreed and acknowledged that immediate injunctive relief would be necessary and appropriate in instances of any misappropriation of Homestead's Proprietary Information or solicitation of Homestead employees to work for another mortgage lender, as set forth in sections 16 and 17 of their respective Employment Agreements [located in Exhibit E to Rutherford Affidavit].

Even assuming, arguendo, that Fairway claims to not have knowledge of Aiello's and Daprato's own contractual consent to immediate injunctive relief under the present circumstances, Homestead is still entitled to a preliminary injunction because it can readily show a probability of success on the merits, irreparable injury absent an injunction, and a balancing of equities in its favor. See C.P.L.R. 6301; Frank May Assocs. Inc. v. Boughton, 281 A.D.2d 673, 674 (3d Dep't 2001); see Nobu Next Door, LLC, v. Fine Arts Housing, Inc. 4 N.Y.3d 839 (2005); Doe v. Axelrod, 73 N.Y.2d 748, 750 (1988). In order to be granted preliminary injunctive relief, a plaintiff must "demonstrate a probability of success on the merits, danger of irreparable injury in the absence of an injunction and a balance of equities in its favor." Nobu Next Door, LLC v Fine Arts Hous., Inc. 4 N.Y.3d 839, 840 (2005); *accord* Green Harbour Homeowners' Assn., Inc. v Ermiger 67 A.D.3d 1116, 1117 (3d Dep't 2009). "The purpose of a preliminary injunction is to maintain the status quo and prevent the dissipation of property that could render a judgment ineffectual" Perpignan v. Persaud 91 A.D.3d 622 (2d Dep't 2012).

Each of the required elements for the grant of a preliminary injunction will be addressed in turn, which will demonstrate to this Court that a preliminary injunction should issue without delay to preserve the status quo pending a final decision on the merits and to militate against Fairway's unrestrained and wrongful interference with contractual rights and obligations as between Homestead and its employees, causing a loss of customers for residential mortgage

loans, permanent loss of revenues from those customers, and loss of referral business usually generated from these customers. See Vanderminden v. Vanderminden, 226 A.D.2d 1037, 1042 (3d Dep't 1996); *see also* Battenkill Veterinary Equine P.C. v. Cangelosi, 1 A.D.3d 856, 859 (3d Dep't 2003).

## A. HOMESTEAD CAN DEMONSTRATE A PROBABILITY OF SUCCESS ON THE MERITS

"To demonstrate a likelihood of success on the merits, it is sufficient for the moving party to make prima facie showing of his or her right to relief and the actual proving of the case should be left to the full hearing on the merits." Cangemi v. Yeager 185 A.D.3d 1397, 1398 (4th Dep't 2020) (internal citations omitted); *see* McLaughlin, Piven, Vogel, Inc. v. W. J. Nolan & Co. 114 A.D.2d 165, 172–73 (2d Dep't 1986). "To establish a likelihood of success on the merits, the movant must show that its right to a preliminary injunction is plain on the facts of the case." Peterson v. Corbin, 275 A.D.2d 35, 37 (2d Dep't 2000), *lv. app. dism.*, 95 N.Y.2d 919 (2000). "Importantly it is not for this court to determine finally the merits of an action upon a motion for preliminary injunction; rather, the purpose of the interlocutory relief is to preserve the status quo until a decision is reached on the merits." Tucker v. Toila 54 A.D.2d 322, 325 (4th Dep't 1976) (internal citations omitted). "[I]t is clear that the showing of a likelihood of success on the merits required before a preliminary injunction may be properly issued must not be equated with the showing of a certainty of success." Id. at 326.

Siegel's New York Practice treatise characterizes likelihood of success on the merits as "a strong showing in affidavits and other proof supplying evidentiary detail." *See* David D. Siegel and Patrick M. Connors, New York Practice § 328 (6th ed.). "The existence of factual questions for a trial does not prevent a party from establishing a likelihood of success on the merits; success need not be a certainty to obtain a preliminary injunction." Cooperstown Capital, LLC, v. Patton 60 A.D.3d 1251, 1252-53 (3d Dep't 2009); *see also* Karabatos v. Hagopian, 39 A.D.3d 930 (3d

Dep't 2007). "Indeed, '[w]here, as here, the denial of a preliminary injunction would disturb the status quo and render the final judgment ineffectual, the degree of proof required to establish the element of likelihood of success on the merits should be reduced.'"[2] Lake George Ass'n v. NYS Adirondack Park Agency 2022 WL 2127993 at 5 (Sup. Ct. Warren Co. 2022); *see* State of New York v. City of New York 275 A.D.2d 740 (2d Dep't. 2000).

The facts surrounding this case incontrovertibly evidence that Homestead will more than likely prevail on its claim for injunctive relief because Homestead has, at this early stage, provided demonstrable evidence to the Court in the form of exhibits and affidavits showing that Fairway patently and intentionally induced two employees to leave Homestead and breach their respective contractual obligations to Homestead in June and July. The intentional procurement of these breaches by Fairway occurred despite having received a Cease-and-Desist Letter on May 20, 2022. This letter expressly provided notice to Fairway of an employment agreement for a definite term being in full force and effect for all Homestead loan originators. Between the various inculpatory text messages from Fairway's employees showing an active and ongoing effort to recruit loan originators, and Attorney Rutherford's Affirmation and Michael Rutherford's Affidavit, the Court is provided a detailed account of the ensuing facts, which plainly makes out a prima facie case of tortious interference with contract sufficient to support a need for injunctive relief against an organization that has and continues to willfully interfere with Homestead's contracted employees.

## B. HOMESTEAD HAS ALREADY SUFFERED AND RISKS SUFFERING FURTHER IRREPARABLE INJURY IF AN INJUNCTION DOES NOT ISSUE

To succeed on an action seeking permanent injunction, much like the showing required for a preliminary injunction, "a plaintiff must establish that he or she would suffer 'irreparable injury

---

[2] Homestead asserts that it has met its burden regarding this element without any reliance on the line of cases such as The Lake George Association v. The NYS Adirondack Park Agency and State of New York v. City of New York. This line of cases is mentioned because it is true that if Fairway is successful in its predation of Homestead's LOs, the ultimate judgment would be rendered ineffectual due to the irreparable harm caused to Homestead's goodwill before the judgment is obtained.

in the absence of an adequate legal remedy.'" Xiaokang Xu v. Xiaoling Shirley He, 1225–26 (3d

Dep't 2017); Town of Liberty Volunteer Ambulance Corp. v. Catskill Regional Med. Ctr., 30

A.D.3d 739, 740 (3d Dep't 2006). In circumstances like this case, irreparable injury is defined as

"any injury for which a monetary award alone cannot be adequate compensation." Ikon Off. Sols.,

Inc. v. Usherwood Off. Tech., Inc., 21 Misc. 3d 1144(A) 17 (N.Y. Sup. 2008); *see* Winkler v.

Kingston Hous. Auth., 238 A.D.2d 711 (3d Dep't 1997). Further, the party seeking relief must

show that any such "injury is more than just a mere possibility and, in fact, is likely and imminent

absent injunctive relief." Id.; *see* Golden v. Steam Heat, 216 A.D.2d 440 (2d Dep't 1995). Among

other ways, irreparable injury can be shown by the loss of a business's goodwill to support a

request for injunctive relief, notwithstanding a request for money damages in the same action.

Battenkill Veterinary Equine P.C. v. Cangelosi at 859; *see* Frank May Assoc. v. Boughton at 674.

"Injunctive relief is protection for the future" and is proper where an injury is imminent. Electrolux

Corp. v. Val-Worth, Inc., 6 N.Y.2d 556, 565 (1959). The fact that an injury has not actually

occurred does not prohibit the Court from restraining the alleged illegal act. Matter of Korn v.

Gulotta, 72 N.Y.2d 363, 534 (1988). The decision to grant or deny provisional relief lies within

the sound discretion of the trial court. *See* Doe v. Axelrod at 750; *see also* Giffords Oil Co. v. Wild

106 A.D.2d 610 (2d Dep't 1984) (in action for permanent injunction against misuse of trade secrets,

plaintiff was granted preliminary injunction restraining former employee from such misuse while

action was pending).

In *Battenkill Veterinary Equine, P.C.*, the Plaintiff, a veterinary clinic and former

employer—seeking preliminary injunctive relief against its former employee—had spent over 20

years building its business in a certain geographic area through establishing goodwill, including

referral business. The Third Department held that the prospective destruction of said goodwill by

a former veterinarian violating the restrictive covenants in an employment agreement was prima

facie evidence of irreparable injury and also served to balance the equities in the aggrieved party's favor, resulting in a preliminary injunction being affirmed by the Third Department.

The instant case is analogous to *Battenkill* because Homestead, through its loan originators, has invested years and extensive resources into cultivating and building its brand in the markets in which it operates. Through its tortious interference, Fairway induced two loan originators, who are de facto public faces of the organization by virtue of their roles, to breach the terms of their respective employment agreements. In so doing, they undermined the goodwill of Homestead with realtors, current and prospective customers, and other actors within the mortgage banking market.

There can be no doubt that Fairway's conduct has *already* imposed a significant injury to Homestead in the form of losing Aiello, an LO with over a decade of institutional knowledge, professional relationships, and training, most, or all of which had been facilitated by Homestead. Then, even after commencement of the instant litigation, Fairway compounded the injury to Homestead by inducing yet another loan originator in Daprato to breach her agreement, expecting to come to work for Fairway (but as noted in Mr. Rutherford's Affidavit and in a footnote in the Statement of Facts, Daprato is inexplicably not presently working for Fairway and instead working for another mortgage lender). Further, upon Daprato's notice of her intent to terminate her employment, Homestead has uncovered extensive email evidence of Daprato's misappropriating confidential customer information, client lists and proprietary information (at a time when she was in active discussions with Fairway and intending to go to work there), all of which violates her employment agreement and other Homestead policies.

Aiello has already contacted former co-workers from Homestead, in what can only be described as a veiled invitation to consider following his lead as a newly minted "branch manager." Less surreptitiously, Daprato has patently exfiltrated confidential active and prospective customer information by sending said information from her Homestead email account to her personal

"Gmail" account.

Confidential customers lists requiring the utilization of extensive resources and expense to assemble the customer information containing non-public personal information which would be difficult, if not impossible to recreate, have been found to be entitled to trade secret status, with appropriate protections, including the grant of immediate injunctive relief, found to be warranted by the Courts in the event of misappropriation. *See* Town & Country House & Home Serv. v. Newbery 3 N.Y.2d 554, 558 (1958). *see also* McLaughlin, Piven, Vogel, Inc. v. W. J. Nolan & Co. 114 A.D.2d 165 (2d Dep't 1986), Eastern Business Systems, Inc. v. Specialty Business Solutions, LLC 292 A.D.2d 336 (2d Dep't 2002). Taken together, it is indisputable that the behavior collectively exhibited by Aiello and Daprato is in service of pilfering goodwill and referral business that has been generated by Homestead for decades in order to immediately benefit Fairway.

These incursions overwhelmingly support Homestead's obligation to show that further injury is beyond a mere possibility. Simply stated, as bad as the present injuries are, the effects of which will be felt for years, the looming threat of unbridled solicitation and tortious interference with more contracted employees is what poses an even greater risk of imminent, incalculable, and irreparable injury to Homestead— a risk which can only be mitigated by this Court enjoining Fairway from continuing its unlawful predatory conduct. Homestead also fears that if Fairway is not restrained from its continued raiding through the grant of a TRO and subsequently a preliminary injunction, that Fairway may procure additional breaches, and these other breaching Homestead LO's may act in the same inappropriate way, misappropriating other Homestead confidential and proprietary information, including trade secrets.

In addition to the risk of corporate raiding of Homestead's employees, there also exists actual instances of misappropriation of Homestead's confidential customer information in the form

of non-public personal information, customer lists, and other proprietary information that Aiello and Daprato were prohibited from taking under the provisions in their employment agreements, as previously mentioned. The Court of Appeals unambiguously held in Electrolux Corp. v. Val-Worth, Inc. that injunctive relief protects aggrieved parties for the future and, here, this honorable Court would be right to conclude that the future risk of harm to Homestead would be irreparable and is dangerously imminent, as the facts readily suggest.

Homestead seeks to maintain the status quo to avoid any further malfeasance by Fairway during the pendency of this action. As stated supra, the very purpose of injunctive relief is to prevent a future harm. Thus, the fact that Fairway—with utter indifference towards a Cease-and-Desist Letter sent by Homestead's legal department—induced Aiello and Daprato to breach their employment agreements only bolsters Homestead's claim that the risk of further damage is unsettlingly imminent. Thus, the Court would be well within its power to restrain Fairway and its agents from initiating any contact with current Homestead employees who are under an employment agreement, i.e., LOs.

## C. BALANCING OF THE EQUITIES COMPELS INJUNCTIVE RELIEF IN FAVOR OF HOMESTEAD

When balancing the equities, "it must be shown that the irreparable injury to be sustained by the plaintiff is more burdensome to it than the harm caused to defendant through imposition of the injunction." Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp., 70 A.D.2d 1021, 1022 (3d Dep't 1979); see Xiaokang Xu v. Xiaoling Shirley He at 1225. "Here, the irreparable injury to plaintiffs is more burdensome than the harm caused to defendants through the imposition of the injunction." Felix v. Brand Service Group LLC 101 A.D.3d 1724, 1726 (4th Dep't 2012). "Courts have found the balance of equities to be tipped in favor of a party seeking preliminary injunctive relief when 'an injunction would provide some security to [plaintiff,] while merely restraining defendant from continuing any unlawful or wrongful activities'" Cangemi v. Yeager at 1400. "As

there is no proof of prejudice and the injunction preserves the status quo, the equities balance in favor of plaintiff..." Green Harbour Homeowners' Assn., Inc. v. Ermiger at 1117.

In the case at bar, a balance of the equities strongly favors both preliminary and permanent injunctive relief for Homestead. Allowing Fairway's aggressive solicitation to continue during the pendency of the predicate action would doubtless have a deleterious effect on Homestead's business (as detailed above and in Mr. Rutherford's Affidavit) and would further embolden a company that has demonstrated a flagrant disregard for the contractual obligations of Homestead's employees – a dangerous precedent, indeed.

Enjoining Fairway from further predatory attempts to solicit Homestead's contractually obligated loan originators would allow Homestead to maintain the very lifeblood of its business development without Fairway tortiously interfering with its employment agreements and would prevent further irreparable economic harm from occurring. On the other hand, an injunction proscribing Fairway from continuing to raid Homestead's employees with impunity would be, at most, a minor inconvenience causing Fairway to solicit "at-will" employees from any number of other mortgage lenders or to employ alternative ways of establishing a presence in the markets where it has been targeting Homestead's loan originators.

As in *Green Harbour*, there is no proof that an injunction restraining Fairway from tortiously interfering with Homestead's loan originators would cause any prejudice to Fairway with the abundance of other lenders with "at-will" employees to recruit from and it would serve to preserve the status quo pending a determination of this matter. Not granting a preliminary injunction at the outset of this litigation would permit Fairway to continue to raid Homestead's loan originators during the pendency of the action which could render the ultimate judgment in this action ineffectual. Thus, the balance of equities weighs heavily in favor of granting the requested preliminary injunctive relief to protect Homestead during the pendency of this action.

## II.   PLAINTIFF POSSESSES A MERITORIOUS CLAIM AGAINST FAIRWAY FOR TORTIOUS INTERFERENCE WITH CONTRACT

"Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." Lama Holding Company v. Smith Barney Inc. 88 N.Y.2d 413, 424 (1996); *see* Colgate Inn, LLC v. Eberhardt, LLC 206 A.D.3d 1197, 1204 (3d Dep't 2022). "Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc. 87 N.Y.2d 614, 621 (1996); *see generally* Israel v. Wood Dodson Co. 1 N.Y.2d 116 (1956) "Courts have noted that "[a] defendant intentionally procures a breach when he ... 'commits an intentional act whose probable and foreseeable outcome is that one party will breach the contract, causing the other party damage.'" Prime Materials Recovery, Inc. v. J.J.R. Properties of New York, LLC 2019 WL 4805378 at 3 (N.D.N.Y. 2019).

Under New York jurisprudence, courts have drawn a significant distinction between the treatment of "at-will" employees working under an employment contract and those employees who are signatories to a contract for a definite term. In order to prove tortious interference with contract in an instance involving at-will employment, the use of "wrongful means" to procure a breach on the part of the interfering party must be alleged and proven. "Significantly, as the contract here was terminable at will, plaintiff was also required to show 'that [Hussain] employed wrongful means, such as fraud, misrepresentation or threats[,] to effect the termination of employment." Hobler v. Hussain 111 A.D.3d 1006, 1008 (3d Dep't 2013); *see also* Barbagallo v. Marcum LLP 820 F. Supp. 2d 429, 444 (E.D.N.Y. 2011). "Where contracts terminable at will have

been involved, we have upheld complaints and recoveries in actions seeking damages for interference when the alleged means employed by the one interfering were wrongful... [a]bsent some such misconduct, no liability has resulted to one whose actions have induced nonperformance of a contract deemed to be voidable and thus unenforceable." Guard-Life Corp. v. Parker Hardware Mfg. Corp. 50 N.Y.2d 183, 194 (1980). "Moreover, inasmuch as the alleged interference on this branch of the case was with respect to an unenforceable contract, there is no liability in tort unless the means employed to effect the interference was wrongful; mere knowing persuasion would not be sufficient." Id. at 196; see also Carvel Corp. v. Noonan 3 N.Y.3d 182 (2004).

Contrast the foregoing with the treatment of the courts when addressing questions of tortious interference with contract in an instance of a contract for a definite term. In the instance of a binding, enforceable contract, lawful conduct is still enough to constitute the commission of tortious interference with contract, including specifically, mere persuasion. In the instance of at-will or voidable contracts, the courts instead apply the same standard that is utilized in cases involving tortious interference with contractual relations, requiring wrongful conduct in the part of the interfering party. "Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior. Where there has been no breach of an existing contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant." Carvel Corp. v. Noonan at 189-90; see also Prime Materials Recovery, Inc. v. J.J.R. Properties Of New York, LLC 2019 WL 4805378 (N.D.N.Y. 2019).

"Wrongful means" requires substantial culpable conduct on the part of the interfering party. "The Carvel Court also defined more culpable conduct as including the wrongful means described

earlier by the Court in *Guard-Life Corp*..." Ray v. Stockton 162 A.D. 3d 1677, 1679 (4th Dep't 2018) (internal quotations omitted). The Fourth Department continued to explain "wrongful means" in *Ray*, stating: "The *Carvel* Court wrote, 'Continuing to draw on the Restatement, we added in *Guard-Life*: Wrongful means include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract.'" Id. at 1679-80 (citing the Second Restatement of Torts §§ 767-68).

On the instant facts (emphasized below), involving an employment agreement for a definite term, there is no need to demonstrate "wrongful means" on the part of Fairway in order to make out a prima facie case of tortious interference with contract. Once knowledge of the existence of a contract for a definite term is shown on the part of Fairway, mere persuasion by Fairway deliberately focused on procuring a breach by a Homestead LO is enough to demonstrate tortious interference with contract, if it ultimately results in an actual breach causing damage.

Each of the elements of a cause of action for tortious interference are present under the facts of this case. As related in Mr. Rutherford's Affidavit, all Homestead LOs are subject to an employment agreement with a definite term. As confirmed in Attorney Rutherford's Affirmation, Fairway was formally notified of the existence of a contractual relationship between Homestead and its loan originators in a Cease-and-Desist Letter sent by Attorney Rutherford on May 19th, 2022, and received by Fairway the following day. As further related in Attorney Rutherford's Affirmation, a few days after this letter was delivered to Fairway, corporate counsel for Fairway acknowledged in a telephone conference with Attorney Rutherford that the Cease-and-Desist Letter was received by Fairway, so Fairway unquestionably had knowledge of these employment agreements as of May 20th, the date the letter was delivered to Fairway.

Subsequent to Fairway obtaining knowledge that Homestead has contracts providing for a

definite term with all of its LOs, it nonetheless proceeded to induce Aiello, and later Daprato, to breach their respective employment agreements with Homestead and come to work for Fairway, which has caused irreparable and incalculable harm to Homestead. The evidence proffered in Mr. Rutherford's Affidavit and contained in Homestead's Complaint shows that Fairway was able to procure Aiello's breach as a direct result of the conditional offer of employment made to Aiello by Fairway, deliberately made to Aiello by Fairway after obtaining knowledge of his employment contract for a definite term.

This conditional offer of employment provides for a signing bonus of $600,000.00 payable to Aiello within the first two months of employment and also provided for an additional performance bonus of $500,000.00 if Aiello is able to recruit and staff a branch that can produce $200,000,000.00 in closed mortgage volume within the first two years of his employment. There is no doubt under these facts that Fairway intentionally acted in such a manner so that the probable and foreseeable outcome of their deliberate activities was that Aiello would breach his employment agreement. His subsequent breach was the direct result of the deliberate conduct by Fairway seeking that very outcome, with full knowledge that he was bound by an employment agreement at the time Fairway was taking these actions.

It is the language in the conditional offer of employment incentivizing Aiello to recruit other originators that compounds the irreparable harm caused by Aiello's breach to Homestead. There is no doubt based on the evidence submitted in Mr. Rutherford's Affidavit that Aiello already has violated his employment agreement by soliciting other Homestead loan originators to breach their employment agreements and come to work for Homestead, in order to meet the $200,000,000.00 threshold entitling him to this additional performance bonus. Fairway has unquestionably aided Aiello's efforts to induce breaches by Homestead loan originators by sending additional texts, both in the immediate aftermath of Aiello's breach and as recently as this past

week.

The exact terms regarding the inducements offered to Daprato by Fairway are not presently known to Homestead, but likely parallel those offered to Aiello. Notably, the procurement of Daprato's breach of her employment agreement by Fairway occurred after Fairway had received a copy of Aiello's actual employment agreement, so it had specific knowledge of the terms of Homestead's employment agreement, when making its offer to her (even though Daprato, for a reason unknown to Homestead at this time, did not ultimately go to work for Fairway).

Homestead has made out a prima facie case of tortious interference with contract and a prima facie showing that Fairway's wrongful conduct has caused and is causing irreparable harm to Homestead. This is readily shown in Homestead's Complaint and supplemented in the evidentiary presentation accompanying this application for equitable relief, including Mr. Rutherford's Affidavit and Attorney Rutherford's Affirmation and the Exhibits attached thereto. Homestead therefore has a likelihood of success on the merits in this action, warranting the grant of the temporary restraining order and the preliminary injunction requested herein.

As stated in Mr. Rutherford's Affidavit, subsequent to the filing of the Complaint in this action, Homestead has become aware that Daprato misappropriated Homestead's proprietary and confidential information and took other actions, which actions were taken in concert with and apparently under the direction of Fairway, such that additional causes of action have arisen since the date Homestead's Complaint was filed. As stated in Mr. Rutherford's Affidavit, as soon as Homestead has completed its investigation, it intends to amend its Complaint as of right to include other causes of action, including a cause of action against Fairway for aiding and abetting the breach of Daprato's fiduciary obligations to Homestead, aiding and abetting Daprato's misappropriation of Homestead's trade secrets and unfair competition by Fairway, as well as other possible claims.

## CONCLUSION

In summary, granting the preliminary injunctive relief Homestead is seeking would preserve the status quo and protect Homestead from irreparable and incalculable harm; while not granting the requested relief would permit Fairway to continue to benefit from its tortious conduct and unscrupulous corporate behavior. The balance of equities weighs heavily in favor of Homestead under the facts presented to the Court, and Homestead has a likelihood of success on the merits in this action. Granting a preliminary injunction would restrain Fairway from continuing its efforts to procure future breaches while protecting Homestead's legitimate business interests from irreparable harm. Homestead respectfully submits that the requested temporary restraining order should be granted by the Court in its entirety, and that following a hearing a preliminary injunction should be granted, with an appropriate undertaking as set by the Court, together with such other, different, and further relief as the Court may deem to be just, equitable and proper.

Respectfully submitted,

LAW OFFICES OF
RICHARD C. MILLER, JR., PLLC

Richard C. Miller, Jr., Esq.
*Attorney for Plaintiff*
Homestead Funding Corp.
LAW OFFICES OF
RICHARD C. MILLER, JR., PLLC
P.O. Box 12155
Albany, New York 12212-2155
(518) 464-9700

To:     Simone R.D. Francis, Esq.
        *Attorney for Defendant*
        Fairway Independent Mortgage
        Corporation
        OGLETREE, DEAKINS, NASH,
        SMOAK & STEWART, P.C.
        599 Lexington Avenue, Suite 1700
        New York, NY 10022

## CERTIFICATION AS TO WORD COUNT

I certify, pursuant to Rule 202.8-b of the Uniform Rules for the Supreme and the County Court, that the:

1. Memorandum of Law is 6,925 words in length and complies with the word count requirements contained in Rule 202.8-b(a).

_____
Richard C. Miller, Jr., Esq.

# EXHIBIT A-3

At the IAS Part of the Supreme
Court of the State of New York for
Albany County at the Albany County
Courthouse, located on Eagle Street,
Albany, New York, on the **10th**day
of August 2022

P R E S E N T :

HON. RICHARD M. PLATKIN

Acting Justice, Supreme Court

---

HOMESTEAD FUNDING CORP.

                         Plaintiff,

        –against–

FAIRWAY INDEPENDENT MORTGAGE
CORPORATION

                         Defendant.

---

**ORDER TO SHOW CAUSE and
TEMPORARY RESTRAINING ORDER**
Index No. **904554-22**

.

Upon reading the Affidavit of Michael G. Rutherford, President of the Plaintiff, duly sworn
to on the 9th day of August 2022, the Attorney Affirmation of Justin M. Rutherford, Esq., dated
August 9th, 2022, and the exhibits attached thereto, and the Plaintiff's Memorandum of Law in
support of the relief requested herein, and upon reading the Summons and Verified Complaint
previously filed herein, it is hereby

ORDERED, that Defendant Fairway Independent Mortgage Corporation show cause at a
hearing before this Court at the Albany County Courthouse located at Eagle Street, Albany, New
York, to be held in and for the County of Albany on the **2nd** day of **September**, 2022, at **9:30**
a.m. or as soon thereafter as counsel can be heard, why a preliminary injunction pursuant to
CPLR 6301 and 6311 should not be entered herein restraining, enjoining and prohibiting
Defendant Fairway Independent Mortgage Corporation and its employees, representatives and
agents from the following: (1) Tortiously interfering with the employment agreements signed by
Homestead's loan originators by approaching, soliciting, initiating communication with or
otherwise seeking to encourage a discussion with a current Homestead employee about going to
work for Fairway or any affiliates thereof and/or taking any other steps in furtherance of
encouraging or soliciting Homestead employees to breach their employment agreements in order
to work for Fairway or any affiliate thereof; and (2) Seeking to induce Homestead loan originators
to breach their employment agreements with Homestead in any other manner; and

**\*\* No personal or virtual appearances on return; written submission only \*\***

**Exhibit A-3**

It being alleged by the Plaintiff in its Verified Complaint that it possesses valid causes of action against Defendant Fairway Independent Mortgage Corporation due to its efforts to induce Homestead employees, and specifically Andrew Aiello, a Homestead loan originator subject to a contract of employment for a definite term, to breach his employment agreement with Homestead, and said Defendant, in furtherance of a plan or scheme and as an ongoing, continuous and intentional pattern of tortious interference with contract, seeks to have additional Homestead loan originators who are under contract with Homestead breach their respective employment agreements with the Plaintiff, and come to work for the Defendant, a competing mortgage lender, which Plaintiff alleges has and is causing incalculable and irreparable harm to the Plaintiff; and sufficient cause appearing therefor, it is

ORDERED, that pending the hearing scheduled herein, Defendant Fairway Independent Mortgage Corporation is hereby restrained, enjoined and prohibited from 1. approaching, soliciting, initiating communication with or otherwise seeking to encourage a discussion with a current Homestead loan originator about going to work for Fairway Independent Mortgage Corporation or any affiliates thereof and/or taking any other steps in furtherance of encouraging or soliciting Homestead employees working under an employment contract to go to work for Fairway Independent Mortgage Corporation or any affiliate thereof, and 2. Otherwise seeking to induce any of Homestead's loan originators to breach their employment agreement, in any other matter, in order to maintain the status quo ante prior to the hearing; and it is further

ORDERED that personal service upon Defendant or its attorney(s) of record in this action of this Order to Show Cause and the papers upon which it is based made on or before the 12th day of August , 2022 shall be deemed to be good and sufficient service; and it is further

ORDERED, that pursuant to CPLR 2214 (b), all responsive papers shall be served at least seven days before the hearing herein, and Plaintiff shall be entitled to serve Reply Papers at least one day prior to the hearing.

ENTER,

Hon. Richard M. Platkin, Acting J.S.C.

08/10/2022

** The requested TRO is denied. It does not appear that notice of this application was provided to defendant, and the papers otherwise fail to demonstrate that temporary relief is necessary to avoid imminent and irreparable harm during the pendency of this expedited application for a preliminary injunction.